UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,


       -against-                            S13 98 Crim. 1023 (LAK)


SULAIMAN ABU GHAYTH,


               Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


              Appearances:

              John P. Cronan
              Michael Ferrara
              Assistant United States Attorneys
              Preet Bharara
              UNITED STATES ATTORNEY

              Stanley L. Cohen
              STANLEY COHEN & ASSOCIATES, LLC

              Geoffrey S. Stewart
              Zoe Dolan
              Ashraf Nubani

              *Attorneys for Defendant Sulaiman Abu Ghayth*

LEWIS A. KAPLAN, *District Judge*.

Sulaiman Abu Ghayth ("Abu Ghayth"), reputedly a son-in-law of Usama bin Laden, stands indicted for conspiring to kill Americans in violation of 18 U.S.C. § 2332(b). The matter is before the Court on defendant's motion to suppress custodial statements made by him during a flight from Country X, where he was taken into federal custody, to New York. He contends that he was not given *Miranda* warnings, did not knowingly waive the rights of which those warnings advise, and that his statements in any case were not voluntary. These are the Court's findings and conclusions after a lengthy evidentiary hearing.

I

Abu Ghayth allegedly was in the company of Usama bin Laden in Afghanistan immediately after the World Trade Center attacks of September 11, 2001 and, while in bin Laden's company, made recorded statements threatening further harm to Americans. It appears that he soon thereafter fled Afghanistan, eventually arriving in Iran where he claims that he was held by Iranian authorities until some time in 2013 when he was permitted to depart Iran to Turkey. He then apparently was arrested in Turkey and held for about six weeks following which he was released to the custody of Country X. Country X surrendered him into the custody of a team of FBI personnel, accompanied by a deputy United States Marshal,[1] at an airport where Abu Ghayth was placed on a U.S. government plane at about 9:32 p.m. Eastern Standard Time ("EST") and flown to New York

---

[1]
       The FBI team included four agents, an intelligence analyst, and an interpreter. Two of the agents were charged with security, one was designated the lead interrogator, and the fourth was a physician's assistant.  The intelligence analyst had made some study of Abu Ghayth and was available to assist the interrogators, one of whom was the deputy marshal.

2

(with a refueling stop in Country Y) with the FBI team and the deputy marshal.[2]


II

*A.     Miranda*

"The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary."[3] A waiver of *Miranda*[4] must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception . . . [and] made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[5] In determining whether a waiver was knowing, intelligent, and voluntary, a court must consider the "totality of the circumstances surrounding the interrogation."[6]

Pre-*Miranda* custodial statements generally are inadmissible, although there is an exception for statements made in response to so-called public safety questions, *i.e.*, questions "the need for answers to [which] in a situation posing a threat to the public safety outweighs the need for

---

[2]      Gov. Ex. 1 at 1.

[3]      *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007).

[4]      *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5]      *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

[6]      *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

3

the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."[7] In addition, a defendant may invoke *Miranda* at any point.[8] In such an event, all questioning must cease.[9] Any invocation of the right to remain silent or to an attorney must be "unambiguous."[10]

      Abu Ghayth argues that the FBI agents violated his rights because they did not read him the *Miranda* warnings until well after questioning began and because the FBI disregarded his alleged requests to speak with a lawyer both early in and again towards the end of the flight. These factual assertions – raised only in Abu Ghayth's affidavit[11] – are belied by the credible evidence.

      First, *Miranda* warnings were read to Abu Ghayth early in the flight and before the

---

[7]

    *New York v. Quarles*, 467 U.S. 649, 657 (1984).

[8]

    *Miranda*, 384 U.S. at 444-45.

[9]

    *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

[10]

    *Davis v. United States*, 512 U.S. 452, 459 (1994) ("Although a suspect need not 'speak with the discrimination of an Oxford don,' *post*, at 2364 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." (citation omitted)).

[11]

    Abu Ghayth declined to testify at the suppression hearing and relies on only his affidavit. This Court considers his affidavit, but affords it less weight than credible testimony offered at the hearing. *See generally United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) ("Although defendant submitted an affidavit . . . it was not clearly erroneous for the District Court to credit the officers' testimony over defendant's affidavit." (citation omitted)); *DiMattina v. United States*, 13-CV-1273 (JBW), 2013 WL 2632570, at *22 (E.D.N.Y. June 13, 2013) ("DiMattina has chosen not to testify in his own defense. That is his constitutional right. Yet, he cannot use that right as shield to protect him from potential criminal liability while concomitantly wielding his affidavits as a sword to cast doubt on testimony found credible by the court as fact-finder. Without the threat of cross-examination, DiMattina's affidavits are viewed as self-serving and given little weight."); *United States v. Al-Marri*, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002) ("Consequently, this Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to Al–Marri's version of the facts.").

4

vast bulk of the questioning began.  Upon boarding the aircraft and before the *Miranda* warnings were read, Abu Ghayth was given a medical evaluation by an FBI agent, who also was a physician's assistant, and asked some public safety questions. Immediately thereafter, Agent Butsch read the *Miranda* warnings. Abu Ghayth replied that he understood them and would answer the agents' questions.[12] Abu Ghayth's affidavit, in which he states that he was not advised of his right to an attorney or to remain silent during the "introductory talk" or "during ongoing questioning," is not persuasive except to the extent of addressing the brief period of the medical evaluation and the public safety questions.[13]  The statements made in response to the public safety questions, and thus before the *Miranda* warnings were given, are admissible under *United States v. Quarles*.[14] All subsequent statements were made after the *Miranda* warnings were given and after Abu Ghayth agreed to answer questions.

Second, Abu Ghayth claims that he "asked if [he] could speak to a lawyer" shortly after the plane took off "and [that] Mike [Agent Butsch] told me that when we landed in the United

---

[12]

Virtually all oral communications during the flight took place through an English-Arabic interpreter. The interpreter testified that he translated accurately and, in particular, confirmed that the rights were accurately translated to Abu Ghayth and that he responded as noted in the text. Sept. 17, 2013 Hr'g Tr. at 87:1-89:8 (Abusuneima).

[13]

Def. Aff. [DI 1267] ¶¶ 17, 24 (stating that Agent Butsch advised him of his right to an attorney for the first time at the end of the flight, approximately thirty minutes before landing).

The witnesses who testified as to the *Miranda* warnings were entirely credible, and the weight of the evidence clearly favors finding that Abu Ghayth was advised of his *Miranda* rights before questioning began, with the exception of the brief public safety questions. Sept. 17, 2013 Hr'g Tr. at 14:5-17:18 (McHugh); *id.* at 87:1-89:8 (Abusuneima); *id.* at 134:3-135:2, 156:5-23 (D'Agostino); Sept. 23, 2013 Hr'g Tr. at 23:18-33:24, 56:5-58:3 (Butsch); Sept. 24, 2013 Hr'g Tr. at 28:3-29:8 (Luciano).

[14]

468 U.S. 649 (1984).

5

States I could have a lawyer at that time."[15]  The hearing witnesses, however, testified consistently that Abu Ghayth did not request a lawyer before questioning began or at any other point during the flight.[16] Nevertheless, the subject of a lawyer came up late in the flight, and the evidence on what occurred is not entirely unambiguous.

Agent Butsch testified that he told Abu Ghayth late in the flight that there would be two options when the plane landed in New York.[17]  He said that Abu Ghayth would have the right to be presented to a judge and that the judge would appoint an attorney for him.[18] Abu Ghayth said he wanted to think about it but would continue to answer questions, which he did.[19]

Deputy McMugh's contemporaneous notes arguably vary somewhat from this account. The notes suggest that, at about 9 a.m. EST, during a discussion between Agent Butsch and

---

[15]

DI 1267 ¶¶ 14-15.

[16]

Sept. 17, 2013 Hr'g Tr. at 89:6-8, 91:25-92:2 (Abusuneima) (Q. "After the rights were read to him, did Abu Ghayth say he wanted a lawyer?" A. "No, sir."; "Q. At any point during the flight, did Abu Ghayth say he wanted to speak to a lawyer. A. No, sir."); *id.* at 139:17-19 (D'Agostino) ("Q. At any point during the flight, did you hear the defendant ask to speak to an attorney? A. No, I did not."); Sept. 23, 2013 Hr'g Tr. at 57:24-58:3 (Butsch) ("Q. . . . At any point during the interview, did the defendant tell you he wanted to have an attorney present for the interview? A. He did not.").

[17]

Sept. 23, 2013 Hr'g Tr. at 42:19-25 (Butsch).

[18]

*Id.*

[19]

*Id.* at 47:6-24 ("Q. Now, the first time when you explained the criminal justice system briefly, Sulaiman Abu Ghayth responds that he wanted some time to think about whether he wanted to waive presentment, correct? A. Yes. After the first time I mentioned it, yes."); Sept. 17, 2013 Hr'g Tr. at 135:9-136:10 (D'Agostino) ("Q. What did Abu Ghayth say when he was advised of these additional rights? A. He asked to think about it. He said that he wasn't quite sure what he wanted to choose to do but that he would certainly be agreeable to continuing the interview for the remainder of the flight and continue speaking with us. And the agents chose to revisit the issue with him a bit later, to again advise him of that right to see what he wanted to do.").

Abu Ghayth about the latter's book, Abu Ghayth stated that "whether I have a lawyer or not, you can ask any question you like. I am being honest. If there are any misunderstandings, I can correct them."[20] In response, Agent Butsch explained how presentment would work: that Abu Ghayth would have the right to be brought before a judge and assigned an attorney. In such event, according to the notes, the FBI probably would not be able to speak to him again.[21] Abu Ghayth responded that his "cooperation will be 100% with you whether or not I have a lawyer."[22] At that point, questioning resumed.

Somewhat later, the witnesses consistently testified (and Deputy McHugh's notes confirm), Agent Butsch read Abu Ghayth a waiver of presentment form. Abu Ghayth decided not to waive presentment, but he agreed to continue cooperating with the FBI.[23]

In light of the foregoing, the only significant point of difference is whether the first mention of a lawyer after the *Miranda* warnings were read to Abu Ghayth was in a comment late in the flight, seemingly recorded in Deputy McHugh's notes in the context of a discussion of the

---

[20] Gov. Ex. 3504a at 17.

[21] *Id.*

[22] *Id.*

[23] *Id.* at 20 ("10:20 Waiver of Presentment Form Translated -Did not waive presentment, but still wants to cooperate"); Sept. 23, 2013 Hr'g Tr. at 47:25-50:2, 57:24-58:3, 59:6-17 (Butsch) ("Q. And I believe you testified that you had discussed that topic twice with him, once orally and once using a form, is that right? A. That's right. Q. At either point, did the defendant ever say to you that he wanted the interview to end? A. No, he did not. It was actually the opposite. Q. What do you mean it was the opposite? A. He said I'm willing to continue. Q. And did he say I'm willing to continue even after the form was read to him the second time? A. Yes."); Sept. 17, 2013 Hr'g Tr. at 22:17-23:2 (McHugh); *id.* at 136:11-24 (D'Agostino) ("Q. Did he say he wanted to stop speaking until then? A. No, he did not. In fact, he explicitly said I would be happy to continue speaking with you for the remainder of the flight.").

book – viz., that Abu Ghayth said he the agents could ask him anything they wished "whether I have a lawyer or not" – or, instead, in Agent Butsch's description of the options with respect to presentment and the appointment of a lawyer at that time. But this ultimately is immaterial. Regardless of whether the word "lawyer" or "attorney" first came from the mouth of Agent Butsch or of Abu Ghayth, and regardless of Abu Ghayth's undisputed election to go forward with a presentment upon arrival in New York, the Court finds that he made no clear and unambiguous request for a lawyer and certainly said nothing that was "sufficiently clear[] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[24] This is particularly true when the remark is considered alongside his subsequent assurance that he would cooperate with or without an attorney.

The Court credits the witnesses' testimony and written evidence. It finds that the government has demonstrated by a preponderance of the evidence that Abu Ghayth did not invoke his right to an attorney or to remain silent at any point during his transfer to the United States.

B.      *Voluntariness*

Next, Abu Ghayth argues that even if he did waive *Miranda*, any waiver and statements that he made to the FBI were not voluntary.

"The ultimate test" for whether a statement was compelled is "the test of voluntariness. Is the [statement] the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to [make his statement], it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of

---

[24] *Davis*, 512 U.S. at 459.

8

his [statement] offends due process."[25] Whether a statement was voluntary depends not on a single

factor, but upon an "examin[ation of] all of the circumstances surrounding the interrogation to see

if police overreaching overcame a suspect's will and led to an involuntary" statement.[26]  "[T]hese

circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3)

the conduct of the police."[27] The government bears the burden of demonstrating voluntariness by

---

[25]

       *Schneckloth v. Bustamante*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

[26]

       *Weaver v. Brenner*, 40 F.3d at 527, 536 (2d Cir. 1994). The Fifth Amendment provides that "'[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . .' It guarantees 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty. . .  for such silence,'" *id.*, and it applies "regardless of the origin – *i.e.*, domestic or foreign – of a statement . . . [and] it does not matter whether the defendant is a U.S. citizen or a foreign national," *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 199 (2d Cir. 2008).

[27]

       *In re Terrorist Bombings*, 552 F.3d at 213 (quoting *Parsad v. Greiner,* 337 F.3d 175, 183 (2d Cir. 2003)).  The Supreme Court has noted that

       "[i]n determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, *e.g., Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; his lack of education, *e.g., Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; or his low intelligence, *e.g., Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; the lack of any advice to the accused of his constitutional rights, *e.g., Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; the length of detention, *e.g., Chambers v. Florida*, . . . ; the repeated and prolonged nature of the questioning, *e.g., Ashcraft v. Tennessee*, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; and the use of physical punishment such as the deprivation of food or sleep, *e.g., Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948.   In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe v. Connecticut*, . . . 367 U.S., at 603, 81 S.Ct., at 1879.  The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances." *Schneckloth*, 412 U.S. at 226.

a preponderance of the evidence.[28]

   The government introduced substantial evidence of voluntariness during the hearing. First, the evidence overwhelmingly demonstrates that Abu Ghayth was treated humanely while aboard the airplane. Before the flight took off Agent McKinley, the physician's assistant present on board, conducted a medical evaluation. He took Abu Ghayth's medical history and measured his heart rate, respiratory rate, blood pressure, and oxygen saturation,[29] all of which Agent McKinley reassessed periodically throughout the flight.[30] He testified that although Abu Ghayth's heart rate, respiratory rate, and blood pressure were slightly elevated, at least intermittently, and his oxygen saturation level was slightly depressed,[31] the measures were not "alarming" or "concern[ing]."[32] He further testified that he assessed Abu Ghayth's mental status and determined that the defendant was fully alert and oriented.[33] Agent McKinley noted that Abu Ghayth reported having had a stroke approximately six years earlier, but testified that he observed no evidence of any stroke-related impairments during the flight. Nor did Abu Ghayth complain of any.[34]

---

[28]
  *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

[29]
  Sept. 17, 2013 Hr'g Tr. at 177:24-178:8 (McKinley); Gov. Ex. 3505A at 1.

[30]
  Sept. 17, 2013 Hr'g Tr. at 178:9-14 (McKinley).

[31]
  *Id.* at 181:25-184:11, 192:18-193:1; 201:19-202:17.

[32]
  *Id.* at 184:4-11, 193:5-7.

[33]
  *Id.* at 207:1-15, 205:2-206:20. Agent Luciano testified also that Abu Ghayth appeared "aware, and alert, of what was going on and what was being asked of him." Sept. 24, 2013 Hr'g Tr. at 35:23-36:15 (Luciano).

[34]
  Gov. Ex. 3505A at 1; Sept. 17, 2013 Hr'g Tr. at 205:2-206:1 (McKinley).

10

Shortly after the medical examination concluded and before asking any questions, Agent Butsch told Abu Ghayth "I know you have a lot of questions, so I'm going to start by telling you who we are, where we're going, and why. . . . I'm from the F.B.I., we're going to New York, and we're going to New York because you've been charged with a crime in New York, conspiracy to murder U.S. nationals . . . ."[35] He assured Abu Ghayth that he would be treated well, and that he could ask for breaks to pray, eat, drink, or use the restroom at any time.[36] According to the government's transfer log, Abu Ghayth was given water at 9:53 p.m., 10:55 p.m., 11:13 p.m., 1:42 a.m., 6:22 a.m., and 8:35 a.m.[37] He was offered food at 10:57 p.m., which he declined, at 1:04 a.m., which he also declined, explaining that he was fasting, at 1:45 a.m. when he accepted an orange, and at 10:46 a.m., which he declined.[38] He was given time to pray at 11:13 p.m. and 6:40 a.m. and was unshackled so that he could stretch at 11:53 p.m., 1:03 a.m., 6:23 a.m., 8:33 a.m., and 10:38 a.m.[39] He took six bathroom breaks, a nap break, and was given a blanket when the plane stopped to refuel in Country Y.[40]

During breaks, one of the agents charged with security placed blackout goggles – essentially ski goggles with duct tape covering the plastic lenses – over Abu Ghayth's eyes and ear

---

[35] Sept. 23, 2013 Hr'g Tr. at 18:21-19:4 (Butsch).

[36] *Id.* at 19:5-11; Sept. 17, 2013 Hr'g Tr. at 13:20-14:2 (McHugh).

[37] Gov. Ex. 1 at 1-2; *see generally* Sept. 17, 2013 Hr'g Tr. at 18:1-7 (McHugh); *id.* at 89:25-91:12 (Abusuneima); Sept. 24, 2013 Hr'g Tr. at 30:20-31:18 (Luciano).

[38] *See Supra*, note 37.

[39] *Id.*

[40] *Id.*

plugs and "ear muffs," which are akin to the ear covers used at a shooting range, over his ears, both for security purposes.[41]   According to Agent Luciano, who was in charge of security, Abu Ghayth several hours into the flight complained that the ear muffs were digging into his jaw bone. From that point forward, the security agents left the ear muffs off, using only the goggles and ear plugs.[42] Abu Ghayth never complained about claustrophobia.[43] Moreover, Agent Luciano testified that there was one occasion in which Abu Ghayth urinated on the toilet seat but, contrary to Abu Ghayth's claim, testified that he did not yell at or degrade Abu Ghayth after this incident – he merely handed Abu Ghayth some Clorox wipes in order to clean up.[44] No witness testified to having heard yelling at any point during the flight.[45]

---

[41]
        Sept. 24, 2013 Hr'g Tr. at 9:15-17:11, 31:19-32:1 (Luciano) ("Q. In this particular case, there were periods of time, I'm not talking about handcuffs or shackles, when the blackout goggles and the earmuffs and the inserts were on Sulaiman Abu Ghayth and other periods of time when they were off, is that correct? A. That's correct, yes.").

[42]
        *Id.* at 31:19-32:1 ("Q. And when the breaks occurred, you then placed the blackout goggle, the muffs, and the plugs back on him, is that correct? A. At a certain point, through the, in the flight fairly early, he was  complaining that the earmuffs were hurting the back of his jawbone. So we stopped using the earmuffs and we just used the earplugs. Q. And you continued with the blackout goggles? A. Yes, sir.").

[43]
        Sept. 17, 2013 Hr'g Tr. at 107:19-22 (Abusuneima) ("Q. Do you recall during the medical examination that Sulaiman Abu Ghayth had told the medical examiner that he suffered from claustrophobia? A. I don't recall that, sir."); Sept. 23, 2013 Hr'g Tr. at 60:8-10 (Butsch) ("Q. And did he tell you about developing claustrophobia during his time in Turkish detention? A. In Turkish detention, no.").

[44]
        Sept. 24, 2013 Hr'g Tr. at 24:22-25:1, 41:20-42:14. Agent Luciano testified also that neither he nor any other individual aboard the flight was armed. Instead, after the agents first took custody of Abu Ghayth "all the weapons are secured in a lockbox, which is forward, in the forward section of the aircraft." *Id.* at 42:15-19.

[45]
        Sept. 17, 2013 Hr'g Tr. at 19:11-13, 20:22-25 (McHugh) ("Q. During any of these bathroom breaks, do you recall hearing anyone yell or reprimand the defendant? A. No."); *id.* at 90:20-22 (Abusuneima) ("Q. During any of the bathroom breaks, did you hear any yelling or

In an effort to convince the Court that the government has not sustained its burden, Abu Ghayth argues, first, that there were circumstances during the flight that compromised his ability to act voluntarily.[46] He relies for this purpose on only his affidavit. The evidence presented during the suppression hearing, however, contradicts starkly Abu Ghayth's claims of harsh treatment and poor conditions. The Court credits the agents' testimony and gives diminished weight to the affidavit, which was not supported by other evidence or subject to cross examination. It thus finds that, considering the totality of the evidence, Abu Ghayth was not overcome by fear such that his will was overborne and his ability to act voluntarily was compromised.

Abu Ghayth relies also on testimony from Dr. Stephen Xenakis, a psychiatrist and previously a brigadier general in the United States Army. Dr. Xenakis testified in substance that the agents did not conduct a fully comprehensive mental status examination[47] and that Abu Ghayth's vital signs were consistent with the possibility of stroke-related ailments.[48] Accordingly, he stated

---

arguing? A. No, sir."); *id.* at 137:22-138:4 (D'Agostino) ("Q. At any point in the flight, did you hear anyone yell at the defendant? A. No, I did not."); Sept. 23, 2013 Hr'g Tr. at 59:1-2 (Butsch) (same).

[46] These claims include that he was: overwhelmed by fear, having been hooded and brought into United States custody upon his arrival in Country X, despite his belief that he was returning home to Kuwait; aware of alleged past U.S. actions towards detainees; claustrophobic; exhausted from lack of sleep; subjected to sensory deprivation throughout the flight to the United States; not permitted to pray; photographed without clothing; told that he would not be treated well if he did not answer questions; questioned for thirteen hours; degraded and yelled at after he urinated on the bathroom floor accidentally; cold; not permitted to sleep; given inadequate food and water; and surrounded by armed soldiers. Def. Omnibus Mot. [DI 1263] at 61-63.

[47] Oct. 8, 2013 Hr'g Tr. at 8:2-25, 12:24-13:21. Agent McKinley testified that he did assess Abu Ghayth's mental status and that Abu Ghayth was fully alert and oriented. Sept. 17, 2013 Hr'g Tr. at 207:1-15 (McKinley).

[48] Oct. 8, 2013 Hr'g Tr. at 13:22-14:20 (Xenakis).

the view that the government had not proven that Abu Ghayth was free from health complications that interfered with his voluntariness.[49]

The Court affords minimal weight to Dr. Xenakis's testimony. Dr. Xenakis never examined or met Abu Ghayth, relying instead on hearsay concerning Abu Ghayth's time in Iran, Abu Ghayth's affidavit, witness testimony, and the FBI agents' transfer log in reaching his conclusions.[50] He was obviously partisan and expressed opinions with little basis, relying predominantly on second-hand accounts and theoretical possibilities. Although Agent McKinley has fewer qualifications than Dr. Xenakis, his testimony was more credible. It was based on his observations of and interactions with Abu Ghayth throughout the 12 to 14 hour flight. Agent McKinley's sustained contact with Abu Ghayth allowed him to conclude that the latter was mentally competent[51] and that his slightly elevated vital signs could have been a consequence of any number of things[52] and in any event were not troublesome.[53]

Even if the Court were to accept Dr. Xenakis's testimony, it is not the government's burden to prove that Abu Ghayth suffered no conceivable malady. Indeed, it cannot be the case that where a criminal defendant allegedly has experienced past illness or mistreatment that theoretically could lead to disorientation, confusion, or other compromised medical states, the government must

---

[49] *Id.* at 20:6-21:5, 31:17-32:3.

[50] *Id.* at 4:16-25, 17:6-12, 32:16-33:2.

[51] Sept. 17, 2013 Hr'g Tr. at 207:7-15 (McKinley).

[52] *Id.* at 207:16-21.

[53] *Id.* at 193:5-7.

14

prove the negative – that the illness or mistreatment in fact did not have any such effect. Accepting Dr. Xenakis's position here would require the rejection of *Miranda* waivers and the acceptance of otherwise largely unsupported claims of involuntariness by any person who has had a stroke or other perhaps serious past illnesses, has slightly elevated vital signs, and/or claims to have suffered past harm unless the government proves that such events did not affect the statements made. Such a position is simply untenable.

The government has offered consistent and credible testimony that Abu Ghayth was treated well and that he was competent to speak with the FBI throughout the flight. Abu Ghayth has offered scant evidence to the contrary. Accordingly, viewing the totality of the circumstances, the Court finds that the government has met its burden of proving by a preponderance of the evidence that Abu Ghayth acted knowingly and voluntarily when he waived his *Miranda* rights and spoke at length with the FBI.

III

Abu Ghayth argues also that his statements should be suppressed because he suffered a delay in presentment. He alleges that the government played a role in his Turkish detention before he was turned over to United States custody and that this conduct violated Federal Rule of Criminal Procedure 5(a)'s requirement that the police promptly present a criminal defendant to a judge. Abu Ghayth, however, has failed to present any evidence that the United States colluded with Turkey or was otherwise involved in his arrest or interrogation in that country in order to delay presentment.[54]

---

[54]    *E.g.*, *United States v. Bin Laden*, 132 F. Supp. 2d 198, 209 (S.D.N.Y. 2001) ("The caselaw makes very clear that the Defendants bear the burden of establishing that [foreign] custody was improperly used to circumvent the rigors of Rule 5(a). . . . Mere suspicion of a collusive arrangement is insufficient. . . . To satisfy their burden, the Defendants must show that the

15

*Conclusion*

For the foregoing reasons, the defendant's omnibus motion [DI 1263] is denied with respect to his motion to suppress. The balance of the motion is denied in an Order of even date.

SO ORDERED.

Dated:        November 26, 2013

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

Government made deliberate use of [foreign] custody to postpone their presentment requirements."), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177 (2d Cir. 2008).