UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

     - v. -                :             S14 98 Cr. 1023 (LAK)

SULAIMAN ABU GHAYTH,         :
       a/k/a "Salman Abu Ghayth,"

                            :

              Defendant.

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MOTION TO OFFER THE TESTIMONY OF A WITNESS VIA LIVE CLOSED-CIRCUIT TELEVISION DURING TRIAL OR, IN THE ALTERNATIVE, FOR A DEPOSITION PURSUANT TO RULE 15 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE; AND IN OPPOSITION TO DEFENDANT'S MOTION TO TAKE A <u>DEPOSITION PURSUANT TO RULE 15</u>**


                                             PREET BHARARA
                                             United States Attorney
                                             Southern District of New York


John P. Cronan
Nicholas Lewin
Michael Ferrara
           Assistant United States Attorneys
           - Of Counsel -

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................1

II.  MOTION FOR LIVE CLOSED-CIRCUIT TELEVISION TESTIMONY OR, IN THE ALTERNATIVE, FOR A RULE 15 DEPOSITION ................................................................................2

    A.   Applicable Law ................................................................................2

        1.   Live Closed-Circuit Television Testimony at Trial: *Gigante* ........................2

        2.   Rule 15 Deposition: The *Johnpoll* Test ........................................4

    B.   The Government's Proposed Witness Offers Material, Inculpatory Testimony That Cannot Reasonably Be Put Before the Jury in Any Remotely Comparable Way— But the Witness Is Unavailable Because He Is Beyond Its Subpoena Power and He Refuses to Travel ................................................................................7

        1.   The Witness's Testimony Demonstrates That the Defendant Had Foreknowledge of al Qaeda's Plot to Use Shoe Bombs to Kill U.S. Nationals ................................................................................8

            a.   The al Qaeda Airplane Storm Video ........................................9

            b.   The Witness Was Intended to Be a Suicide Bomber in the Very Airplane Plot Described by the Defendant ........................................10

            c.   The Witness's Testimony Is Critical Proof of the Defendant's Role in the al Qaeda Conspiracy to Kill U.S. Nationals ........................................11

        2.   The Witness Was at the Same Al Qaeda Military Training Camp, at Approximately the Same Time the Defendant Gave a Speech There ........................13

        3.   The Witness Offers Material Testimony Regarding Brevity Cards ........................14

    C.   The Witness is Unavailable ................................................................................15

    D.   Any Testimony from the Witness Would Be Taken in Accord with Rule 15 and Is Necessary to Prevent a Failure of Justice ........................................16

III.   THE TESTIMONY PROFFERED BY THE DEFENDANT IS INCULPATORY, INADMISSIBLE OR IMMATERIAL, AND THE ABSENCE OF PRACTICAL PROTECTIONS TO ENSURE TRUTHFUL TESTIMONY MILITATE STRONGLY AGAINST THE DEFENDANT'S PROPOSED RULE 15 DEPOSITION .........................................................................................................19

    A.   Some of the Proffered Hamdan Testimony is Inculpatory ....................................20

    B.   Some of the Proffered Hamdan Testimony is Plainly Inadmissible .....................23

    C.   Some of the Proffered Hamdan Testimony is Irrelevant .......................................24

    D.   Substantial Countervailing Factors Militate Against Deposing Hamdan ..............28

IV.   CONCLUSION..............................................................................................................31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

   - v. -                                                    :                    S14 98 Cr. 1023 (LAK)

SULAIMAN ABU GHAYTH,                        :
      a/k/a "Salman Abu Ghayth,"

                                :

          Defendant.

                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MOTION TO OFFER THE TESTIMONY OF A WITNESS VIA LIVE CLOSED-CIRCUIT TELEVISION DURING TRIAL OR, IN THE ALTERNATIVE, FOR A DEPOSITION PURSUANT TO RULE 15 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE; AND IN OPPOSITION TO DEFENDANT'S MOTION TO TAKE A <u>DEPOSITION PURSUANT TO RULE 15</u>

### I. PRELIMINARY STATEMENT

By this memorandum of law, the Government respectfully moves to offer the testimony of a cooperating witness during trial via two-way closed-circuit television from a remote location or—in the alternative—for a deposition of the witness prior to trial pursuant to Rule 15 of the Federal Rules of Criminal Procedure.

The instant memorandum of law also sets forth the Government's opposition to the defendant's motion, filed on December 11, 2013, for Letters Rogatory and Rule 15 Deposition of Salim Ahmed Hamdan.

For the reasons that follow, the Court should grant the Government motion and deny the defendant's.

## II. MOTION FOR LIVE CLOSED-CIRCUIT TELEVISION TESTIMONY OR, IN THE ALTERNATIVE, FOR A RULE 15 DEPOSITION

**A.     Applicable Law**

**1.        Live Closed-Circuit Television Testimony at Trial: *Gigante***

It is long-standing law in this Circuit that in circumstances in which an individual with material information is unavailable to physically appear as an in-court trial witness, live trial testimony of that witness, appearing via close-circuit television ("CCTV"), is permissible.  The foundational case is *United States* v. *Gigante*, 166 F.3d 75, 81 (2d Cir. 1999).

In *Gigante*, Judge Weinstein considered a motion by the Government to offer the testimony of a sick cooperating witness who was then located in the federal witness protection program.  *See United States* v. *Gigante*, 971 F. Supp. 755 (E.D.N.Y. 1997).  The District Court first determined that the Government had made the requisite showing for a Rule 15 deposition, *id.* at 758, but concluded that, for two reasons, live CCTV testimony was preferable to a Rule 15 deposition.  First, the Court found that Rule 15's requirement of disclosure of identifying information about the witness, Fed. R. Crim. P. 15(b)(1), in particular his location, "would be dangerous."  *Id.* at 758-59.  Second, the Court concluded that because the defendant could not be physically present at the deposition, live CCTV testimony during trial "afford[ed] greater protection of his confrontation rights than would a deposition."  *Id.* at 759.  The District Court explained:

> It is desirable that the defendant be permitted, if he wishes, to face the witness directly so that each sees the other and the jury sees both while the testimony is being given. The televising arrangements made by the government provide this full confrontation since the witness sees and hears the defendant while the defendant sees and hears the witness. The jury, court, and counsel simultaneously see both. In short, the arrangements proposed by the government in this case

2

> satisfy fully the requirements of the Constitution and the Federal Rules of Criminal Procedure.

*Id.* Accordingly, the Court ordered that the cooperating witness be permitted to testify via CCTV during the trial; during his testimony, the cooperating witness was visible on video screens in the courtroom to the jury, defense counsel, Judge Weinstein and the defendant. The cooperating witness, similarly, could see and hear defense counsel and other courtroom participants on a video screen at his remote location. *See Gigante*, 166 F.3d at 80.

The Court of Appeals affirmed. It observed that "[t]he closed-circuit television procedure utilized for [the cooperating witness]'s testimony preserved all of these characteristics of in-court testimony: [the witness] was sworn; he was subject to full cross-examination; he testified in full view of the jury, court, and defense counsel; and [the witness] gave this testimony under the eye of [the defendant] himself." *Id.*

The Court of Appeals went on to hold that the standard for use of live CCTV testimony at trial is the same as that applied to a Rule 15 deposition—namely (1) that the witness must be unavailable and (2) that his testimony must be material to the case. *See id.* at 81 (citing *United States* v. *Johnpoll*, 739 F.2d 702, 708 (2d Cir. 1984)). The Court of Appeals agreed with Judge Weinstein that "the closed-circuit presentation of [the witness]'s testimony afforded greater protection of [the defendant]'s confrontation rights than would have been provided by a Rule 15 deposition. It forced [the witness] to testify before the jury, and allowed them to judge his credibility through his demeanor and comportment." *Id.* Among other things, the Court of Appeals observed that live CCTV testimony allowed the defense attorney to "weigh the impact of [the witness]'s direct testimony on the jury as he crafted a cross-examination." *Id.*[1]

---

[1] The Court of Appeals approved Judge Weinstein's identified bases for his authority to permit live CCTV testimony during the trial, which included his "inherent power" under Rules 2 and 57(b) of the Federal Rules of Criminal Procedure to structure a criminal trial in a just manner. *Gigante*, 971 F.Supp. at 758–59; *Gigante*, 166 F.3d

## 2.  Rule 15 Deposition: The *Johnpoll* Test

Rule 15 authorizes a party to "move that a prospective witness be deposed in order to preserve testimony for trial," and a "court may grant the motion because of exceptional circumstances and in the interests of justice." Fed. R. Crim. P. 15(a)(1).  In this Circuit, it has been "well-settled" for thirty years that "the 'exceptional circumstances' required to justify the deposition of a prospective witness are present if that witness' testimony is material to the case and if the witness is unavailable to appear at trial."  *Johnpoll*, 739 F.2d at 709.  The burden of satisfying the *Johnpoll* test is on the party seeking a Rule 15 deposition.  *See United States* v. *Whiting*, 308 F.2d 537, 541 (2d Cir. 1962); *see also United States* v. *Kelley*, 36 F.3d 1118, 1124 (D.C. Cir. 1994).[2]  "The decision to grant or deny a motion to take a deposition rests within the sound discretion of the trial court, and will not be disturbed absent clear abuse of discretion."  *Johnpoll*, 739 F.2d at 708.

While depositions are not—and should not be—part of most trials, it is also true that "the shrinking size of the globe means that certain criminal activities increasingly manifest an international cachet and, because federal courts frequently lack the power to compel a foreign national's attendance at trial, Rule 15 may offer the only practicable means of procuring critical evidence."  *United States* v. *McKeeve*, 131 F.3d 1, 7-10 (1st Cir. 1997) (upholding admissibility of foreign deposition); *see also* Fed. R. Crim. P. 15(a)(1) (granting of Rule 15 deposition

---

at 80.  One other District Court in this District has questioned whether such authority exists.  *See United States* v. *Banki*, No. 10 Cr. 08 (JFK), 2010 WL 1063453, at *1 -2 (Mar. 23, 2010) (observing that Rule 26's provision that "[i]n every trial the testimony of witnesses must be taken in open court, unless otherwise provided by a statute or by rules adopted under 28 U.S.C. §§ 2072–2077" would be violated by CCTV testimony at trial because there is no such provision in law or rule, and pointing to the 2002 Supreme Court rejection of a proposed revision to Rule 26 which would have explicitly permitted trial testimony via two-way videoconferencing (citing Order of the Supreme Court of the United States, 207 F.R.D. 89, 93–96 (2002)).   But the Supreme Court's rejection of a proposed Rule of Criminal Procedure did not presume to diminish the *inherent* power of District Courts, or to *sub silentio* overrule *Gigante*.

[2] Some courts have also said that the testimony must be "necessary to prevent a failure of justice." *United States* v. *Cohen*, 260 F.3d 68, 78 (2d Cir. 2001); *United States* v. *Stein*, 482 F. Supp. 2d 360, 363 (S.D.N.Y. 2007).

permissible when doing so is "in the interest of justice"); *United States* v. *Vilar*, 568 F. Supp. 2d 429, 442-43 (S.D.N.Y. 2008) ("[W]hen a substantial likelihood exists that the prospective deponents will be unavailable for trial and their testimony is highly relevant to a central issue in the case, *justice generally requires preservation of that testimony*." (emphasis added)).

The first prong of the *Johnpoll* inquiry is the materiality prong. *Johnpoll*, 739 F.2d at 709. Materiality is a fact-based inquiry that turns on the relevance of the proposed testimony to the elements of the charged crimes. *See*, *e.g*., *id.* (in trial related to transport of stolen securities, testimony of Swiss witnesses involved in arranging the transport was material); *United States* v. *Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993) (in bank fraud trial involving bank employee, testimony of defendant's superiors that they had not authorized the allegedly fraudulent transaction was material because it rebutted an expected defense); *see also United States* v. *Cohen*, 260 F.3d 68, 78 (2d Cir. 2001) (holding that the proposed testimony not material because it was not relevant to the question of the defendant's guilt or innocence).

When a defendant makes a motion for a Rule 15 deposition, he must typically show, beyond "unsubstantiated speculation," that the testimony sought "exculpates the defendant." *Kelley*, 36 F.3d at 1125 (affirming denial of depositions where anticipated testimony, although relevant, was not exculpatory) (internal quotation marks and citation omitted); *United States* v. *Merritt*, No. 90 Cr. 767 (JSM), 1991 WL 79235, at *5 (S.D.N.Y. May 7, 1991) (denying Rule 15 deposition request where "the defendants have made no showing that the deponents' testimony would be exculpatory"); *United States* v. *Esquivel*, 755 F. Supp. 434, 439 (D.D.C. 1990) ("[A] defendant typically demonstrates the 'exceptional circumstances' necessary for success on a Rule 15(a) motion by some preliminary showing that the testimony will exculpate him" (citations omitted)). The moving party must do more than show that the testimony sought is

relevant to the case.  *Ismaili*, 828 F.2d at 161 & n.6; *see also id.* at 161 (holding that a district court cannot abuse its discretion in denying a Rule 15 deposition where the testimony "could not negate the crux of the government's indictment").  Moreover, a Rule 15 motion should be denied if it seeks to take testimony that is cumulative, *United States* v. *Stein*, 482 F. Supp. 2d 360, 365 (S.D.N.Y. 2007) (citing *United States* v. *Grossman*, No. S2 03 Cr. 1156 (SHS), 2005 WL 486735, at *3 (S.D.N.Y. March 2, 2005)), or that is inadmissible, *Grossman*, 2005 WL 486735, at *3.

The second prong of the *Johnpoll* inquiry is the unavailability prong.  *Johnpoll*, 739 F.2d at 709.  A witness located outside the United States who cannot or will not travel to testify in the United States is unavailable, because the government cannot secure the witness's testimony at trial through its subpoena power.  *See id.* (four Swiss nationals were all "unavailable" pursuant to Rule 15, including one who refused to come to the United States and three others who refused to come unless the Government agreed to pay them); *see also* Fed. R. Evid. 804(a)(5) (declarant is unavailable if proponent of a statement "has been unable to procure the declarant's attendance . . . by process or other reasonable means"); *Drogoul*, 1 F.3d at 1551 (government should have been permitted to take depositions in Italy because it could not subpoena the witnesses); *United States* v. *Kelly*, 892 F.2d 255, 262 (3rd Cir. 1989) (government had no power to compel foreign witnesses to attend trial in United States); *Moon*, 93 F.R.D. at 559-560 (granting defense application to depose witnesses in Japan who were unavailable because they were "neither presently residing in the United States nor subject to the [Court's] subpoena power" and they would not travel to the United States); *United States* v. *Varbaro*, 597 F. Supp. 1173, 1181 (S.D.N.Y. 1984) ("Although the rule does not necessarily require a showing of certainty that a witness will be unavailable, surely it requires a showing of a specific reason why the witness

might not be available."), *reversed on other grounds*, *United States* v. *Riccardelli*, 794 F.2d 829, 834 (2d Cir. 1986); *cf. United States* v. *Ismaili*, 828 F.2d 153, 160 (3d Cir. 1987) (observing that the mere fact that a putative witness resides in another country, without any further showing, is insufficient to demonstrate unavailability); *United States* v. *Chusid*, No. 00 Cr. 263 (LAK), 2000 WL 1449873, *1 (S.D.N.Y. Sept. 27, 2000) (holding that "[c]onclusory statements of unavailability by counsel are insufficient" to meet a movant's burden).  Moreover, a party can establish that it has taken "'good faith' efforts to obtain the witnesses' presence at trial by indicating that it had repeated contact with the witnesses and had promised 'to pay all expenses of the witnesses' in traveling to the United States."  *Vilar*, 568 F. Supp. 2d at 438 (quoting *United States* v. *Sindona*, 636 F.2d 792, 804 (2d Cir.1980)).


**B.      The Government's Proposed Witness Offers Material, Inculpatory Testimony That Cannot Reasonably Be Put Before the Jury in Any Remotely Comparable Way— But the Witness Is Unavailable Because He Is Beyond Its Subpoena Power and He Refuses to Travel**

As set forth above, the *Johnpoll* standard for offering the testimony of a witness, whether via live CCTV during trial or a Rule 15 deposition, is that (1) his testimony is material and that (2) the witness is unavailable.  The Government has comfortably met that standard here with respect to its proposed witness ("the Witness").  As to the first prong of the test, the Witness offers material and significantly inculpatory testimony that cannot be put before the jury in any comparable way.  And as to the second prong of the *Johnpoll* test, the Witness clearly is unavailable.

The Witness is a citizen and resident of the United Kingdom.[3]  He speaks fluent English and would testify that, in or about 1999, he traveled to Afghanistan, where he subsequently received military-type training at al Qaeda training camps.  Among other plots, after the September 11, 2001 attacks, the Witness agreed to participate, along with Richard Reid, in al Qaeda's so-called "shoe bomb" plot—by carrying explosives in his shoes with the intent to detonate them during a suicide mission, while on a transatlantic flight.  After being provided with the explosive shoes necessary for the attack, and traveling back to the United Kingdom in late 2001 in order to undertake the attack, the Witness decided not to follow through with the al Qaeda plot.  In November 2003, the Witness was arrested by British authorities.  The Witness pled guilty to offenses related to the plot and ultimately signed a cooperation agreement with British authorities pursuant to which he was sentenced.  The Witness now receives witness security protection from the British government.  In 2004, the Witness was indicted in the District of Massachusetts and charged with offenses related to the shoe bomb plot.

1.      **The Witness's Testimony Demonstrates That the Defendant Had Foreknowledge of al Qaeda's Plot to Use Shoe Bombs to Kill U.S. Nationals**

The Witness will provide critical, inculpatory testimony on what is very likely the central issue for the jury in this case: whether the defendant *knowingly* participated in al Qaeda's overall conspiracy to kill Americans.  In October 2001, the defendant filmed multiple videos explicitly threatening that al Qaeda was going to strike America with *more* airplane-borne suicide terrorist attacks.  At the very same time, the Witness was in the midst of exactly that al Qaeda plot—to

---

[3] The summary of the Witness's anticipated testimony set forth herein—and included in part in the Declaration of Nicholas J. Lewin, dated December 20, 2013—is based on a variety of sources, including interviews of the Witness conducted by the undersigned AUSAs; reports of other interviews of the Witness prepared by U.S. law enforcement agents; and the Witness's prior testimony, taken via a Federal Rule of Criminal Procedure Rule 15 deposition in a 2012 trial in the United States District Court for the Eastern District of New York.

down U.S. airplanes with suicide bombs.  And more: Within weeks of the defendant's public

threats, in late 2001, the Witness was dispatched to carry out the airplane plot by al Qaeda

leaders—indeed, by two senior al Qaeda leaders (Usama bin Laden and Abu Hafs al-Masri)

whom the defendant had just been with in Afghanistan.

The Witness's testimony is absolutely singular.  It is the sole means of introducing this

direct evidence—that the very terrorist attack on America that the defendant publicly threatened

was coming was, in fact, coming; that the suicide airplanes attack was coming from al Qaeda;

and that two of the men at the center of the plot were physically with the defendant at the precise

time and place of the plotting.  The Witness's testimony thus helps to establish that the defendant

acted with foreknowledge of an al Qaeda terror plot against America—and thus helps to prove

what Count One of the Indictment alleges: that as the defendant worked with al Qaeda he did so

knowing that its goal was the murder of Americans.

### a.       The al Qaeda Airplane Storm Video

In or about October 2001, the defendant appeared in a publicly disseminated video with

an AK-47 assault rifle resting at his shoulder.  In this video, which will be offered at trial, the

defendant referred explicitly to the American invasion of Afghanistan and to the attacks of

September 11, 2001.  He made a series of statements on behalf of "the al Qaeda organization,"

including that "the al Qaeda organization declares" that identified Western and Israeli leaders

have "committed the most horrendous tragedies." And the defendant vowed that al Qaeda will

"exercise just retribution."

The defendant concluded the video by putting an extremely fine point on these al Qaeda

threats, by closely particularizing them.  The defendant explicitly addressed "the U.S. Secretary

of State" who the defendant claimed "downplayed our [prior] statement that the storm of aircraft will not stop."  The defendant threatened:

> [T]he storm of the airplanes will not stop. . . .  [I]f the al Qaeda organization promises or threatens, it fulfills, God willing.  And that is why we say to him [presumably the U.S. Secretary of State] explicitly, tomorrow shall come soon enough. . . . The storms shall not lessen, especially the storm of the airplanes, until you withdraw from Afghanistan in defeat. . . . Finally, as a word of advice and for emphasis, we strongly advise Muslims in America and the Britain, the children, and those who reject the unjust American policies—we advise them not to board aircraft.

Critically, the defendant's threats of this coming attack include a number of notable—and highly relevant—details:

- The attack will involve airplanes ("the storm of the airplanes");

- Al Qaeda will be behind the attack ("if the al Qaeda organization promises or threatens, it fulfills");

- The attack is coming in the near future ("soon enough");

- The attack involves suicide attackers (who "seek to die for the sake of God"); and

- The attack will be targeted only at "America and the Britain" (notwithstanding mention in the video of numerous other countries, such as "Israel" and "the polytheists in the Arabian peninsula").

### b.    The Witness Was Intended to Be a Suicide Bomber in the Very Airplane Plot Described by the Defendant

The Witness will testify that, at the end of September 2001, he was summoned by Abu Hafs al-Masri, who gave the Witness a suicide mission.  (The Witness will describe Abu Hafs al-Masri, based on this and other plots the two men were involved with, as an extremely senior al Qaeda leader and someone who directed overseas terrorist operations.)  According to the

Witness, Abu Hafs tasked the Witness to carry a bomb onboard a U.S. airplane and detonate it. The Witness agreed.  In October and November 2001, the Witness received his shoe bomb from a Kabul, Afghanistan-based bombmaker, and returned to meet with Abu Hafs in Kandahar.  Abu Hafs directed the Witness to meet with Khalid Sheikh Muhammad, a senior al Qaeda operative, to further plan the shoe bomb plot.

In this same time-period, the Witness was also summoned to meet one-on-one with Usama bin Laden to discuss the mission.  During this meeting, bin Laden explained to the Witness bin Laden's justification for the suicide mission.

In approximately early December 2001, at the direction of Khalid Sheikh Mohammed, the Witness traveled back to England, wearing the shoe bomb, intending to travel onward from England to the United States where he would detonate the shoe bomb, killing himself and everyone on board the aircraft.   But, upon his return to England, the Witness decided not to follow through with the plot.[4]

### c.    The Witness's Testimony Is Critical Proof of the Defendant's Role in the al Qaeda Conspiracy to Kill U.S. Nationals

The Witness's testimony is critical to proving that the defendant was, as charged, a member of a conspiracy to kill Americans, and that he provided material support to that conspiracy.  The details enumerated in the defendant's October 2001 videotaped threat, *see supra*, align seamlessly with the Witness's testimony about this shoe bomb plot: Beginning in September 2001, al Qaeda plotted to destroy airplanes via a suicide attack, with at least one targeted plane flying from Britain to the United States.  This was a terror plot that unfolded

---

[4] In December 2001, Reid was arrested by U.S. authorities at Boston's Logan International Airport.  In October 2002, Reid pleaded guilty in the District of Massachusetts to crimes stemming from the shoe bomb plot.  He is currently serving a life sentence in a federal penitentiary in Colorado.

precisely as the defendant *said* in advance that it would—and a plot that, accordingly, the defendant must have *known* about in advance.

Moreover, the trial proof will incontrovertibly and directly tie the defendant to two of al Qaeda's principal leaders of the shoe bomb plot. First, the Government will introduce at trial a videotape filmed on the morning of September 12, 2001 in Afghanistan that depicts four men sitting together and making speeches about the September 11 attacks, including and making further generalized threats against the United States. The men include the defendant as well as bin Laden and Abu Hafs al-Masri. Thus, in the same few weeks as the Witness will testify about being given the shoe bomb mission in Afghanistan, there is incontrovertible proof that the defendant was engaged in al Qaeda activities in Afghanistan with two extremely senior al Qaeda leaders—the same two leaders who were at *that same time personally directing the shoe bomb plot*. There is no great mystery as to how the defendant came to learn in advance of the shoe bomb plot.[5]

In sum, the Witness's testimony is critically important, and the jury should be able to hear it. The Witness's testimony lays plain that the defendant knew *in advance* about the shoe bomb plot to kill Americans. This powerfully proves that as the defendant worked to assist al Qaeda throughout the fall of 2001, he did so with full awareness that the terror group was dead-set, in the very near term, on the murder of Americans on a horrible scale. No other witness, no other evidence, can even begin to substitute for the Witness's testimony. For this reason, alone, it is "highly relevant" to all three counts in the Indictment and therefore satisfies the

---

[5] In addition, a third videotape, dated November 9, 2001, depicts the defendant, again with bin Laden and Ayman al-Zawahiri, and again talking about the September 11 attacks. In that video, bin Laden says while the defendant did not have specific foreknowledge of the September 11 attacks, he "knew there were operations."

Government's burden.  *Cf. Cohen*, 260 F.3d at 78; *Johnpoll*, 739 F.2d at 709; *Drogoul*, 1 F.3d at 1553.

### 2.     The Witness Was at the Same Al Qaeda Military Training Camp, at Approximately the Same Time the Defendant Gave a Speech There

In his Mirandized post-arrest statement, the defendant admitted that, at the request of bin Laden, he gave speeches at al Qaeda training camps, including at a training camp the defendant called "Matar."  The defendant stated that more than 150 trainees attended his speeches at this al Qaeda camp.  The defendant described the types of training provided at the camp to include weapons, explosives, and guerrilla tactics.  And the defendant acknowledged in his post-arrest statement that his goal for his speech at Matar was to help the trainees understand the purpose of the training they were receiving.

In the spring of 2001, shortly before the defendant admits to have delivered his speech at the camp, the Witness received advanced "urban warfare" and "security" training at the very same al Qaeda camp: Matar.  The Witness will also describe Matar as an al Qaeda camp, and will describe the urban warfare training as including explosives, firearms and assassinations; for example, the Witness participated in firearms training in which the students practiced marksmanship by firing at balloons labeled "Clinton," "Sharon," and  "Blair."  During the Witness's time in training at Matar, bin Laden visited the camp three times.  Ayman al-Zawahiri visited Matar at least once.  During one of bin Laden's visits, the Witness saw bin Laden recognize the high achievers in the urban warfare course; the Witness will identify one of these high achievers as one of the hijackers involved in the September 11 attacks.

The Witness's testimony about the nature of the training at the camp provides absolutely critical context regarding the defendant's admitted presence at the Matar camp, and crucial

corroboration of the defendant's admission.  It is the Witness's testimony that would make clear that the camps at which the defendant gave speeches served as al Qaeda's means of preparing terrorists for committing terrorist acts—which is at the heart of the al Qaeda conspiracy to kill U.S. nationals.  For the jury to assess the fact that the defendant provided motivational speeches to trainees at a particular camp, it is critical for the jury to understand the precise nature and goals and operational program of the camp.  The Witness clearly can provide that—and not in an abstract way, but with specific reference to the very camp that the defendant addressed, at near the very point in time that the defendant addressed it.

In a similar vein, the Witness is also thoroughly familiar with other al Qaeda locations, such as an al Qaeda training facility known to both the Witness and defendant as the "House of Pomegranates," and an al Qaeda guesthouse used by individuals traveling from and to al Qaeda camps, both located in Kandahar, Afghanistan.  In addition to explaining how these facilities were used by al Qaeda, the Witness would testify that, due to al Qaeda's intensive security practices, many of these locations were accessible only to trusted insiders; accordingly, firsthand knowledge of these locations were reserved largely to those on the inside of al Qaeda, such as the Witness.  In his post-arrest statement, the defendant acknowledged that bin Laden asked him to speak at each of these two locations.


### 3.      The Witness Offers Material Testimony Regarding Brevity Cards

The parties have stipulated to the admission at trial of, *inter alia*, a number of laminated cards seized from al Qaeda personnel in Afghanistan and Pakistan in 2001 and 2002.  These printed cards (which are discussed in the defendant's submission) are known as "code cards" or "brevity cards."  These cards are designed to be used for coded communications over public

14

radio frequencies: They have columns listing individuals' names and locations, and each name/location corresponds to a number.  These cards list locations (such as Matar) and names (such as the defendant, Abu Hafs al-Masri, Ayman al-Zawahiri, and Khalid Sheikh Muhammad). These cards enable secret communications between people with access to the cards, by enabling the use of numbers as a substitute for names.[6]  The Government anticipates that the Witness will be able to provide testimony, based on his first-hand knowledge, regarding the vast majority of the people and locations listed on the brevity cards.  And, importantly, the Government expects this testimony to demonstrate that these people and locations were closely affiliated with al Qaeda.[7]

## C.     The Witness Is Unavailable

As to the second prong of the *Johnpoll* test, the Witness is unavailable because he is located outside the United States and thus beyond its subpoena power; and because he has repeatedly refused to travel to the United States.  Specifically: (1) the Witness is a citizen of and is resident in the United Kingdom, *see* Declaration of Nicholas J. Lewin, dated Dec. 20, 2013 ("Lewin Decl.") at ¶ 3; (2) the witness has consistently refused to travel to the United States to testify or for any other purpose, *id.* at ¶¶ 5, 6; (3) in the course of his 2012 Rule 15 deposition, the Witness testified that he "would not be willing to travel" because "upon arrival in the United States, I would be arrested," *id.* at ¶ 5; and (4) on December 18, 2013, in response to a Government request that the Witness travel to the United States to testify at trial, the Witness

---

[6] By means of an example, if two communicants each had a brevity card listing Usama bin Laden as number 100 and the Matar as number 14, and wanted to communicate bin Laden's movement, they could send a coded message to each other such as: "100 en route to 14."

[7] The Government also anticipates proving, including through the Witness, that al Qaeda used numerical coding for communications, including battlefield communications.

responded that he would not travel to the United States because he feared arrest,[8] *id.* at ¶ 6. There are no further reasonable steps that the Government can take to procure his testimony in the United States.  And the good faith steps taken by the Government to secure the Witness's in-court testimony are sufficient.  *See Vilar*, 568 F.Supp.2d at 438 (quoting *Sindona*, 636 F.2d at 804) (concluding that a party can establish that it has taken "'good faith' efforts to obtain the witnesses' presence at trial by indicating that it had repeated contact with the witnesses and had promised 'to pay all expenses of the witnesses' in traveling to the United States").  Accordingly, the Witness is unavailable.  *See generally* Fed. R. Evid. 804(a)(5) (declarant is unavailable if proponent of a statement "has been unable to procure the declarant's attendance . . . by process or other reasonable means").

**D.**     **Any Testimony From the Witness Would Be Taken in Accord with Rule 15 and Is Necessary to Prevent a Failure of Justice**

Rule 15 provides that a deposition of a witness outside the United States requires the Court to find: (1) that the witness's testimony "could provide substantial proof of a material fact;" (2) that there is a "substantial likelihood that the witness's attendance at trial," or for a U.S.-based deposition, cannot be obtained; (3) that the defendant cannot be present either because the country "will not permit the defendant to attend," or because "secure transportation and continuing custody" of the incarcerated defendant "cannot be assured;" and (4) that "the defendant can meaningfully participate in the deposition through reasonable means." Fed. R. Crim. P. 15(c).

---

[8] The Witness was told that his travel costs to travel to the United States to testify at trial would be covered by the Government.  *See* Lewin Decl. at ¶ 6.

Each of these factors would be met here.  First, the Witness's testimony does, in fact, provide substantial proof of material facts; indeed, the Witness's testimony ties the defendant directly to an al Qaeda plot to kill Americans, and that proof simply cannot be put before the jury in any remotely comparable way.  *See, supra*, at Part II.B; Lewin Decl. at ¶ 9.

Second, the live, in-court testimony of the Witness cannot be obtained.  *See, supra*, at Part II.C; Lewin Decl. at ¶¶ 5-6.

Third, due to safety and other concerns in this case, the defendant would not be permitted to depart the United States or to gain entry into the United Kingdom to attend the requested deposition in person.  *See* Lewin Decl. at ¶ 7.

Fourth, in the event that the Court denies the Government's request to offer the cooperating witness's testimony via live CCTV, but grants the request to conduct a Rule 15 deposition, the Government will ensure that the defendant can effectively participate in any deposition via a live broadcast.[9]

Moreover, particularly because the Witness's testimony is central to the charges, *see supra* at Part II.B, allowing the jury to consider it is emphatically in the interest of justice.  *See* Fed. R. Crim. P. 15(a)(1) (providing that a court may grant a Rule 15 motion in the interest of

---

[9] The Court of Appeals has held that, in the case of a deposition in a foreign country that will not permit the defendant to be present, this provision is satisfied "so long as the prosecution makes diligent efforts . . . to attempt to secure the defendant's presence, preferably in person, but if necessary via some sort of live broadcast."  *United States* v. *Salim*, 855 F.2d 944, 950 (2d Cir. 1988); *see also, e.g.*, *United States* v. *Abu Ali*, 528 F.3d 210, 239 (4th Cir. 2008) (admitting deposition of Saudi Arabian police officers where defendant observed the witnesses, and vice versa, through a two-way live video link); *United States* v. *Medjuck*, 156 F.3d 916, 920 (9th Cir. 1998) (where no mechanism for transporting defendant to deposition in Canada and back again in time for trial, but defense counsel present and defendant able to watch via video feed and to consult with counsel via private telephone, no violation of Constitution or Rule 15); *McKeeve*, 131 F.3d at 10 (incarcerated defendant listened to deposition and consulted with attorney on separate telephone lines; non-videotaped deposition was admissible); *United States* v. *Gifford*, 892 F.2d 263, 265 (3rd Cir. 1989) (defendant's rights not violated by admission of Rule 15 deposition testimony where Belgian authorities refused U.S. request to transport pretrial detainee defendant to that country, but defense counsel present at deposition, and defendant able to listen via open telephone line, and to consult with counsel via private line); *United States* v. *Meuller*, 74 F.3d 1152, 1156-57 (11th Cir. 1996) (no error from admission of Rule 15 deposition testimony taken in London where defendant was not present but "listened to the testimony on the telephone and was able to consult with his a lawyer as the deposition proceeded").

justice).  And there are no countervailing factors that militate against it.  *See Vilar*, 568 F. Supp. 2d at 442-43. Perhaps most importantly, there are myriad factors present on the specific facts here that will help to ensure that the Witness testifies truthfully—and those guarantees of truthful testimony very much help to insure that remote testimony will, in this instance, advance the cause of justice.  *See* Fed. R. Crim. P. 15(a)(1)

First, the Witness will be sworn, and thus subject to criminal penalties in the United States if he testifies falsely.  *See*, *e.g.*, 18 U.S.C. § 1001 (providing a maximum five years sentence of imprisonment for making "any materially false, fictitious, or fraudulent statement"); 18 U.S.C. § 1621 (providing a maximum five year sentence of imprisonment for perjury).  Via our extradition treaty with the United Kingdom, the U.S. could of course pursue an extradition request for the Witness to prosecute him here.  *See* Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America, entered into force on Apr. 26, 2007, Art. 2, Par. 1 ("An offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty.")

Second, if the Witness testifies falsely, he could be held in violation of his cooperation agreement with United Kingdom authorities, pursuant to the Serious Organized Crime and Police Act.  *See* Lewin Decl. at ¶ 8.

Third, false testimony could subject the Witness to prosecution in the United Kingdom for the crime of "perversion of the course of justice."  *See id.* at ¶ 8.

Further, the Witness currently receives witness protection from British authorities and his failure to testify truthfully could result in termination of that protection.  *See id.* at ¶ 8.

Finally, the Witness has an extensive record of prior statements, including prior sworn Rule 15 testimony taken and offered in a 2012 trial in this Circuit, and an extensive number of prior reports of interviews by U.S. and British officials. Pursuant to our obligations under Title 18, United States Code, Section 3500 (as well as other constitutional obligations, such as *Giglio* v. *United States,* 405 U.S. 150, 154 (1972), and its progeny), all relevant materials will be provided to defense counsel for testing through effective, well-informed cross examination.  In addition, whether taken via Rule 15 or live CCTV testimony, assuring that the jury is provided the testimony of the Witness should not occasion any delay in this trial.  *See* Lewin Decl. at ¶ 10. In either event, the defendant would receive the requisite disclosures well in advance of what is required, and the Government would not move—and would oppose any defense motion—for an adjournment on this basis, as none is warranted.  *See id.*

*      *      *

In sum, the Witness has remotely testified, and recently, in a United States District Court. He should be permitted to do so again here.  His testimony is unique, and sheds powerful light on the questions for the jury that are at the very core of the case.  And there are forceful guarantees here that the Witness will tell the truth—such that allowing the jury to hear from the Witness, whether by CCTV or a Rule 15 deposition, is firmly in the interest of justice.

### III.    The Testimony Proffered by the Defendant is Inculpatory, Inadmissible or Immaterial, and the Absence of Practical Protections to Ensure Truthful Testimony Militate Strongly Against the Defendant's Proposed Rule 15 Deposition

The defendant has not met his burden to demonstrate that the proffered testimony of Salim Hamdan is material.  *See* Defendant's Memorandum of Law in Support [of] Defendant Sulaiman Abu Ghayth's Motion for Letters Rogatory & Rule 15 Deposition of Witness ("Def. Mem.), dated December 11, 2013, at 4-8.  First, much of Hamdan's proffered testimony is

consistent with the Government's theory of guilt—that is, it is inculpatory.  Proffered testimony

that actually inculpates the defendant, *see infra* at Part III.A, categorically cannot satisfy the

requirement that the testimony sought "exculpates the defendant."  *Kelley*, 36 F.3d at 1125;

*Merritt*, 1991 WL 79235, at *5; *Esquivel*, 755 F. Supp. at 439.  (In addition, because the

Government will likely prove some of these inculpatory facts, such testimony would be

cumulative of the Government's evidence.  *See Stein*, 482 F. Supp. 2d at 365.)  Second, some of

the proffered testimony is inadmissible because it is hearsay, speculative, or lacks foundation,

*see infra* at Part III.B; such evidence cannot satisfy the defendant's burden.  *See Grossman*, 2005

WL 486735, at *3.  Third, what proffered testimony remains is immaterial, *see infra* at Part III.C,

because it is not "'highly relevant to a central issue in the case.'"  *Vilar*, 568 F.Supp.2d at 440

(quoting *Drogoul*, 1 F.3d at 1556).  Finally, as set forth below, none of the background facts that

help to insure the Witness who is the subject of the Government's application will be testifying

truthfully, apply to Salim Hamdan, *see infra* at Part III.D.  Thus, there is simply no reliable

assurance that Hamdan will feel any compulsion to testify truthfully.  This is a "substantial

countervailing factor[]" that "militat[es] against the taking of the deposition," *Vilar*, 568 F. Supp.

2d at 442-43.  False testimony, whether offered in Court or by deposition is never in the "interest

of justice," Fed. R. Crim. P. 15(a).


**A.      Some of the Proffered Hamdan Testimony is Inculpatory**

          Some of the proffered testimony from Hamdan is actually inculpatory, and thus

consistent with the prosecution's theory, including: (i) that Hamdan first met the defendant when

"Usama bin Laden personally introduced" the two, *see* Declaration of Stanley L. Cohen, dated

December 11, 2013 ("Cohen Decl.") at ¶ 21; (ii) that it was not unusual for bin Laden to "use

[people]'s skills, if and as needed," *id.* at ¶ 22; (iii) that Hamdan saw the defendant meet with bin Laden "only" a few times before the September 11 attacks, *id.* at ¶ 25; (iv) that the last time Hamdan saw the defendant was "during the U.S. bombing campaign in or around Kandahar," *id.* at ¶ 15; (v) that the defendant "was used by bin Laden to give a few religious sermons, and ultimately to add religious 'weight' to the three videos that were aired after 9-11," *id.* at ¶ 26; (vi) that Hamdan "drove the Defendant on one occasion with bin Laden to visit a camp, where he briefly heard him give a religious sermon," *id.* at ¶ 28; (vii) that he saw the defendant give a "religious" speech on "at least" one occasion in Kandahar, *id.* at ¶ 31; (viii) that "Abu Ghayth was in Afghanistan for only a relatively short time before 9-11," *id.* at ¶ 31; (ix) that brevity cards were used for coded communications, including military communications, *id.* at ¶ 32; (x) that Hamdan was "with bin Laden" from 1995 through 2001, "through the twin embassy bombings, the USS Cole attack, and 9-11, but that he was not aware of any given operation or involved in its planning or execution," *id.* at ¶ 36; (xi) that the defendant was "a newbie" at the al Qaeda camp, "without any influence or input, authority or responsibility," *id.* at ¶ 38; (xii) that the defendant had "no followers of any sort in the so-called military camps," *id.* at ¶ 39; (xiii) that the camps were used "almost exclusively" to train "Arab fighters and others" to fight with the Taliban against the Northern Alliance, *id.* at ¶ 40; and (xiv) that Hamdan "only once" saw the defendant at a camp "preaching general religion to a small group of visitors," *id.* at ¶ 42.

Each of these assertions is consistent with the Government's trial proof and theory of the case. For example, the Government will prove via videos made in the fall of 2001, and via the post-arrest statement of the defendant, that bin Laden and the defendant were together on multiple occasions —just as Hamdan will purportedly testify, *id.* at ¶¶ 21 and 25. To cite another example, Hamdan's testimony that, at bin Laden's behest, the defendant gave speeches

to al Qaeda personnel and trainees, including at training camps that were providing military training, *see id.* at ¶¶ 26, 28, 31, 36, 38-40, 42, is precisely what the Government's evidence will show.  Specifically, the Government will offer evidence in the form of testimony of a cooperating witness, the defendant's post-arrest statement, and 2001 videos of the defendant, to prove that the defendant was a member of the al Qaeda conspiracy to kill U.S. nationals, and that he conspired to provide material support thereto.  Assuming that it is even admissible, the proffered testimony that Hamdan believes that the defendant "was used by bin Laden to give a few religious sermons, and ultimately to add religious 'weight' to the three videos that were aired after 9-11," *id.* at ¶¶ 22, 26, is also consistent with the Government's theory of guilt: as the defendant admitted in his post-arrest statement, bin Laden asked the defendant to provide speeches on behalf of al Qaeda and the defendant agreed to do so.  Indeed, the defendant acknowledged in his post-arrest statement that he understood that bin Laden believed that the defendant's prominence would help al Qaeda recruit personnel.  This is of course significant evidence that the defendant joined the al Qaeda conspiracy to kill Americans and provided material support to it.[10]

In sum, the fact that the above-described evidence tends to prove that the defendant was in fact part of al Qaeda's conspiracy to kill U.S. nationals, and that he provided material support to that conspiracy, categorically does not "exculpate[] the defendant," *Kelley*, 36 F.3d at 1125, and thus cannot satisfy the defendant's burden.

---

[10] To the same end is Hamdan's proffered testimony that he was "with bin Laden" for years but did not know in advance about certain al Qaeda attacks, *see id.* at ¶ 36.  Even if true, this testimony is either immaterial or inculpatory.  It is immaterial insofar as the Government does not need to prove that the defendant knew in advance of al Qaeda attacks in order to convict him.  But it is inculpatory insofar as the Government intends to introduce evidence, though the testimony of the Witness, that the defendant did, in fact, have foreknowledge of an al Qaeda plot—the shoe bomb plot.  It thus highlights a contrast between Hamdan, who professes to have had no foreknowledge of any al Qaeda attacks, and the defendant.

**B.      Some of the Proffered Hamdan Testimony is Plainly Inadmissible**

Evidence that is inadmissible as hearsay, because it lacks a conceivable foundation, is speculative, or for other reasons, similarly cannot satisfy the defendant's burden, *see Grossman*, 2005 WL 486735, at *3.  Much of Handan's proffered testimony falls into this "inadmissible" category, including: (i) Hamdan's opinion that "Abu Ghayth was, in effect, a 'nobody,'" Cohen Decl. at ¶ 23; (ii) that in Hamdan's few conversations with the defendant, the defendant described his "motives for coming to Afghanistan . . . he wanted to witness life under the Taliban," *id.* at ¶ 24; (iii) that because the defendant was only briefly in Afghanistan before 9-11, the defendant "would not have been a member of al Qaeda, let alone a member of its inner circle," *id.* at ¶ 31; (iv) that, though Hamdan watched other al Qaeda leaders "plan, command, organize and do things for al Qaeda" the defendant "could not have done so," *id.* at ¶ 35;  (v) that the defendant "was essentially a tourist" in Afghanistan during the summer of 2001 "and was neither charged with nor capable of performing any duties on or through the authority of al Qaeda, *id.* at ¶ 35; (vi) that "no person in Afghanistan played any role of consequence or importance for al Qaeda or Usama bin Laden who had not been with bin Laden for years," *id.* at ¶ 38; and (vii) that the defendant "was accorded no particular special respect from persons and went largely unnoticed," *id.* at ¶ 39.

Much of this proffered testimony is inadmissible lay opinion testimony.  Lay opinion testimony is only admissible if it is rationally based on the witness's perception and helpful to determining a fact in issue.  *See* Fed. R. Evid. 701.  Hamdan's opinion that the defendant was "a nobody," Cohen Decl. at ¶ 23; that he could not have been a member of al Qaeda or its inner circle because he was new to Afghanistan, *see id.* at ¶ 31; that he was "essentially a tourist," *id.* at ¶ 35; and that he was not "charged with" or "capable of" performing duties on behalf of al

Qaeda, *id.* at ¶ 38, is all inadmissible lay opinion testimony that also lacks any conceivable foundation.  *See Whiting*, 308 F.2d at 541 (holding that the burden is on the Rule 15 movant).  Moreover, Hamdan's testimony about his conversations with the defendant, *id.* at ¶ 24, is of course inadmissible hearsay.  And because the Government does not need, or intend, to prove that the defendant "was a member of al Qaeda," *id.* at ¶ 31, such proffered testimony would be irrelevant under Rule 401 and would, in any event, be objectionable under Rule 403 of the Federal Rules of Evidence.  The Government will, of course, prove that the defendant was a member of the charged conspiracies, but that is different than proving that he was also a sworn member of al Qaeda.  In sum, the testimony set out above would not be admissible at trial; as such it cannot be "highly relevant to a central issue in the case," *Vilar*, 568 F.Supp.2d at 440 (internal quotation marks omitted).

**C.      Some of the Proffered Hamdan Testimony is Irrelevant**

The rest of the proffered testimony is simply irrelevant to the question of whether the defendant conspired to kill U.S. nationals or to provide material support, or to provide, attempt to provide, or aid and abet the provision of material support—or to any crime, for that matter.  That irrelevant proffered testimony includes the following: (i) that "Arabs of all backgrounds, skill-sets and interests floated in and out of the various Arab sectors [in Afghanistan] to see what the new Islamic state was about," Cohen Decl. at ¶ 22; (ii) that bin Laden "especially liked to meet Arabs from the Gulf states," *id.* at ¶ 22; (iii) that bin Laden never spoke to Hamdan about the defendant, *id.* at ¶ 23; (iv) that bin Laden never instructed Hamdan to pick up the defendant, *id.* at ¶  25; (v) that Hamdan "never saw Abu Ghayth with other inner circle leadership at meetings or at dinners or at camps," *id.* at ¶  27; (vi) that Hamdan "never heard Abu Ghayth discuss the

strategy, plans, operations, goals or assignments of al Qaeda or the al Qaeda leadership," *id.* at
¶ 29; (vii) that Hamdan never saw the defendant with a weapon or radio or giving or taking
instructions from anyone, *id.* at ¶ 30; (viii) that Hamdan did not see the defendant give a loyalty
oath to bin Laden or take such an oath from anyone else, *id.* at ¶ 31; (ix) that he never saw the
defendant in possession of or using a "brevity card," that some of the various cards identified
(presumably) al Qaeda "committees and offices with which Abu Ghayth had no involvement,"
and that Hamdan never heard the defendant contacted or described by reference to a brevity card
number, *id.* at ¶¶ 32-34; (x)  that "before 9-11" the defendant was not an al Qaeda leader, ¶ 35;
(xi) that Hamdan knew the "inner circle" and the defendant was not among them, *id.* at ¶ 37; (xii)
that there were "many clerics, preachers, imams and religious scholars" in Afghanistan, *id.* at
¶ 39; (xiii) that "most" of the attendees of the military training camps were not members of al
Qaeda, and that "'sworn' membership in al Qaeda was not significantly large," *id.* at ¶ 41; and
(xiv) that Hamdan "never heard the Defendant say anything against the United States or any
other government or person, nor did he hear the Defendant at any time support attacks or
violence or urge others to do so," *id.* at ¶ 43.

   Much of this evidence seeks to knock down a defense-erected straw man, and to prove
the negative: namely that the defendant was not in a certain place, or with certain people, or
being talked about by certain people, or that he did not do certain things.  But the Government
does not need (or intend) to prove that: bin Laden spoke to Hamdan about the defendant, *see id.*
at ¶ 23; or that bin Laden instructed Hamdan to pick up the defendant, *id.* at ¶  25; or that the
defendant discussed the strategy, plans, operations, goals or assignments of al Qaeda or the al
Qaeda leadership, *id.* at ¶ 29; or that the defendant was in possession of a "brevity card," or was
involved in all of the "committees and offices" listed on that card, *id.* at ¶¶ 32-34.  As such, this

proffered testimony is irrelevant to the case.  The same holds for those aspects of the proffered testimony that relate to background issues, such as that "Arabs of all backgrounds, skill-sets and interests floated in and out of the various Arab sectors [in Afghanistan] to see what the new Islamic state was about," *id.* at ¶ 22, and that that there were "many clerics, preachers, imams and religious scholars" in Afghanistan, *id.* at ¶ 39.  The Government will prove what the defendant did while in Afghanistan, not what other "clerics, preachers, imams and religious scholars" were doing there.

The Government does intend to prove, through the testimony of a cooperating witness, that the defendant urged individuals at an al Qaeda guesthouse to swear bayat to Usama bin Laden.  But Hamdan's proffered testimony that he did not see the defendant give a loyalty oath to bin Laden or take such an oath from anyone else, *id.* at ¶ 31, does not undercut that proof. First, the Government will not seek to prove that the defendant gave or took a loyalty oath from others, but rather that he urged others to swear that oath.  More fundamentally, however, the fact that Hamdan, who by his own account, only had a "few conversations," *id.* at ¶ 24, with the defendant did not see the defendant do something that the Government does not intend to prove he did, clearly cannot be "highly relevant to a central issue in the case," *Vilar*, 568 F. Supp. 2d at 442-43.

As described above, the parties have stipulated to the admission of, *inter alia*, a number of laminated cards seized from al Qaeda personnel in Afghanistan and Pakistan in 2001 and 2002, which are known as brevity cards.  Brevity cards are designed to be used for coded communications.  The defendant's name is listed, among numerous other identified al Qaeda leaders and locations on these cards.  Among other things, Hamdan will purportedly testify that he never heard the defendant contacted or described by reference to a brevity card number, *id.* at

¶ 34, and that "the brevity cards included the names of some inner circle members and leaders of al Qaeda; some old friends of Usama bin Laden; as well as the names of auto mechanics and persons of no particular importance or consequence, including visitors passing through the Kandahar community," *id.* at ¶ 33.

Hamdan's testimony that he never heard the defendant contacted or described by reference to these cards is, at best, only marginally relevant—and certainly not highly relevant— to the case. The fact of the defendant's name on these cards—regardless of whether Hamdan heard anyone refer to the defendant by his code number—is what is principally significant on these cards. Perhaps just as importantly, the defendant lays only the barest foundation for Hamdan's knowledge on this point. It is likely an insufficient foundation for the proffered testimony to be admissible, and it certainly does not approach the threshold for holding a Rule 15 deposition in any event. *See Whiting*, 308 F.2d at 541 (holding that the burden is on the Rule 15 movant).

As set forth above, the Government intends to prove that the cards bear the names of a variety of senior al Qaeda leaders, associates and other al Qaeda-affiliated extremists, along with relevant locations, including al Qaeda camps, and to prove that al Qaeda used the code set forth on these cards to communicate about extremely sensitive subjects. The defendant's name appears on many of these cards. The proffered testimony set forth above—that these cards bear the names of "auto mechanics and persons of no particular importance or consequence, including visitors passing through the Kandahar community," *id.* at ¶ 33—could potentially be considered relevant rebuttal evidence. But the defendant does not say that he saw the precise cards that have been stipulated into evidence. The defendant does not indicate the names on the cards that are said to belong to any of his hypothesized "auto mechanics" or passers-through. And he has

27

offered virtually no meaningful foundational information—beyond general assertions about the people on the cards.  How does he know the people on the cards?  Which people?  Which cards?  The defendant bears the burden of proof, *see Whiting*, 308 F.2d at 541, and his proposed witness Hamdan does not substantially answer these most basic questions.  In any event, the proposed (and vague) testimony about the brevity cards does not even remotely "negate . . . the crux of the government's indictment," *Ismaili*, 828 F.2d at 161, which is that the defendant conspired with others to kill U.S. nationals, and to provide material support to that conspiracy, and that he took a variety of overt acts to further the conspiracy's objectives.  Indeed, in some ways the proffered testimony is inculpatory.  Hamdan is said to assert that the cards list people who were "inner circle members and leaders of al Qaeda; some old friends of Usama bin Laden; as well as the names of auto mechanics," ¶ 33, and the trial proof will show that the defendant was neither an auto mechanic nor an old friend of bin Laden.

### D.     Substantial Countervailing Factors Militate Against Deposing Hamdan

But even if the Court were to conclude that Hamdan's anticipated testimony was "highly relevant to a central issue in the case," *Vilar*, 568 F. Supp. 2d at 442-43, the Court should deny the defendant's motion.  Deposing Hamdan would frustrate, not advance, the interests of justice.  This is because there are no reliable protections available to help ensure that Hamdan will not lie or otherwise deliberately obstruct these proceedings on the defendant's behalf.

In the normal course, courts place witnesses under oath prior to the witness testifying.  That oath very strongly incentivizes witnesses to testify truthfully, because violating it carries serious repercussions, including criminal prosecution. That is the purpose of the oath.  Hamdan, bin Laden's former personal driver, is a Yemeni national residing in Yemen.  *See* Cohen Decl. at

¶¶ 6-7.  If Hamdan were to lie or deliberately obstruct the administration of justice, the Court and Government would simply have no recourse.  Hamdan surely knows this.

The Yemeni constitution explicitly forbids the extradition of a Yemeni national to a foreign authority.  *See* Const. Republic Yemen art. 45, *available at* http://www.refworld.org/cgi-bin/texis/vtx/rwmain?page=category&category=LEGAL&publisher=&type=&coi=YEM&docid=3fc4c1e94&skip=0.  The prospect of a U.S. perjury prosecution will therefore have no deterrent effect at all.  Moreover, the United States and Yemen do not have a bilateral mutual legal assistance treaty or an extradition treaty.

Nor are there controls within Yemen to ensure Hamdan's truthful testimony.  Hamdan has no agreement or cooperative relationship with Yemeni authorities, and indeed the deposition does not appear to have been coordinated through the Yemeni government.  In addition, it is unclear whether extraterritorial perjury—lying from Yemen, in a U.S. proceeding—violates Yemen's own criminal law.  Therefore, requiring Hamdan to provide sworn testimony would be a hollow endeavor; Hamdan's oath would provide little or no incentive for him to testify truthfully.  This situation sits in stark contrast with that of the Witness, who, as described above, has every incentive to be truthful.

That this Court and the U.S. government would be essentially powerless to ensure Hamdan's truthful testimony is particularly problematic given Hamdan's admitted history as a member of al Qaeda.  As described in the Government's motion for an anonymous jury, al Qaeda has unequivocally demonstrated, through words and actions, that it poses a threat to the truth-seeking process—to the integrity of the administration of justice.  *See*, *e.g.*, *United States* v. *Odeh*, 552 F.3d 93 (2d Cir. 2008) (affirming defendant El-Hage's convictions for perjury before a grand jury).  And by his own admission, Hamdan was personally and integrally involved at the

very core of al Qaeda, acting as bin Laden's personal driver.  In short, Hamdan, like the defendant, worked personally and directly with al Qaeda terrorist leaders, and has no incentive to testify truthfully, and every incentive to lie to aid a fellow al Qaeda associate.

In his declaration, the defendant's counsel asserts that Hamdan has in the past provided truthful information to U.S. authorities.  *See, e.g.*, Cohen Decl. ¶ 9.  Even if those assertions are true, their truth only proves the Government's argument:  that proper controls are necessary to ensure Hamdan's truthful testimony.  At the times he provided the claimed truthful information to which defense counsel refers in his brief, Hamdan was under the control of the U.S. government and presumably hoped to obtain his release by providing truthful information to U.S. authorities. As described above, Hamdan is now in Yemen, far from the reach of the United States, and has every incentive to lie.

In light of the substantial countervailing factors militating against deposing Hamdan, the Court should deny the defendant's motion.  Hamdan's testimony—not backstopped by incentives to truthfulness-could not be in the "interest of justice," Fed. R. Crim. P. 15(a).

## IV. CONCLUSION

For all of the foregoing reasons, the Government's motion should be granted, and the

defendant's motion denied.

Dated: New York, New York
          December 20, 2013

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

          By:          /s/ Nicholas J. Lewin
                              JOHN P. CRONAN
                              NICHOLAS LEWIN
                              MICHAEL FERRARA
                              Assistant United States Attorneys
                              212-637-2779 / -2337 / -2526

31

## AFFIRMATION OF SERVICE

NICHOLAS LEWIN, pursuant to 28 U.S.C. § 1746, hereby declares under the penalty of perjury:

I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York. On December 20, 2013, I caused copies of the Government's Motion to Offer the Testimony of a Witness Via Live Closed-Circuit Television During Trial or, in the Alternative, for a Deposition Pursuant to Rule 15 of the Federal Rules of Criminal Procedure; and in Opposition to Defendant's Motion to Take a Deposition Pursuant to Rule 15 to be delivered by ECF and electronic mail to the following counsel for defendant Sulaiman Abu Ghayth:

|  |  |
|---|---|
| Stanley Cohen, Esq. | Ashraf Nubani, Esq. |
| stanleycohenlaw@verizon.net | awn@awnpointlaw.com |
| | |
| Geoffrey Stewart, Esq. | Zoe Dolan, Esq. |
| gstewart.defender@gmail.com | zdolan@gmail.com |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: New York, New York
       December 20, 2013

                                        /s/ Nicholas J. Lewin
                                   Assistant United States Attorney