Exhibits A-E, in Support
of Defendant's Response to
Government Motion Pursuant to
Rule 15,
S14 98-CR-1023 (LAK)

# Exhibit A

FD-302 (Rev. 5-8-10)

- 1 of 21 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry          10/10/2012

███ WITNESS ███, who may be in a position to testify, was interviewed at ███
█████████████████ in London, England, during the time period
09/26 27/2012 ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████ After being advised of the identities of the
interviewing investigators and the nature of the interview, ███WITNESS███ provided
the following information:

Investigation on   09/26/2012   at   London, United Kingdom (In Person)

File #  ████████████████████████████          Date drafted  10/10/2012

by  █████████████████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ████████████ ,On  09/26/2012 ,Page  16 of 21

████ was shown a photograph labeled #2 (known to the FBI as SULAYMAN ABU GHAYTH). ████ advised that he met and knew the individual in photograph #2, however, he could not recall any specifics about this individual or when/where he met him.



# Exhibit B

FD-302 (Rev. 5-8-10)

- 1 of 34 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    12/26/2013

██ WITNESS ██, who may be in a position to testify, was interviewed ██
██ in London, England, during the time period
11/06 07/2013 ████████████████████████████████████
███████████████████████████████████████ After being advised of
the identities of the interviewing investigators and the nature of the
interview, ██ WITNESS ██ provided the following information:


Investigators showed ████ a video with the name "rm high" on a compact
disk with the SDNY name and seal and entitled "Videos". After watching the
video, ████ advised that he had never before seen this video. Given the
topics discussed in the video, ████ assumed that it was made
post 09/11/2001, but not long after 09/11/2001 because ABU HAFS AL MASRI
was shown in the video and ABU HAFS AL MASRI was killed in approximately
late November 2001. ████ observed USAMA BIN LADEN and AYMAN AL ZAWAHIRI on
this video. With regard to the individual seated to USAMA BIN LADEN's right
in the video, ████ observed this individual in Afghanistan, likely during
the later portion of ████'s time there, pre 09/11/2001, but had no
specific recollection of exactly when or where he observed him. This
individual was not prominent in ████'s mind as someone he interacted with
or saw regularly in Afghanistan during ████'s 2 3 years there. ████ saw
the name SULEIMAN ABU GHAITH associated with this individual during the
video, but ████ would not otherwise have known his name. The name SULEIMAN
ABU GHAITH was somewhat familiar to ████ prior to viewing this video,
however, ████ could not recall specifically when or where he may have
previously heard this name. ████ did not know ABU GHAITH as someone who
was an official spokesman for USAMA BIN LADEN's Group.


████ did not recall USAMA BIN LADEN's Group having an official
spokesperson, but recalled that ABU HAFS AL MAURITANI spoke to the press on
at least one occasion.


Investigation on  11/06/2013  at  London, United Kingdom (In Person)

File # ████████████████████████         Date drafted  11/12/2013

by ████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

Exhibit C

A

IN THE CENTRAL CRIMINAL COURT

                              No: U20090934

B                             Old Bailey
                              LONDON
                              EC4M 7EH

C                                    Friday, 13th November 2009

                        Before:

           THE HONOURABLE MR JUSTICE CALVERT-SMITH

D          _____

                        R E G I N A
                           -v-

                        U20090934
           _____

E    MR R WHITTAM QC appeared on behalf of the PROSECUTION
     MISS S FORSHAW QC appeared on behalf of the DEFENDANT
           _____

                     FOR APPLICATION
                  (9.37 am - 11.00 am)
           _____

F    Computer-Aided transcript of the Stenograph notes of
                  WordWave International Limited
                (A Merrill Communications Company)
             101 Finsbury Pavement, London EC2A 1ER
              Tel: 020 7422 6130  Fax: 020 7831 8838
             (Official Shorthand Writers to the Court)

G                        Crown copyright©
           _____

H

A

Friday, 13 November 2009

**FOR APPLICATION**

B

MR WHITTAM:  My Lord, I prosecute; Miss Forshaw defends.

Only those who are in court at the moment are myself and

Miss Forshaw, my instructing solicitor and her

C

instructing solicitor.  Sitting to the side are either

senior police officers or officers directly related to

matters in the United States of America and the escort.

I do have a list of all those in court that we can keep

D

with the court papers.

MR JUSTICE CALVERT-SMITH:  That ought to be done.  I think

we will formally -- since the case has not been called

on -- you, Mr Whittam, and you, Miss Forshaw, are

E

satisfied that the person sitting in the dock is the

person in these papers.

MISS FORSHAW:  I am.

F

MR WHITTAM:  My Lord, we are quite satisfied and the officer

who conducted all the interviews is in court and can

verify that, as well.

MR JUSTICE CALVERT-SMITH:  Thank you.

G

MR WHITTAM:  My Lord, before we proceed with the

application --

MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  -- there is an application under section 75 of

H

2

A

   the Serious Organised Crime and Police Act.  It should

   be at divider 11 of my Lord's bundle.

B

MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  At that divider, at the very top, the pages are

   numbered.  Once we get past the introduction it is

   page 46, top left.

C

MR JUSTICE CALVERT-SMITH:  I have it.

MR WHITTAM:  My Lord, it is a joint application, if it

   assists the Court, to exclude members of the public

D

   other than those who have been identified and will be on

   the list available to the Court from --

MR JUSTICE CALVERT-SMITH:  The gentleman at the back here?

MR WHITTAM:  One of the escorting officers as well, my Lord.

E

MR JUSTICE CALVERT-SMITH:  Thank you.

MR WHITTAM:  I can confirm precisely --

MR JUSTICE CALVERT-SMITH:  Yes, I saw the escort coming into

   court.

F

MR WHITTAM:  Thank you.

   The Court has the power to make such order as it

   thinks appropriate to exclude from the proceedings any

   person who does not fall within subsection 4 and, my

G

   Lord, we have the officers, of course, and those

   representing the defendant, and to give such directions

   as it thinks appropriate prohibiting the publication of

H

   any matter relating to the proceedings, including the

3

A

fact that the reference has been made and it should be

made only to the extent that the Court thinks that it

B      necessary to do so to protect the safety of the person

and it is in the interests of justice.

MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  My Lord knows the nature of the case from the

C      papers that have been provided.

MR JUSTICE CALVERT-SMITH:  I do.

MR WHITTAM:  And it will be our joint application that

D      plainly for the safety of the individual who is affected

by these proceedings and in the interests of justice of

any of the proceedings that may follow that are referred

to in these papers, the Court should make an order

E      prohibiting the publication of any matter relating to

these proceedings, my Lord, until further order and the

reason that I indicate that is that there are two

scenarios that may occur:

F      One is should the defendant not comply with the

terms of the contract that he has signed, there is the

ability to refer the matter back to the Court, and the

Court of Appeal in the case of Blackburn indicated that

G      should there be a reference back to the Court, it is

unlikely that such hearing would be in private.  So that

might be one instance where the Court might vary the

order.

H

4

A

The second would be, should the defendant give

evidence in a public court in any jurisdiction, it

B

would, in our respectful submission, not put this court

in a good light in the areas of transparency and with

the press if publicly pronounced in another court was

what has taken place in this court.

C

MR JUSTICE CALVERT-SMITH:  Quite.

MR WHITTAM:  And so we would, subject to any observation my

Lord has, suggest that the order is made until further

order either of this court or my Lord, or the

D

High Court; whatever my Lord thinks most appropriate.

Should evidence be given in another court, it is

anticipated that would be during next year, but the

E

timing of which, I am afraid I cannot -- because of the

complexity of these matters -- give my Lord any accurate

assistance.

MR JUSTICE CALVERT-SMITH:  Yes.  It is pretty well

F

inevitable, therefore, that in due course the order

would have to be lifted because, as I read the terms of

the document you handed in this morning, if he does not

give evidence in another court, he is almost certain to

G

be brought back in breach of the agreement, so one way

or the other there is going to be publicity and there

will have to be publicity at some stage of these

proceedings one way or the other.

H

5

A

MR WHITTAM:  My Lord, certainly, and our submission would be

that if either of those follow, the reasons for making

B

the order, such as the protection of the safety of the

person and the interests of justice are likely to fall

away.

MR JUSTICE CALVERT-SMITH:  Quite.  Well, I did want to press

C

you a little on his safety should, for instance, by

lunchtime -- this morning -- it be public knowledge of

what is the procedure.  I have not seen anything in my

papers.  He is in custody at present?

D

MR WHITTAM:  He is in custody at present.

MR JUSTICE CALVERT-SMITH:  Hopefully well-protected, in any

event.

E

MR WHITTAM:  My Lord, he is.  He was taken and there should

be in my Lord's papers a short statement from

Detective Superintendent McKinney.

MR JUSTICE CALVERT-SMITH:  Tell me where to find that.

F

MR WHITTAM:  I shall, if my Lord gives me one moment.

MR JUSTICE CALVERT-SMITH:  Is it behind 3?

MR WHITTAM:  It should be, my Lord.  It is.

MR JUSTICE CALVERT-SMITH:  Yes.  Well that is what I was

G

referring to.

MR WHITTAM:  He has been --

MR JUSTICE CALVERT-SMITH:  Protected custody.

MR WHITTAM:  He has been in protected custody and not set

H

6

A

out in detail in the statement, but Mr McKinney is in
court.  Should the Court, for example, make an order

B today that has the effect of making his immediate
release, appropriate arrangements are in place for his
protection immediately from this court to go to managed
premises where there has been a full risk assessment.

C MR JUSTICE CALVERT-SMITH:  The danger to him, therefore, is
what?  Hopefully none at all.

MR WHITTAM:  Hopefully none at all but, as an example, there
was an enquiry made by a member of the press of my

D chambers yesterday as to what was the nature of
a hearing within this building today.

MR JUSTICE CALVERT-SMITH:  Really?

E MR WHITTAM:  That was dealt with appropriately and it may
simply be because they were aware that an anonymous
number was listed, but there plainly is a risk, managed
as best it properly can be.

F MR JUSTICE CALVERT-SMITH:  I am focusing at the moment on
the first of the two criteria, safety of this and at the
moment I am finding it hard to see why, with his current
whereabouts and his subsequent whereabouts, were he to

G be released, he would be at risk, physically.

MR WHITTAM:  If he was released, albeit staying within the
protection of that, he is free to move around.  The

H difficulties with a permanent change of identity is that

7

A

        that is not facilitated immediately because, of course,

        it would have to be repeated once there were appearances

B

        in court.

    MR JUSTICE CALVERT-SMITH:  I think you may be saying, well,

        if he is released early and that gets out, people will

        start to smell a rat as to why he has been released

C

        early and assume that something like what has happened

        has happened and therefore try to take action.  That I

        can quite understand.

           So far as the interests of justice are concerned,

D

        this is, as I understand it, principally those of

        another country.

    MR WHITTAM:  My Lord, it is.

    MR JUSTICE CALVERT-SMITH:  They will clearly want to be able

E

        to present their case with the least risk to the

        integrity of their proceedings.

    MR WHITTAM:  My Lord, certainly.

F

    MR JUSTICE CALVERT-SMITH:  You presumably do not have

        instructions -- or perhaps you do; I do not know -- as

        to whether there is any kind of programme, assuming

        I make the order today, as to when and in what

G

        circumstances inevitably what will have to happen,

        happens.

    MR WHITTAM:  I can assist my Lord in this way and one of

        those present in court is from the United States

H

8

A

Department of Justice who was in consultation with us

B
yesterday and, obviously, slightly depending on whatever

order is made here, there will be a further process of

some debriefing element because, of course, the

debriefing is being done by trained officers here

specifically to deal with his giving evidence in the

C
quite specific trials that are referred to, so there

will be a further process here, or anticipated to take

place here, before he moves to the other jurisdiction.

D
The first trial is indicated in the report of

Mr McAulay.  It is in relation to a person whose name

begins with T --

MR JUSTICE CALVERT-SMITH:  I have seen that.

E
MR WHITTAM:  -- who features largely in the facts due for

extradition in the early part of next year and so the

precise mechanics will depend upon the nature of the

outcome of today's proceedings and the precise mechanics

F
in relation to outstanding matters in the

United States of America, but it is --

MR JUSTICE CALVERT-SMITH:  You have clear instructions from

that jurisdiction that in the interest of their

G
administration of justice --

MR WHITTAM:  They are adamant.

MR JUSTICE CALVERT-SMITH:  -- this person's identity should

be protected until such time as it has to be revealed.

H

9

A

MR WHITTAM:  Precisely.  That is what ordinarily happens in
their jurisdiction.  In similar circumstances -- I say

B
similar, perhaps circumstances precisely like this have
not occurred before -- but that is how they would do it
and it would assist in their management of the
preparation of those trials.

C
MR JUSTICE CALVERT-SMITH:  Miss Forshaw, what do you want to
say?  Clearly you have instructionS from your client
which you can pass on, if you wish, to his apprehensions

D
as to his personal safety.

MISS FORSHAW:  He is -- undoubtedly was -- highly trusted
within the higher echelons of the organisation.  Those
against whom he proposes to provide assistance and

E
ultimately evidence would know very well if the Court
were to provide him with what might be perceived as
a lenient sentence.  Precisely how well-placed he was
and how well-placed he is to give extraordinary

F
information.

MR JUSTICE CALVERT-SMITH:  One would have thought that rats
would have been smelt from the moment Mr Justice Fulford
passed his sentence.

G
MISS FORSHAW:  Possibly, but there is a big difference
between the blandness of the sentencing remarks that
were appropriate in that situation and which were given

H
and a positive identification of this man and it is

10

A

       something that he would be concerned about.

           The assistant chief of the --

B

   MR JUSTICE CALVERT-SMITH:  But they are your clear

       instruction from your client.

   MISS FORSHAW:  They are.

   MR JUSTICE CALVERT-SMITH:  Thank you.  I wanted to know

C

       that.

   MISS FORSHAW:  Also, the assistant chief from the

       Department of Justice from America is over here and in

       court today and she was good enough to indicate to me

D

       that the United States would be concerned to assure

       publicity is really not something, at this stage --

   MR JUSTICE CALVERT-SMITH:  It will be very important, if

E

       I make the order sought --

   MISS FORSHAW:  Yes.

   MR JUSTICE CALVERT-SMITH:  -- that channels of communication

       are perfect so that the consequences to the (inaudible)

F

       of justice in this country are not prejudiced -- are

       avoided -- if there is late disclosure here of something

       that will be available no doubt widely and therefore on

       the Internet, etcetera, in the US.

G

   MISS FORSHAW:  I am quite sure that lady hears

       your Lordship's words.

   MR JUSTICE CALVERT-SMITH:  That is all I am saying.  Very

       well.

H

*Merrill Legal Solutions, 101 Finsbury Pavement, London EC2A 1ER*
*Tel: 020 7422 6130        Fax 020 7831 8838*
*www.merrillcorp.com*

Well, Mr Whittam, I am prepared to make the order. I am satisfied, in particular, that the two matters which appear at the end of the document that you served on me this morning in which it is proposed as part of the contract that this person be a witness and the second of those two matters is of such international and overwhelming importance to the administration of justice, not just in this country but worldwide, that if there is any prejudice to those proceedings by the disclosure of these proceedings, in particular, of course, the identity of the gentleman in the dock, but I am also satisfied that there is a significant risk to his own personal safety if the identity was to be disclosed or the nature of these proceedings.  So that I will make the order sought until further order with a caveat that I have just expressed to Miss Forshaw, (inaudible) that it is essential that there is coordination on the day in which the revelation has to be made.

MR WHITTAM:  My Lord, thank you.

Consequent upon that, bearing in mind the request that was made of my chambers yesterday --

MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  -- there has been some concern as to how the police who manage the making of the order in that if,

12

for whatever reason, enquiries are made either of them

or their press office or the Crown Prosecution Service's

press office --

MR JUSTICE CALVERT-SMITH:  Yes, I understand.

MR WHITTAM:  -- that one suggestion that has been made is

simply that in relation to the application with the

number that appears on the court list, if they are

asking any enquiries, Mr Calvert-Smith made the

following orders: "He excluded members of the public not

concerned in or with the proceedings," and it seems to

us to put off any further enquiry, reference would have

to be made to section 752 (a), because otherwise

ordinarily it follows: "Well, what was the jurisdiction?

Was the Court sitting *in camera*?  We were not given

notice," and then adding, "He prohibited the publication

of any matter relating to those proceedings."

MR JUSTICE CALVERT-SMITH:  You probability ought to put the

word "directly" to comply with subsection 4 (d).

MR WHITTAM:  My Lord, certainly.  If I may enquire whether

my Lord thinks there should be reference to the Act?

MR JUSTICE CALVERT-SMITH:  I was hoping we could get away

without it because it is a bit of a risk area, is it

not?

MR WHITTAM:  Those that will be giving the answers will be

happier not to refer to the Act and they can deal with

13

A

the fact that it was a lawful order without having to

refer -- and there is no need to give a notice period.

B    MR JUSTICE CALVERT-SMITH:  I would exclude reference to the

Act.

MR WHITTAM:  My Lord, we will so do.

MR JUSTICE CALVERT-SMITH:  And that will have the potential

C    effect of putting the order itself at risk, it seems to

me.

MR WHITTAM:  Any further information adds to it.

MR JUSTICE CALVERT-SMITH:  Very well.  Thank you.

D    Of course, before we get onto the subject matter,

there will have to be a record as there is being kept

which will obviously have to be stored very safely and

E    we will have to decide, perhaps, at the end of the

hearing, what, in due course when the "until further

order" moment arrives, will be released.

MR WHITTAM:  Perhaps it is convenient to deal with that at

F    this stage in the sense that arrangements have been made

in accordance with the judges in Blackburn for there to

be a transcript of these proceedings prepared very

shortly after them, and when I come to deal with the

G    facts, bearing in mind my Lord was not the original

sentencing judge, for good reason --

MR JUSTICE CALVERT-SMITH:  Quite.

MR WHITTAM:  -- rather than perhaps open them, my Lord has

H

14

A

       the transcript of precisely how it was opened previously

       to Mr Justice Fulford.

B

MR JUSTICE CALVERT-SMITH:  Which I have read.

MR WHITTAM:  And the transcript of his sentencing remarks.

MR JUSTICE CALVERT-SMITH:  Both of which I have read.

MR WHITTAM:  And it would be convenient and easy to

C

       facilitate the storage of those two documents with the

       transcript of today and then when today's transcript is

       published, those two are appended to it.

MR JUSTICE CALVERT-SMITH:  Miss Forshaw, are you content

D

       that I, as it were, take as read the transcript of

       Mr Horwell, I think it was, opening at the trial and the

       sentencing remarks of Mr Justice Fulford.

E

MISS FORSHAW:  Perfectly happy; it seems very sensible.

MR JUSTICE CALVERT-SMITH:  It seems a sensible course, as

       well as saving a good deal of time.

MR WHITTAM:  My Lord, in those circumstances -- and I am in

F

       the Court's hands -- if I introduce the nature of the

       application and how it has come about -- my Lord has the

       note that I prepared -- and very shortly summarise what

       has occurred both previously and since.

G

MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  I was going to deal with the motivation of the

       defendant as set out very shortly in Mr McAulay's report

       and then deal with any other matter that concerns

H

*Merrill Legal Solutions, 101 Finsbury Pavement, London EC2A 1ER*
*Tel: 020 7422 6130        Fax 020 7831 8838*
*www.merrillcorp.com*

A

my Lord, if my Lord is content with that procedure.

B
This defendant pleaded guilty to a single count of

conspiracy to destroy, damage or endanger the safety of

an aircraft contrary to section 1 of the

Criminal Law Act 1977 on 28 February 2005.

MR JUSTICE CALVERT-SMITH:  Yes.

C
MR WHITTAM:  He was sentenced on 22 April 2005 to 13 years'

imprisonment.  The judge on that occasion was

Mr Justice Fulford, sitting at the

D
Central Criminal Court.  That sentence has been referred

back to this court by a specified prosecutor, the head

of the counter-terrorism provision, being a person so

designated by the director of public prosecutions under

E
the Serious Organised Crime and Police Act of 2005.  I

will, if I may, just refer to that as "the Act" at any

future point.

MR JUSTICE CALVERT-SMITH:  Quite.

F
MR WHITTAM:  The specified prosecutors referred the sentence

back to this court because the defendant received

a sentence that was not discounted in the strict sense

of the Act as under section 74, subsection 10, although

G
he did receive a sentence that was reduced and my Lord

knows that material was made available to

Mr Justice Fulford.

H
My Lord, Miss Forshaw knows, and I should indicate

16

A

to my Lord, that Mr Justice Fulford made a number of

efforts to see what mechanism could be used so as to not

B   make it obvious that the sentence that was being passed

was largely below that which would ordinarily be passed.

MR JUSTICE CALVERT-SMITH:  When did the Act come into force,

in fact?  I meant to look it up but I did not.

C   MR WHITTAM:  My Lord, I am confident --

MR JUSTICE CALVERT-SMITH:  It must have been going through

Parliament at the time.

MR WHITTAM:  It was going through Parliament and there was

D   a debate about what sort of mechanism could be deployed;

it was not in force at this time.

MR JUSTICE CALVERT-SMITH:  I gather that from the sentencing

remarks.  Just out of interest to know quite what stage

E   the legislation had reached --

MR WHITTAM:  Certainly before the end of the proceedings, I

will be able to tell my Lord.  I am sorry; I did not

F   have that at my finger tips.

MR JUSTICE CALVERT-SMITH:  No, no.

MR WHITTAM:  My Lord, I have already indicated that now

Mr Justice Fulford is a judge at the

G   International Criminal Court.  He is not available and

the Court has considered whether, if possible, he could

have dealt with it and he is not, which is why my Lord

is dealing with it.

H

17

A

B

MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  And I perhaps do not need to go through the procedure as set out by the Court of Appeal in the case of Blackburn; I know my Lord will be familiar with that authority and the levels of discount appropriate in the cases.

C

My Lord, I can indicate that there have been a number of cases listed.  I am told that the Serious Organised Crime and Police Act came into

D

force on 1 April 2006; I am grateful to Miss Forshaw for that.

MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  Those instructing me have liaised in relation to matters that were heard by the Lord Chief Justice on

E

Wednesday and, in fact, Thursday.

MR JUSTICE CALVERT-SMITH:  I have a transcript -- albeit a draft transcript -- of Wednesday, but I have not got

F

Thursday which my spies tell me may have a bearing on this application.

MR WHITTAM:  My Lord, if it assists, I was provided late yesterday with a note from a lawyer who detained it

G

that said -- and I think that is in the case of Bevan; does that assist my Lord?

MR JUSTICE CALVERT-SMITH:  It does.

H

MR WHITTAM:  Leave to appeal sentence was refused and at the

18

start of the hearing, the Lord Chief Justice explained

to counsel in today's case that his judgment in his

appeals yesterday, he did not think they said anything

different than in the case of R v P and the

R v Blackburn.

MR JUSTICE CALVERT-SMITH:  The problem that will have to be

highlighted, that probably we are going to have to

discuss this morning, is the danger of -- not suggesting

it is this case at all; in fact quite the contrary --

but the danger of a defendant drip-feeding the system

with information and coming back every so often and

saying, "Can I have a bit more off my sentence, please?"

And I believe, in argument, the hypothetical possibility

that he might actually end up in credit at the end of

that progress against the next sentence he got.

Clearly, I think the Lord Chief Justice -- what I

have heard, although, as I say, I have not seen

a transcript -- was anxious to point out to the

appellant's counsel and the applicant's counsel in that

case that he would not necessarily get the full

discount, particularly if there was at least

a possibility that further information might come to

hand which is, of course, this case, so it does seem to

me that it is a matter that --

MR WHITTAM:  There is plainly a relevance as to, putting it

19

bluntly, double accounting.

MR JUSTICE CALVERT-SMITH:  Exactly.  Well, thank you for
that.  Your information coincides with mine.  As I say,
I have a transcript of the previous case which, in fact,
does not impinge, really, on our facts at all.

MR WHITTAM:  I do not -- unless my Lord thinks it
appropriate -- need to deal with the precise detail of
the content of the contract signed under this Act.

MR JUSTICE CALVERT-SMITH:  No, I have read that and
understood it.

MR WHITTAM:  And the content of Mr McAulay's report as to
the quantity of contact.

MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  Save, perhaps, as just to indicate -- and
I raise this with Miss Forshaw and I raise it in case
my Lord has any objection -- it would seem to us
appropriate simply just to mention the motivation that
the defendant has had, because that seems to us to be
relevant and that is set out in Mr McAulay's report,
tab 2.  It is simply paragraphs 38 to 41.

MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  And that as my Lord has indicated that, of
course, there was from this defendant previous
assistance before his first sentence and, therefore,
although the level of cooperation has have been variable

20

over time, the current level of cooperation is high and the defendant's main motivation is to prove that he has renounced terrorism not purely through words but by actions and he sees himself and others like him as victims manipulated and exploited by the likes of Osama Bin Laden and Khalid Sheikh Mohammed, and that he has firm beliefs that Al-Qaeda has hijacked Islam, misinterpreted the religious creeds for his own ends and thereby manipulated and pressured many Muslims into terrorist-related activities.

My Lord, I could continue --

MR JUSTICE CALVERT-SMITH:  Clearly, some support for what you have read is given by the fact that he has entered into this contract knowing that there is an outstanding indictment against him in the States.

MR WHITTAM:  Purely for quantity and relating only to that which he has given since his sentence, he was, as the phrase is used, interviewed 55 times in scoping interviews; that was some almost 45 hours of interviews. He was assessed of being of potential use in between 12 and 18 future trials and the evidential debrief was some 112 interviews over some 26 days.

MR JUSTICE CALVERT-SMITH:  Yes.  He clearly, because of his particular mental abilities, has the ability to be of enormous assistance.

21

A

MR WHITTAM:  He is assessed as being highly intelligent and

  having a particularly good recall of --

B

MR JUSTICE CALVERT-SMITH:  So I see.

MR WHITTAM:  -- relevant detail.

MR JUSTICE CALVERT-SMITH:  So far it has checked out?

MR WHITTAM:  Yes, it has.

C

MR JUSTICE CALVERT-SMITH:  Right.

MR WHITTAM:  In essence, the matter for my Lord to determine

  is the additional discount, if any, that would be

  appropriate.

D

MR JUSTICE CALVERT-SMITH:  Perhaps I could explore with you

  to what extent on the authority of Blackburn, which is

  really the only authority on numbers, so to speak, to

  the extent to which the Court's hands are tied.  If we

E

  go straight away to the transcript of

  Mr Justice Fulford's sentencing remarks at page 7, at F

  and onwards.

F

MR WHITTAM:  Yes.

MR JUSTICE CALVERT-SMITH:  He now refers to what should read

  "Mars Jones J" -- since I was junior counsel for the

  Crown in the case I can remember it -- and the sentence

G

  of Nezar Hindawi.

  Stopping there for a moment, my recollection of the

  sentencing regime in 1986 was that Hindawi would have

  served -- and therefore is possibly still serving; I do

H

22

*Merrill Legal Solutions, 101 Finsbury Pavement, London EC2A 1ER*
*Tel: 020 7422 6130  Fax 020 7831 8838*
*www.merrillcorp.com*

A

be a sentence of 60 years in Hindawi, as it were.

MR WHITTAM:  Precisely.

B

MR JUSTICE CALVERT-SMITH:  Assuming parole was granted.  And
then he (inaudible) the alternative of an indeterminate
sentence accompanied by a substantial tariff which would
of course be the time actually served and then released

C

following that tariff period, so that in
Mr Justice Fulford's remarks -- and, of course, I am
trying to get what was going through his mind --

D

MR WHITTAM:  Of course.

MR JUSTICE CALVERT-SMITH:  He was thinking of an actual time
to be served of 25 years minimum --

MR WHITTAM:  Yes.

E

MR JUSTICE CALVERT-SMITH:  -- following a trial.  With that
in mind, he then passed a sentence which was just over
a quarter of the determinate sentence of 50 years and
half the actual.

F

MR WHITTAM:  Yes.

MR JUSTICE CALVERT-SMITH:  And the Lord Chief Justice's
remarks in Blackburn suggest that three quarters is --
absent exceptional circumstances -- the most discount

G

that should be afforded in cases of this kind, so that
on those figures as set out by Mr Justice Fulford, he
has just about had the maximum discount, less 6 months,

H

in fact.

24

A

    not know -- 30 years.

  MR WHITTAM:  As I understand it, my Lord, that is right.

B

  MR JUSTICE CALVERT-SMITH:  The ability to apply for parole

    under the next sentencing regime at half time had not

    come in.

  MR WHITTAM:  As I understand it, not at the time of that

C

    sentence.

  MR JUSTICE CALVERT-SMITH:  Because in the end, we are

    looking at actual time to be served, it seems to me,

    though they might have to compare different sentencing

D

    regimes over a different period, Mr Justice Fulford then

    went on to say that the Court of Appeal rejected

    Hindawi's appeal and went on to indicate that

    a determinate sentence of 50 years or more would be

E

    appropriate in this defendant's case following a trial

    and now at the time Mr Justice Fulford said that

    in April 2005, my understanding was that the ability to

F

    apply for parole was in, or was it?

  MR WHITTAM:  When Mr Justice Fulford passed sentence he

    would have been able to apply for parole after one half.

  MR JUSTICE CALVERT-SMITH:  After 25 years of a 50-year

G

    sentence.

  MR WHITTAM:  And the Secretary of State --

  MR JUSTICE CALVERT-SMITH:  So actually, in order to achieve

H

    the actual time served -- even to equal it -- it would

23

MR WHITTAM:  Yes.

MR JUSTICE CALVERT-SMITH:  However, far be it for me to say
Mr Justice Fulford fell into error, but I do think
actually 60 years was the figure which would have
acquainted with the Hindawi sentence and if he was, as
he was rightly doing saying that in these turbulent
times sentencing levels actually should increase and, of
course, since then they have increased substantially, he
might have said something more like 70 years or even 80,
bearing in mind that Mr Barot, whose name features
somewhere in these papers I noticed, received a minimum
term of 40 years on a life sentence, I think.

MR WHITTAM:  Yes, he did.

MR JUSTICE CALVERT-SMITH:  It was reduced, but he pleaded
guilty.

MR WHITTAM:  Yes.

MR JUSTICE CALVERT-SMITH:  And sentences on the London
bombers were 40.

MR WHITTAM:  I can check; 40.

MR JUSTICE CALVERT-SMITH:  Because I am currently trying
a case as you well know, Mr Whittam, and
Mr Justice Henriques sentenced the principal defendant
in the airline case to a minimum of 40 years, which is
equivalent to 80, so I think I may be entitled to say
that even though it looks as though Mr Justice Fulford

25

A

was attempting to give this person the maximum discount,

absent exceptional circumstances, he perhaps did not.

B      If the mathematics had been done differently and, of

course, we are now measuring against a higher sentencing

tariff as a result of 21/7, the Barot case and the

airline bombers.

C    MR WHITTAM:  Yes.

MR JUSTICE CALVERT-SMITH:  Does that accord?

MR WHITTAM:  My Lord, it does.  There has plainly been an

increase and the Court of Appeal has made it plain why

D      and in that context the original case would have to be

seen in the light of its timing, less than three months

after -- if I can call it -- 9/11 had occurred.

E    MR JUSTICE CALVERT-SMITH:  True.

MR WHITTAM:  And therefore the timing of the effect at that

time, had this defendant and another succeeded in what

they were seeking to do, the combined effects would have

F      justified in putting it within the new regime, if I can

put it in those terms.

MR JUSTICE CALVERT-SMITH:  It is a similar case that is

currently before Woolwich Crown Court, albeit the

G      consequences of that may have been even more so.

That is very helpful.  Perhaps I could come back to

you.

MR WHITTAM:  Unless there is anything else I can assist you

H

26

with.

MR JUSTICE CALVERT-SMITH:  Thank you very much.

Miss Forshaw, you have been listening to what has being going through my mind --

MISS FORSHAW:  Carefully.

MR JUSTICE CALVERT-SMITH:  -- and have you any submissions to make as to any further discount on the substantial discount?

MISS FORSHAW:  No.

MR JUSTICE CALVERT-SMITH:  It is clear Mr Justice Fulford --

MISS FORSHAW:  My Lord, I could repeat, I suppose, word for word what my Lord has just said, but there is no point -- I will put it less elegantly -- and, of course, I agree with that reasoning and it must be right.

MR JUSTICE CALVERT-SMITH:  Yes.  I think so and it would give the Court some --

MISS FORSHAW:  Some leeway.

MR JUSTICE CALVERT-SMITH:  -- elbow room, as it were.  Yes.

Mr Whittam, is there anything so far as -- and bearing in mind you are well instructed today -- practical arrangements are concerned?  Just suppose, so far as the prison service was concerned, he would be free to apply for parole very soon -- as it were, today. Clearly it would have to go to the Parole Board.

MR WHITTAM:  If it is parole, it would have to be dealt with

27

A

as an application.

B MR JUSTICE CALVERT-SMITH:  Yes, and that would be an

expedited one.

MR WHITTAM:  I assume it could be expedited and I see that

the person who has been dealing with the --

C MR JUSTICE CALVERT-SMITH:  Are you able to tell me or can

you take instructions as to which category prisoner he

currently is?

MR WHITTAM:  I can answer that easily: he is currently A

D because of the nature.

MR JUSTICE CALVERT-SMITH:  That might be difficult for

parole.

MR WHITTAM:  May I take some direct instruction?

E MR JUSTICE CALVERT-SMITH:  Yes.

MR WHITTAM:  I am very grateful.  I have asked Mr

(inaudible) to stay close by in case my Lord has any

questions.

F MR JUSTICE CALVERT-SMITH:  Yes please.

MR WHITTAM:  The position is his category has only remained

because of the process that he has been going through

and once it is resolved at this court, that matter can

G be changed very swiftly.

MR JUSTICE CALVERT-SMITH:  Yes.  I know from sitting in

another jurisdiction that it is very difficult for

H prisoners who have not been re-categorised down to C to

28

A

get parole.

MR WHITTAM:  That is the reason the categorisation has

B
remained.

Secondly, if there was -- and we would have to

consider the mathematics of it -- such a sentence passed

that allowed him to be released or the

C
Secretary of State would be obliged to release him but

on licence, if he fell in that period between --

MR JUSTICE CALVERT-SMITH:  That would be a very substantial

reduction.

D
MR WHITTAM:  That could be faxed through, but equally, in

relation to an application of parole, the probation

service at the appropriate level are aware and I am told

E
that that can be substantially expedited and therefore

there is the machinery available to alter his

categorisation and to expedite any application for

parole and I think to allow that to be considered, as I

F
understand it, certainly in a matter of a very few

weeks, if not shorter.

MR JUSTICE CALVERT-SMITH:  Yes.  One cannot forget Blackburn

-- (inaudible) the court not to forget -- that this is

G
a very, very serious criminal offence here despite the

fact that there has been a very welcome change of heart

and the positive contribution thus far made by this

H
defendant to the administration of justice in the

29

A

United States.

Very well, are there any other matters that either

B
of you wish to raise?

MR WHITTAM:  May I just check?  No thank you, my Lord.

Unless there are any specific questions, there is

nothing we seek to add.

C
MR JUSTICE CALVERT-SMITH:  I will rise for a few moments.

**(A short adjournment)**

MR JUSTICE CALVERT-SMITH:  In the latter months of 2001,

D
this defendant lent himself to a conspiracy to detonate

shoe bombs on an aircraft bound for the United States.

A co-conspirator of his actually boarded such an

aircraft and attempted to detonate a bomb.  This

E
defendant, however, who, from his basis of plea,

indicated that he had been having second thoughts for

some time, eventually, a very few days before he was due

to carry out his part of the conspiracy, indicated by

F
email to those who were directing his movements, that he

was not prepared now to go through with it.

The result was that he did not board an aeroplane

and in fact stored the explosives and the detonator with

G
which he had been supplied to commit the offence at his

home, while destroying the shoes which had been adapted

for the purpose of getting on board an aeroplane

H
undetected.  That remained the position for very nearly

30

A

two years, during which time he disassociated himself

completely from those who were minded to carry out acts

B

of terrorism and attended a religious college in

Lancashire.

In November of 2003, he was arrested and immediately

confessed to his part in the conspiracy of 2001 and

C

indicated, before the police commenced their search of

his home and later the college at which he was studying,

where they would find the articles to which I have

referred.  In due course, he pleaded guilty to

D

conspiracy to endanger the safety of an aircraft and

came before Mr Justice Fulford for sentence.  Between

plea and sentence, he gave a good deal of assistance to

E

the prosecution authorities in this country.  However,

the report which I have been shown and was before the

sentencing judge on that occasion indicated that his

cooperation, although extensive, had clearly not been

F

full and there were a number of areas in which he was

clearly holding things back.

However, perfectly properly, the nature of the

information he had given, and the importance of it to

G

the investigation of terrorism in this country, was put

before Mr Justice Fulford, who had the difficult job of

reconciling the gravity of the offence to which he

pleaded guilty with the subsequent change of heart and

H

31

A

positive assistance that had been given.

B
On 22 April 2005, he passed a sentence of 13 years' imprisonment indicating that had this been the case in which the defendant had pleaded not guilty and been convicted, either a determinate sentence of 50 years or upwards or an indeterminate sentence accompanied by

C
a substantial tariff period to reflect such

a determinate sentence would have been passed.  He said that the matters that had been put before him, together with the undoubted facts of the plea of guilty and the

D
two-year period during which he had led a blameless life enabled him to reduce the sentence to a sentence of 13 years.

E
Since then, and in particular this year, I have been provided with material which indicates that the reticence or limit to cooperation provided by this defendant has disappeared and that he has, as it were,

F
cleared the slate so far as his own involvement is concerned, but more importantly for the purposes of these proceedings, has also given information which suggests he would be able to -- and he has expressed

G
a willingness to -- give evidence against some very, very serious offenders currently in the United States.

Accordingly, the new provisions of the

H
Serious Organised Crime and Police Act of 2005 have come

32

in to force on 1 April 2006 and an agreement has been reached which he has signed with a specified prosecutor and the specified prosecutor has now referred the sentence back to this court.

Mr Justice Fulford, who would normally have reconsidered the sentence, as I am doing, is presently a judge in the International Criminal Court and therefore unable to sit in his domestic jurisdiction. I have read documents -- which I accept -- which first, together with submissions made by counsel, have caused me to make an order that there be no publication of the fact of this hearing until further order and have caused me to reconsider and adjust the sentence passed to reflect the assistance given and the contract signed by this accused.

The problem has been in computing the extent of any further discount. Although it is not possible to ascertain exactly the way in which Mr Justice Fulford reached the term of 13 years, it seems fairly clear that he was in fact discounting almost three quarters of the sentence that he was considering.

I have been supplied with the judgment of the president, as he then was, Sir Igor Judge in the case of **R v P and R v Derek Blackburn, 2008, 2 Cr.App.R (S) 5.** In that case, the president gave general guidance going

33

A

B beyond the facts of the instant cases before him as to the extent of discount which should be accorded to defendants under the new regime and he indicated that absent exceptional circumstances, the maximum discount available under these provisions should be three

C quarters of the total sentence and that the normal discount should be in the order of one half and two thirds of the sentence which would otherwise have been passed.

D As I have said, it is to difficult to compute exactly the sentence which was in Mr Justice Fulford's mind, bearing in mind that there would have had to have been the discount for plea and other, no doubt, material

E of mitigating circumstances which would have had to have been taken into account.

On the basis that I have outlined of a 50 plus year determinate term of a plea of not guilty or a similar

F tariff period, together with a life sentence or a sentence of imprisonment for public protection and bearing in mind, as I do, that the tariff sentence for this type of offence is, in fact, now much higher than

G even the figures given by Mr Justice Fulford then, I have been somewhat constrained, it seems to me, in the extent of the further discount I am able to afford this

H defendant.

34

*Merrill Legal Solutions, 101 Finsbury Pavement, London EC2A 1ER*
*Tel: 020 7422 6130       Fax 020 7831 8838*
*www.merrillcorp.com*

His earliest current parole eligibility date
is May 2010 and he is only eligible for automatic
release because of the sentencing regime under which
this sentence was passed in July 2012 with a licence
period extending to August of 2013.  I have made
enquiries as such are possible and proper as to the
parole situation and have been informed that it would be
possible for him to be re-categorised in reasonably
short order.

It seems to me that when, as will undoubtedly be the
case one day, the public in this country reads the
sentence which was eventually passed upon this man, no
doubt together with reading of the assistance that he
may then have given to the authorities in the United
States, they would be appalled if a sentence which was
less than the one that I am about to pass had been
passed, in spite of the cooperation since.  I know --
and it is to his credit -- the defendant has never, in
all the marathon interviews to which he has taken part
to generate the possibility of his giving evidence in
these cases in the United States, sought a reduction
himself in his sentence, albeit, of course, he has
understood that it may well be a by-product of his
cooperation which is due, as Mr Whittam stressed this
morning and is accepted by the authorities, to

35

A

a complete change of heart and a desire to expose those who would use one of the world's great religions to

B

commit very serious crimes.

The upshot of the process through which I have gone in attempting to achieve a just answer which would not go against the commonly understood notions of justice in

C

this country is that I am prepared to reduce the sentence to one of 11 years' imprisonment from the current sentence of 13 years.  That, I understand, will allow for the defendant to apply for parole from today.

D

MR WHITTAM:  My Lord, can I just deal with some practical matters, if I may.  In relation to the reporting restriction, would my Lord allow the officer who has been dealing with this defendant to communicate to the

E

Parole Board that my Lord had passed such a sentence as it was your understanding.

MR JUSTICE CALVERT-SMITH:  Yes.

F

MR WHITTAM:  It would allow him to be re-categorised and therefore allow him to apply for parole, because that might assist the process.

MR JUSTICE CALVERT-SMITH:  Yes and I would also licence,

G

unless you had any objection, either of you, to that person to inform the Parole Board that the matters which have caused the reduction in sentence are of such moment that if the case could be brought forward, it should be.

H

36

A

MR WHITTAM:  My Lord, I am most grateful for that and that

will assist there enormously.

B

MR JUSTICE CALVERT-SMITH:  I know there is a huge backlog of

work for the Parole Board but clearly, albeit you told

me the proceedings are unlikely to come into being until

some time next year, preparation will need to be made

C

well before then.

MR WHITTAM:  Precisely, my Lord.

As far as the --

D

MR JUSTICE CALVERT-SMITH:  I would hesitate about anything

further than that and I would quite like to see, if you

do not mind, to make sure the order is not inadvertently

breached and somehow creeps out.  If you could let me

E

have it.

MR WHITTAM:  If I may liaise with my Lord's clerk.  If we

draft a short paragraph and it will be confined to that.

MR JUSTICE CALVERT-SMITH:  Certainly including my

F

encouragement to the Parole Board on the information I

have received to expedite a hearing, if that is

possible.

MR WHITTAM:  My Lord, thank you.

G

So far as the transcript of the proceedings are

concerned, I am instructed that it would assist if

my Lord was to direct a transcript be available within

seven days.  It will assist its production.

H

37

MR JUSTICE CALVERT-SMITH:  Is that practical?  I will make

　　　that order.

MR WHITTAM:  So far as the list of personnel present in

　　　court, does my Lord wish to see it?

MR JUSTICE CALVERT-SMITH:  No, thank you.  I can trust you,

　　　Mr Whittam and Miss (inaudible) sits behind you.  Nobody

　　　came in who should not have.  Providing it is held --

MR WHITTAM:  We have it and their designations.

　　　　　As far as the documents are concerned, does my Lord

　　　want to retain my Lord's bundle.  Should we keep all

　　　those and the originals again --

MR JUSTICE CALVERT-SMITH:  Every single document you have

　　　provided me with is in this file.

MR WHITTAM:  That will be retained by the specified

　　　prosecution.  Unless there are any other matters that I

　　　can assist my Lord with.

MR JUSTICE CALVERT-SMITH:  Thank you very much, Mr Whittam.

　　　Miss Forshaw.

MISS FORSHAW:  My Lord.

MR JUSTICE CALVERT-SMITH:  You will no doubt explain to your

　　　client what has gone on.  It may have been confusing at

　　　times.  The position is that he will be in a position to

　　　apply for parole very, very shortly.

MISS FORSHAW:  My Lord, there is one matter I am instructed

　　　to raise with my Lord as a result of something which has

38

A

been routed by email communication with your Lordship's

clerk.  It is just this: the industry of my instructing

B
solicitor in this case is so far not remunerated at all.

MR JUSTICE CALVERT-SMITH:  I had not been made aware of

that.

MISS FORSHAW:  I was simply asked, I think --

C
MR JUSTICE CALVERT-SMITH:  Is there no provision for -- no,

I suppose the legal services would not even be told the

identity of the accused.

MISS FORSHAW:  As a matter of fact there was a legal aid

D
order made in relation to Imran Khan, who initially

represented this defendant.  It was under the VHCC

regime, as I understand it.  When my instructing

solicitor --

E
MR JUSTICE CALVERT-SMITH:  Let us cut through this.  What

are my powers?  If I can order a proper legal aid

certificate for the purposes of the preparation of and

F
the conduct of this hearing, I will.

MISS FORSHAW:  I am told all my Lord has to say is that

a legal aid order ought to be made in this case.

MR JUSTICE CALVERT-SMITH:  I will say that then, if that is

G
sufficient to your purposes.

MISS FORSHAW:  I am told it is.

MR JUSTICE CALVERT-SMITH:  And I am grateful to the two of

you for the obvious care which you have dealt with these

H

39

A

proceedings.

MISS FORSHAW:  I am grateful and that legal aid order should

B

cover preparation.

MR JUSTICE CALVERT-SMITH:  Preparation and today's hearing.

MISS FORSHAW:  And would my Lord say continue if

representation is considered in his best interests

C

during briefing procedures which I understand are going

to be taking place not only with the United States but

with our own --

MR JUSTICE CALVERT-SMITH:  That sounds to me, Miss Forshaw,

D

without chapter and verse, as being something that is

beyond the remit of a judge to order.  That sounds more

like duty solicitor --

MISS FORSHAW:  I am not entirely sure how that regime is

E

ever authorised but I thought if I did not ask I would

not get --

MR JUSTICE CALVERT-SMITH:  I will make my own enquiries

F

about that and if I can so order then I will because

clearly there is more work to be done and I would not

want your instructing solicitor to have to do it

*pro bono*.

G

MISS FORSHAW:  Yes.

MR JUSTICE CALVERT-SMITH:  But I am not sure of my powers in

that regard.

MISS FORSHAW:  I suspect he would any way; I was just trying

H

40

A

to be rather protective of him, my Lord.  In any event,

to cover today and preparations for today and if there

B
is any route through which he can --

MR JUSTICE CALVERT-SMITH:  Continue to represent?

MISS FORSHAW:  -- be properly remunerated for any assistance

I know he proposes to give him in future.

C
MR JUSTICE CALVERT-SMITH:  I do not how this is going to be

handled with the Parole Board, but they will have to

know who he is or somebody at the Parole Board will have

to know who he is and consider an application.  I think

D
he has behaved himself in the sort of way that would

give confidence to the Parole Board to release him early

and I am quite sure that persons who are making that

sort of application can apply for and get legal

E
assistance.  Am I wrong?

MR WHITTAM:  As far as I am aware they are, but I am afraid

I am not privy.

F
MR JUSTICE CALVERT-SMITH:  Those who sit behind you; you

have somebody who may know more than you do.

MR WHITTAM:  I am afraid not in the detail that my Lord

would require.

G
MR JUSTICE CALVERT-SMITH:  No.

MR WHITTAM:  If we can be of any assistance --

MR JUSTICE CALVERT-SMITH:  Those people who have appeared in

the constant extreme in the last few years before the

H

41

A

Administrative Court, complaining that their cases have

not been reached or that they are still category A and

B

have not been re-categorised, they all seem to have

legal aid, so I do not think there should be a problem

with that.  If it was concerning that application, I

think that would require a fresh -- the question is

C

further debriefs.

MISS FORSHAW:  And what happens to him if he, for example,

is to go to the United States and when he is represented

not just in this country pending that date but, my Lord,

D

the problem has been -- and I am sorry because it seems

rather undignified to raise it before my Lord --

MR JUSTICE CALVERT-SMITH:  I understand.

MISS FORSHAW:  -- but the problem is because it is so

E

confidential one cannot even ask around about others who

might have been in a similar position, nor can we reveal

our position to the legal aid board.

F

MR JUSTICE CALVERT-SMITH:  You cannot.  I might be able to,

as a general enquiry.

MISS FORSHAW:  Thank you.  That is really what I was asking

rather impertinently.

G

MR JUSTICE CALVERT-SMITH:  Very well.  Thank you.


**End of transcript required**

H

42

A

B

C

D

E

F

G

H

43

A

We hereby certify that the above is an accurate and complete record of the proceedings or part thereof.

B

.................................................

Signed on behalf of WordWave International Limited.

C

D

E

F

G

H

44

Exhibit D



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 26, 2013

**By Electronic Mail**

Stanley L. Cohen, Esq.
The Law Firm of Stanley Cohen
  & Associates, LLC
119 Avenue D, Fifth Floor
New York, New York 10009

Re:   **United States v. Abu Ghayth**
         **S14 98 Cr. 1023 (LAK)**

Dear Mr. Cohen:

The Government provides the following information in response to your request of December 21, 2013 regarding the agreement governing cooperation between the British government and the witness who is the subject of the Government's December 20, 2013 Motion to take testimony via closed-circuit television or, alternatively, via Rule 15 of the Federal Rules of Criminal Procedure (referred to herein as the "Witness" and "Agreement," respectively). The Government is not in possession of the Agreement. But, in the context of a 2012 trial in this Circuit in which the Witness testified by video pursuant to Rule 15, U.S. prosecutors were provided an opportunity to review the Agreement in order to communicate its terms to counsel in that trial; those terms are set forth herein.

The Agreement is dated August 5, 2009, and is entitled "Written Agreement with Assisting Defendant Pursuant to Section 74(2)(b) Serious Organised Crime and Police Act 2005." (We have attached a copy of Section 74 of the Serious Organised Crime and Police Act 2005 ("SOCPA") hereto.)

The Agreement states that the Witness has previously assisted the British authorities by providing information relating to counterterrorism investigations, but that it is not anticipated that he will be required to give testimony relating to those investigations.

The Agreement further states that the Witness has also previously assisted by providing information in relation to investigations being conducted by United States law enforcement authorities. Specifically, the Agreement references potential investigatory targets described in or about 2009 by the Witness in interviews with United States law enforcement. The Agreement indicates that it is anticipated that the Witness would be useful as a witness in such United States

Stanley L. Cohen, Esq.
December 26, 2013
Page 2 of 3

prosecutions, including potential prosecutions involving al Qaeda leaders and operators who
have committed crimes against the United States, and that the Witness has agreed to provide
testimony in such cases if required to do so.

The Agreement further indicates that:

o   By agreeing to cooperate, the Witness understands that he may be subject to
    personal harm;

o   The Witness agrees to continue to assist British and United States authorities in
    relation to investigations involving terrorism offenses;

o   The Witness will not commit any additional crimes;

o   The Witness will provide authorities with all facts, statements, documents,
    evidence or any other item or information available to him relating to such
    investigations;

o   The Witness agrees that the information he previously provided is, and the
    information he will provide in the future will be, an accurate and honest account
    of the full extent of his knowledge and belief;

o   The Witness agrees to continuous and complete cooperation throughout the
    investigation of any such offense until the court proceedings, if any, arising as a
    result of such investigations are complete;

o   The Witness agrees that his cooperation includes, but is not limited to, voluntarily
    and without prompting providing the authorities with all information that becomes
    known or available to him relating to such offenses in addition to any information
    already provided, and providing promptly, and without further legal compulsion,
    all information available to him, wherever located, requested by the authorities in
    relation to such offenses, to the extent it has not already been provided; and

o   Full details of the assistance provided by the Witness under the terms of the
    agreement will be provided to the British court in accordance with the provisions
    of Section 74 of the SOCPA, as well as to the Witness's attorneys and to the
    Witness.

Stanley L. Cohen, Esq.
December 26, 2013
Page 3 of 3

  o Failure to comply with the terms of the agreement may result in any reduction of the Witness's sentence being referred to the court for additional review pursuant to Section 74(2)(a) of the SOCPA.

     Very truly yours,

     PREET BHARARA
     United States Attorney


  By:   /s/
     John P. Cronan
     Nicholas Lewin
     Michael Ferrara
     Assistant United States Attorneys
     (212) 637-2779/2337 /2526


Enclosure

Exhibit E

# United States District Court
## District of Massachusetts (Boston)
### CRIMINAL DOCKET FOR CASE #: 1:04-cr-10223-GAO-1

Case title: USA v. Badat                                      Date Filed: 07/28/2004

Assigned to: Judge George A. OToole, Jr
Referred to: Magistrate Judge Timothy S. HillmanMJ

**Defendant (1)**

**Saajid Mohammed Badat**

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:32(a)(1) Conspiracy to Destroy an Aircraft<br>(1) | |
| 18:32(a)(1) and (7) Conspiracy to Destroy an Aircraft<br>(1s) | |
| 18:2332(b)(2) Conspiracy to Commit Homicide<br>(2) | |
| 18:2332(b)(2) Conspiracy to Commit Homicide<br>(2s) | |
| 18:2332(a)(1) Attempted use of Weapon of Mass<br>Destruction<br>(3) | |
| 18:2332a(a)(1) Attempted Use of Weapon of Mass<br>Destruction; 18:2 Aiding and Abetting<br>(3s) | |
| 49:46505(b)(3) and (c) Placing Explosive Device on<br>Aircraft<br>(4) | |
| 49:46505(b)(3) and (c) Placing Explosive Device on<br>Aircraft; 18:2 Aiding and Abetting<br>(4s) | |
| 49:46505 and 18:1113 Attempted Murder<br>(5) | |
| 49:46506(1) and 18:1113 Attempted Murder; 18:2<br>Aiding and Abetting<br>(5s) | |
| 18:32(a)(1) and (7) Attempted Destruction of Aircraft<br>(6) | |
| 18:32(a)(1) and (7) Attempted Destruction of<br>Aircraft; 18:2 Aiding and Abetting<br>(6s) | |
| 18:924(c) Carrying a Destructive Device During and<br>in RElation to a Crime of Violence<br>(7) | |
| 18:924(c) Carrying a Destructive Device During and<br>in Relation to a Crime of Violence; 18:2 Aiding and<br>Abetting<br>(7s) | |

CM/ECF - USDC Massachusetts - Version 6.1 as of 03/11/2013       https://ecf.mad.uscourts.gov/cgi-bin/DktRpt.pl?874194723550862-

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

USA                                              represented by   **Brian Leske**
                                                                 U.S. Attorney's Office
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Gerard T. Leone , Jr.**
                                                                 United States Attorney's Office
                                                                 John Joseph Moakley Federal Courthouse
                                                                 1 Courthouse Way
                                                                 Suite 9200
                                                                 Boston, MA 02210
                                                                 617-748-3234
                                                                 Fax: 617-748-3953
                                                                 *TERMINATED: 02/16/2006*
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Gregory T. Moffatt**
                                                                 The Raytheon Company
                                                                 Office of General Counsel
                                                                 50 Apple Hill Drive
                                                                 Mail Stop T3TQ1
                                                                 Tewksbury, MA 01876
                                                                 978-858-9411
                                                                 Fax: 978-858-9194
                                                                 Email: gregory_t_moffatt@raytheon.com
                                                                 *TERMINATED: 05/17/2007*
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Kimberly P. West**
                                                                 United States Attorney's Office
                                                                 John Joseph Moakley Federal Courthouse
                                                                 1 Courthouse Way
                                                                 Suite 9200
                                                                 Boston, MA 02210
                                                                 617-748-3176
                                                                 Fax: 617-748-3951
                                                                 Email: kimberly.west@usdoj.gov
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

Michael D. Ricciuti
K&L Gates LLP
One Lincoln Street
State Street Financial Center
Boston, MA 02111-2950
617-951-9094
Fax: 617-261-3175
Email: michael.ricciuti@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/28/2004 | 1 | SEALED INDICTMENT as to Saajid Mohammed Badat (1) count(s) 1, 2, 3, 4, 5, 6, 7. (Gawlik, Cathy) (Entered: 07/30/2004) |
| 07/28/2004 | 2 | MOTION to Seal as to Saajid Mohammed Badat by USA. (Gawlik, Cathy) (Entered: 07/30/2004) |
| 07/28/2004 | | Judge Charles B. Swartwood : ORDER entered granting 2 Motion to Seal as to Saajid Mohammed Badat (1) (Gawlik, Cathy) (Entered: 07/30/2004) |
| 07/30/2004 | | Judge George A. O'Toole Jr.: ORDER entered ORDER REFERRING CASE to Magistrate Judge Charles B. Swartwood Reason for referral: pretrial proceedings as to Saajid Mohammed Badat (Gawlik, Cathy) (Entered: 07/30/2004) |
| 09/01/2004 | | Judge Charles B. Swartwood : ENDORSED ORDER entered re: (3) Motion to Seal as to Saajid Mohammed Badat, "Allowed." cc/cl. (Shattuck, Deborah) (Entered: 09/02/2004) |
| 09/01/2004 | 4 | SEALED INDICTMENT as to Saajid Mohammed Badat (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s. (Shattuck, Deborah) Additional attachment(s) added on 9/2/2004 (Shattuck, Deborah). (Entered: 09/02/2004) |
| 09/02/2004 | | Judge George A. O'Toole Jr.: ELECTRONIC ORDER entered ORDER REFERRING CASE to Magistrate Judge Charles B. Swartwood Reason for referral: Pretrial as to Saajid Mohammed Badat (Shattuck, Deborah) (Entered: 09/02/2004) |
| 09/07/2004 | 5 | Judge George A. O'Toole Jr.: ORDER entered granting sealed letter as to Saajid Mohammed Badat (Smith3, Dianne) (Entered: 09/24/2004) |
| 09/08/2004 | | Judge George A. O'Toole Jr.: ORDER entered regarding copies of indictments as to Saajid Mohammed Badat (Diskes, Sheila) (Entered: 09/08/2004) |
| 09/08/2004 | | Arrest Warrant Issued as to Saajid Mohammed Badat. (Roland, Lisa) (Entered: 09/08/2004) |
| 09/28/2004 | 6 | SEALED MOTION as to Saajid Mohammed Badat by USA. (Roland, Lisa) (Entered: 09/28/2004) |
| 09/28/2004 | | Judge Charles B. Swartwood : Electronic ORDER entered granting [6 Sealed Motion as to Saajid Mohammed Badat (1). "ALLOWED." cc/cl (Roland, Lisa) (Entered: 09/28/2004) |
| 10/04/2004 | 7 | MOTION to Unseal Case as to Saajid Mohammed Badat by USA. (Roland, Lisa) (Entered: 10/05/2004) |
| 10/04/2004 | | Judge Charles B. Swartwood : Electronic ORDER entered granting 7 Motion to Unseal Case as to Saajid Mohammed Badat (1). "ALLOWED." (Roland, Lisa) (Entered: 10/05/2004) |
| 07/12/2005 | 8 | NOTICE OF ATTORNEY APPEARANCE Gregory T. Moffatt appearing for USA. *and Substitution of Counsel* (Moffatt, Gregory) (Entered: 07/12/2005) |
| 02/16/2006 | | Judge George A. O'Toole Jr.: Electronic ORDER entered finding as moot 3 Motion to Seal Document as to Saajid Mohammed Badat (1)This motion was previously dealt with by the Magistrate Judge. (Lyness, Paul) (Entered: 02/16/2006) |
| 02/21/2006 | 9 | Case as to Saajid Mohammed Badat Assigned to Judge Timothy S. Hillman. Judge Charles B. Swartwood no longer assigned to the case. (Hassett, Kathy) Additional attachment(s) added on 3/3/2006 (Hassett, Kathy). (Entered: 02/21/2006) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/29/2013 22:55:24 | | | |
| **PACER Login:** | se0531 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:04-cr-10223-GAO |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |