UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,


       -against-                          S14 98 Crim. 1023 (LAK)


SULAIMAN ABU GHAYTH,


           Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION


Appearances:

John P. Cronan
Michael Ferrara
Assistant United States Attorneys
Preet Bharara
UNITED STATES ATTORNEY

Stanley L. Cohen
STANLEY COHEN & ASSOCIATES, LLC

Geoffrey S. Stewart
Zoe Dolan
Ashraf Nubani

*Attorneys for Defendant Sulaiman Abu Ghayth*

LEWIS A. KAPLAN, *District Judge*.

The government seeks to introduce at trial against defendant Sulaiman Abu Ghayth ("Abu Ghayth") evidence of two out-of-court identifications made by a cooperating witness ("CW") and an anticipated in-court identification by the same witness. Abu Ghayth moves to suppress the out-of-court identification and preclude in-court identification or, in the alternative, for an evidentiary hearing under *United States v. Wade*.[1]

*Background*

The CW previously pled guilty to a terrorism offense, has been sentenced, and now is cooperating with the government.[2] He claims to have encountered Abu Ghayth at an al Qaeda guest house in Afghanistan in May 2001.[3] During a December 2003 interview with the FBI, the CW reported that he "recalled a speech given at the camp by a Kuwaiti Imam by the name of SOLEIMAN ABU GAITH. This speech also focused on the obligation to defend the Taliban and to pledge to MULLAH OMAR. When asked if the SOLEIMAN ABU GHAITH that visited the camp was the same individual identified in public media reports as an Al-Qaeda spokesperson, [the CW] stated that it appeared to be the same person. However, ABU GHAITH had a thicker beard at the time he visited the Al-Farooq Camp. [The CW] further noted that he did not know who ABU GHAITH really was until after he returned to the United States and saw his picture in media

---

[1]  388 U.S. 218 (1967).

[2]  Cronan Decl. [DI 1314] ¶ 2.

[3]  *Id.*

reporting on Al-Qaeda."[4]

Approximately eight years later, in March of 2012, the CW provided a similar account to the FBI.  In the context of a broader discussion about his time in Afghanistan, the CW told the agents that he encountered Abu Ghayth at an al Qaeda guest house in Kandahar, Afghanistan in 2001.[5]  The CW did not know Abu Ghayth's name at that time, but learned his identity after the September 11, 2001 attacks on the World Trade Center and the Pentagon when he appeared in videos alongside Usama Bin Laden.[6]

The FBI again interviewed the CW on May 3, 2012.  The CW provided information consistent with his previous interviews and was shown an array of eight individual photographs,[7] one of which purportedly was a photograph of Abu Ghayth.  He was asked to identify each of the eight individuals.[8]  He was unable to identify six of the eight individuals, but he believed that the seventh photograph was of Abu Ghayth, remarking that it was "possibly . . . the individual that gave

---

[4]

   DI 1314, Ex. A at 3.

[5]

   *Id.* Ex. B at 1.

[6]

   *Id.* at 2.

[7]

   Abu Ghayth argued in his opening brief that the CW was shown a single photograph during the May 3 identification.  Single photograph identifications routinely are held impermissibly suggestive.  *See, e.g.*, *Wiggins v. Greiner*, 132 F. App'x 861, 865 (2d Cir. 2005).  The government subsequently clarified, however, that the CW was shown eight separate photographs, one of which was of Abu Ghayth.  DI 1314 ¶ 5.  Any confusion apparently stemmed from the fact that the government initially provided interview notes to Abu Ghayth from which discussion of the other seven photographs had been redacted.  Gov. Br. [DI 1313] at 12.  In light of this explanation and the subsequent receipt of interview notes and the photograph array without redactions, the Court finds no reason to question the government's statement that the CW viewed an array containing eight separate photographs.

[8]

   DI 1314, Ex. C at 5.

the lecture at the incoming guesthouse and was later featured in the post 9/11 video."[9]

On February 23, 2013, the FBI showed the CW a second photograph array.[10]  That array contained six photographs of different individuals, all shown on the same page.[11]  Photograph 1 was a contemporaneous photograph of Abu Ghayth.  The five remaining photographs were filler images.  The CW was asked whether he "recognized any of the individuals in regards to [his] travel to, participation in, and travel from the terrorist training camp in Afghanistan in May of 2001."[12]  He "advised that the individual in photograph 1 looks similar to" Abu Ghayth.[13]   He further stated that the passage of time, "the way the individual in photograph 1 has aged, the fact that the individual in photograph 1 was not wearing anything on his head, and the difference in the color of the hair of the individual in photograph 1, it was difficult to immediately identify him.  [The CW] further advised that it was the eyes of the individual in photograph 1 that helped him identify him."[14]

---

[9]      *Id.*

[10]      *Id.* Ex. E.

[11]      *Id.* Ex. E & F.

[12]      *Id.* Ex. E at 1.

[13]      *Id.* Ex. E at 2.

[14]      *Id.*

4

*Discussion*

**I.      *The Out-of-Court Identification Procedures Were Not Unduly Suggestive***

      **A.      *Legal Standard***

"In general, a pretrial photographic identification procedure used by law enforcement officials violates due process if the procedure 'is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"[15]  Courts apply a two-part test when asked to determine whether an eyewitness's out-of-court identification is admissible at trial.  First, they must consider "whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator."[16]  "In evaluating whether or not a photographic array was unduly suggestive, a court must consider several factors, including the size of the array, the manner of presentation by the officers, and the contents of the array."[17]  Arrays containing a single photograph are suggestive, but those containing six or eight photographs have been upheld.[18]

Photograph arrays or lineups that include only one individual that meets a physical description previously offered by the identifying witness[19] or suggestive police statements might invalidate the identification.[20]  The individuals depicted need not share every characteristic.  "[T]he

---

[15]

       *Jarrett v. Headley*, 802 F.2d 34, 40-41 (2d Cir. 1986) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1969)).

[16]

       *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001).

[17]

       *United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994) (collecting cases).

[18]

       *Id.*

[19]

       *Raheem*, 257 F.3d at 133-34.

[20]

       *Thai*, 29 F.3d at 808.

principal question is whether the picture of the accused . . . so stood out from all other photographs as to 'suggest to an identifying witness that [the accused] was more likely to be the culprit.'"[21] Out-of-court identifications have been upheld where "[e]ach photograph depict[ed] a man in a frontal mug-shot.  Each [wa]s in color.  Each of the men depicted [wa]s of roughly the same age and coloring.  Finally, each of the men depicted sport[ted] a moustache."[22]  Photograph arrays in which one image contained or depicted unique lighting, angles, or facial hair have been upheld.[23]

If the procedure was not unduly and unnecessarily suggestive, the requirements of due process are satisfied and the court need not inquire further.[24]  "If the court finds, however, that the procedures were suggestive, it must then determine whether the identification was nonetheless independently reliable."[25]  Factors to consider in determining reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."[26]  These factors are weighed

---

[21]

*Jarrett*, 802 F.2d at 41 (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984)).

[22]

*United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994).

[23]

*E.g.*, *United States v. Marchand*, 564 F.2d 983, 995 (2d Cir. 1977) (size of photograph); *United States v. Harrison*, 460 F.2d 270, 271 (2d Cir. 1972) (photograph angle and facial hair).

[24]

*Raheem*, 257 F.3d at 133-34.

[25]

*Id.*

[26]

*Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

6

against "the corrupting effect of the suggestive identification itself."[27]

A witness who makes an out-of-court identification in unduly suggestive circumstances may perform an in-court identification only if the government demonstrates by clear and convincing evidence that the in-court identification rests on an independent source.[28] In making such a determination, courts consider "(1) the victim's prior opportunity to observe the alleged criminal act; (2) any discrepancy between any pre-lineup description and the defendant's actual description; (3) any identification prior to the lineup of another person; (4) a photographic identification of the defendant prior to the illegal lineup; (5) the victim's failure to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the lineup identification."[29]

### B.   The May 3, 2012 Identification

Abu Ghayth argues that the May 3, 2012 identification was impermissibly suggestive because the array contained only photographs of individuals who were criminal suspects and because the FBI did not appear to "blindly administer" the sequential array. "Blind administration" is a procedure wherein the questioner does not know which photograph depicts the suspect and thus cannot indicate inadvertently that the witness should choose one suspect over any other.

These contentions may have merit where the police seek identification of and the

---

[27]

    *Id.*

[28]

    *Young v. Conway*, 698 F.3d 69, 78 (2d Cir. 2012) (citing *United States v. Wade*, 388 U.S. 218, 240 (1967)).

[29]

    *Id.* (citing *Wade*, 388 U.S. at 241).

eyewitness endeavors to identify a particular suspect.  In contrast, the government's interview notes

demonstrate that it sought to have the CW identify each of the eight individuals depicted, any or all

of whom the CW might have encountered.  The request was not confined to questions concerning

Abu Ghayth or even the Kandahar guest house in May 2001.  The request was "to view a photograph

book containing eight [redacted] photographs for [the CW's] identification."[30]  The CW then

identified the individuals in two out of the eight photographs, including Abu Ghayth.[31]

Abu Ghayth argues also that "it seems highly likely that the Government chose an

image for Photo Seven which they knew was likely one the CW had already seen" because it was

taken from an al Qaeda video filmed in 2001.[32]  Abu Ghayth cites no cases in support of the

argument that choosing an image that the witness could have seen previously renders an

identification unduly suggestive.  Even if the CW had seen the image at a previous time, that

circumstance would not have rendered the process unduly suggestive.  To the contrary, courts have

upheld out-of-court identifications where the eyewitness had been exposed to images of the suspect

in the media.[33]  In such cases, the witness first witnesses a crime, then sees a media report depicting

---

[30]

DI 1314, Ex. C at 5.

[31]

*Id.*

Abu Ghayth argues also that the CW is unreliable because he has a cooperation agreement with the government.  The Court rejects the notion that a witness is unreliable simply by virtue of cooperating with the government.  Moreover, the CW already has completed his sentence.  This would remove many if not all of the plausible incentives that the CW would have to falsify information.

[32]

Def. Reply [DI 1340] at 13.

[33]

*See, e.g.*, *United States v. Peterson*, 411 F. App'x 857, 865 (6th Cir. 2011); *United States v. Boston*, 508 F.2d 1171, 1177 (2d Cir. 1974).

8

the image of the suspected criminal, and later selects that person as the perpetrator from a

photograph array.  Here, in contrast, the possibility of suggestiveness or taint is far weaker.  The CW

came to his own conclusion that the individual in the media reports was the same individual that he

had seen at the guest house in Kandahar – no third party urged this conclusion for him.  That he

confirmed his conclusion to the FBI when he was shown an image of Abu Ghayth from a media

report in no way implicates Due Process.

The FBI's procedures did not subject the CW to any suggestion whatsoever.

Accordingly, suppression of the May 3 identification is unwarranted.[34]


B.      *The February 23, 2013 Identification*

Abu Ghayth next cites a variety of reasons for which he argues that the February 23

identification was unduly suggestive.

First, he claims that the appearances of the other five individuals whose photographs

were included in the array were too dissimilar to his own.  This is not so.  Much like in *Jarrett*, cited

above, all of the photographs were head shots with no discernible background or remarkable

clothing.  Of the individuals depicted in the photo array, at least four appear to be of Middle Eastern

descent and all had similar coloring.  Five were bald or balding and all of them had facial hair.  In

any event, any slight discrepancies in hair pattern and other mutable characteristics would be

immaterial here.  This was a contemporaneous photograph, and the CW had not seen Abu Ghayth

---

[34]

> *See United States v. Douglas*, 525 F.3d 225, 243 (2d Cir. 2008) ("Given the lack of any
> suggestiveness in the photo array, the identification testimony of Vitetta and Sarin was
> admissible at trial 'without further inquiry into the reliability of the pretrial
> identification[s].'" (citation omitted)).

since 2001.  He had no way of knowing what Abu Ghayth's hair or beard likely would look like by 2013.

Abu Ghayth argues further that he was the only person depicted who had a "zebibah," or "prayer bump," which is indicative of being a cleric or imam.  The lighting in the photograph somewhat obscures Abu Ghayth's forehead.  As a result, to the extent he has a "prayer bump," it is not visible in his photograph and thus would not have caused his photograph to stand out from the others.

Finally, Abu Ghayth argues that the February 23 identification was impermissibly tainted by the May 3 identification because "false identification rates increase, and accuracy on the whole decreases, when there are multiple identification procedures."[35]  This phenomenon is at times referred to as the "mugshot exposure effect."  The theory goes that "a witness selects a person in a later identification procedure based on a sense of familiarity deriving from [the witness] exposure to [the Defendant's image] during a prior one."[36]  This contention is logically infirm here.

The CW is not a prototypical eyewitness who meets with the police to discuss a single suspect or group of suspects.  The interview notes show that the CW spent considerable time in Afghanistan and was exposed to many suspected al Qaeda members, including Usama Bin Laden.  It thus is not a foregone conclusion that each and every interview that he sat in and photo array that he viewed was designed to single out Abu Ghayth.  Indeed, the opposite appears to have been the case.

The CW's May 3 identification was made in the context of a broader conversation

---

[35]

      *Young*, 698 F.3d at 78.

[36]

      *Id.* at 82.

about his time in Afghanistan.  The interview notes demonstrate that the identification was designed to ascertain the identities of a variety of individuals suspected of criminal activity, one of whom was Abu Ghayth.  It included a picture purportedly of Abu Ghayth from 2001. The February 23 identification, in contrast, involved a contemporaneous photograph of Abu Ghayth and apparently was designed to elicit a positive identification of Abu Ghayth.  According to the interview notes the FBI did not identify Abu Ghayth by name.  Instead, the CW "was instructed to place an 'X' over the photographs which he/she did not recognize and to place his/her initials and date next to the photographs he did recognize."[37]  The CW then advised that the individual in the photograph "looks similar to SULAYMAN ABU GHAYTH."[38]  Moreover, the photographs themselves were so different due the approximately twelve-year age gap, differences in hair style, head wear, and clothing, that it can hardly be said that making an identification of the first image would cause the CW to psychologically commit to selecting the second image.  As a result, first identification did not taint the second.

## II.      There Are No Disputed Facts That Merit a Hearing

Abu Ghayth requests an evidentiary hearing under *United States v. Wade*.[39] "Defendants are not entitled to an evidentiary hearing unless they can show that there is a contested

---

[37]

DI 1314, Ex. E at 1-2.

[38]

*Id.* at 2.

[39]

388 U.S. 218 (1967).

11

issue of material fact with respect to the issue for which the hearing is requested."[40]  For the reasons

discussed above, Abu Ghayth has not demonstrated that there is a contested issue of material fact

as to the neutrality of the out-of-court identifications.   To the extent that he has raised issues

concerning the identifications' reliability, he is entitled to explore those issues in front of the jury.


*Conclusion*

For the foregoing reasons, Abu Ghayth's motion to suppress [DI 1293] is denied.

SO ORDERED.

Dated:        January 2, 2014


_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[40]

*United States v. Dewar*, 489 F. Supp. 2d 351, 359 (S.D.N.Y. 2007) (citing *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)).