UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA


     v.            No. S14 98-CR-1023 (LAK)


Suleiman ABU GHAYTH,

    Defendant.
-----------------------------------------------------------x


## DEFENDANT'S MOTION *IN LIMINE*
## TO PRECLUDE PROPOSED GOVERNMENT EXPERT WITNESS


                 Stanley L. Cohen
                 Geoffrey S. Stewart
                 Zoe Dolan
                 Ashraf Nubani

                 *Attorneys for Sulaiman Abu Ghayth*

## PRELIMINARY STATEMENT

Defendant Suleiman Abu Ghayth is accused in a three count indictment of, *inter alia*, Conspiracy to Murder Americans. The Government has disclosed an Expert Report pertaining to the proposed trial testimony of Evan Kohlmann (the "Kohlmann Report") [1] and has provided a copy of his *curriculum vitae.*[2]

Evan Kohlmann is a self-described "International Terrorist Consultant who specializes in tracking Al-qaida." Mr. Kohlmann's claimed area of expertise involves the interchange between Jihadi groups over the internet. No element of internet recruitment, financing, training or exchange is present in this case.

In relevant part, based upon his Report, it appears as though Kohlmann will offer testimony almost entirely regarding the history, structure, membership and evolution of Al-Qaeda. In addition, if permitted, it is his intent to offer his personal opinion as to the "role" of Suliman Abu Ghayth within Al Qaeda and to venture an opinion about the Defendant's alleged criminal wrongdoing. As part of his report, Kohlmann also opines about so-called guest houses and training camps, a "code" or "brevity card," given to him by the prosecution, containing some names of people presumed to be associated in some way with Al Qaeda and the practice of swearing *bayat*, or allegiance to Al Qaeda.

---

[1] A draft copy of the report, appended to this submission as Exhibit A, is provided to the Court by separate submission. The Government also recently made available thousands of pages of 3500 material with regard to Kohlmann.

[2] Annexed hereto as Exhibit B, *CV* of Evan Francois Kohlmann.

It is respectfully submitted that an examination of the Kohlmann Report, along with the proponent's *curric. vit.*, and his proffered testimony reveal neither specialized expertise beyond the ken of the jury, nor a legitimate methodology, nor unique and admissible factual information, or analysis relevant to the case at bar.  It does appear, however, that his testimony, if admitted, would be unduly prejudicial and cumulative of other, more reliable witness testimony. As such his proposed testimony meets none of the standards of relevance or reliability required for its admission at trial, and must be excluded.

## ARGUMENT

Expert testimony is governed by Federal Rule of Evidence 702, as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999).  This complex of rules governs not only the kinds of methods and knowledge that may be qualified as "expert," but the scope and nature of expert testimony, and the circumstances under which expert testimony is necessary or appropriate.  While the requirements regarding first-hand knowledge and the use of hearsay to form expert opinions are slightly relaxed, nevertheless expert testimony remains subject to the constraints on the admission of hearsay, and unduly prejudicial evidence. For the following reasons, Evan Kohlmann's purported expertise, as well as his proffered testimony, fail to satisfy any element of *Daubert/Kumho,* and accordingly should be precluded.  In the alternative, a pre-trial hearing should be ordered pursuant to FRE 104 (a) to determine the admissibility of Kohlmann's testimony. *See*, *Bourjaily v. United States*, 483 U.S. 171 (1987).

The Legal Standard for Evaluating Expert Testimony

Rule 702 of the Federal Rules of Evidence assigns to the trial judge a "gatekeeping" function to ensure that "any and all" expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. 589, 597. Ensuring that expert testimony comports with the twin values of reliability and relevance requires a preliminary assessment grounded in FRE 702's indicia of reliability, namely: 1) that the testimony is based upon "sufficient facts or data;" 2) that it is the product of "reliable principles or methods;" and 3) that the witness has applied the principles and methods reliably to the facts of the case.

Even if it is determined that the expert testimony is reliable, it must also be something that will help the trier of fact to understand evidence it would not otherwise be able to understand, or determine a fact in issue.  That is, even perfectly reliable expert testimony may nonetheless be properly excluded if it is irrelevant to the case, or unnecessary for helping the trier of fact to understand the case.

*Daubert* sets forth five non-exclusive, non-dispositive factors as guideposts or standards for assessing whether proffered testimony is actually "expert."

1) Explanatory statements "must be capable of empirical test." *Id*., at 593;
2) The testimony has been subject to peer review and publication "will be a relevant, though not dispositive consideration," *Id*;
3) The court "should consider the known or potential rate of error" and
4) "the existence and maintenance of standards controlling the technique's operation." *Id*., at 594; and
5) Finally, "general acceptance," though no longer the primary test, can be helpful, as "acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." *Id*. (All internal quotations omitted).

Other factors have been considered, including whether an expert's opinion was developed "expressly for purposes of testifying," *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d

1311, 1317 (9th Cir. 1995); whether there is an "analytical gap" between reliable data and an "unfounded conclusion," *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); and "whether the expert has adequately accounted for obvious alternative explanations." *Claar v. Burlington N.R.R.*, 29 F. 3d 499 (9th Cir. 1994).

Finally, expert testimony that fully comports with all the required standards will nevertheless merit exclusion under FRE 403 if its probative value is significantly outweighed by its prejudicial effect.

I. <u>Kohlmann Lacks the Necessary Qualifications to Be Certified As An Expert in the Areas of His Proposed Testimony</u>

Evan Kohlmann's qualifications as an expert for the purposes of the proposed testimony are highly suspect. Mr. Kohlmann's primary activities involve running a website, and acting as an expert witness for the US Attorney's office. Under his "major papers" he lists writings for a hyper-conservative think tank—a foundation lacking in scientific or academic independence and political objectivity; and appearances on NBC news shows. He has few or no peer-reviewed publications, and has presented at no juried academic conferences. His undergraduate thesis, written in 2001, appears to be among the most rigorously reviewed pieces of writing he has produced, and which was written when barely out of his teen years.

In Kohlmann's report, he briefly recounts his credentials, mentioning his undergraduate degree, his law degree (although he is admitted to no bar), and a certificate from a academic center housed within Georgetown University. He also refers, without explanation, to having traveled to "underground conferences and rallies," and boasts "one of the largest digital collections of terrorist multimedia and propaganda in the world," a claim that would seem to

bolster his identity as an obsessive collector, rather than work to instill faith in his capacity for reasoned and objective analysis.

Overwhelmingly, his methods and conclusions have not been subject to the scrutiny of academic peers, and where they have been, scholars have roundly abjured them. Leading scholars in the fields in which Kohlmann claims expertise describe him as ill-suited and poorly trained to meet the task. Indeed, Kohlmann lacks any graduate credentials in history, Islam, international politics, comparative religion, political science, sociology, or cultural studies. Nor does Kohlmann speak Arabic or any other language indigenous to the regions and events about which he proffers his expertise, and those areas themselves remain little more than a shopping list of places to which he might like to travel, but has not.

Rule 702 grants the trial court broad discretion to determine what methods and content constitute "specialized knowledge." The Advisory Committee Notes on Rule 702 make perfectly clear, however, that the trial judge must extend "the same degree of scrutiny for reliability" not only to "scientific knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge. Advisory Committee Notes, *citing Watkins v. Telsmith, Inc*., 121 F.3d 984, 991 (5th Cir. 1997). As *Daubert* and *Kumho* have made clear, expert qualifications cannot be called into being by the expert's own *ipse dixit*. Nor, as in the case of Mr. Kohlmann, can previous certifications as a witness in other unrelated cases substitute for the required inquiry into reliability and relevance.

Of the several dozen cases in which Kohlmann has been called upon to venture an expert opinion, almost all involved prosecutions for domestic terrorism involving material support for terrorist organizations, where the material events were largely contingent upon obtaining and interpreting internet communications. These communications involved using the internet to

access training information and weapons manuals, and to enlist individuals both here and abroad for Jihad. No such issues are present here.  The remainder of the cases in which Kohlmann was called to testify involve terrorist organizations in Somalia, which has no bearing on the case at bar, and European Jihad, which is similarly irrelevant.  Although Kohlmann presents a detailed understanding of the history and structure of Al Qaeda—as would anyone else who has followed the news about perhaps the most infamous terrorist organization of the last twenty years, or read a lot about it on the internet—here it bears little relevance where there is no contention that Mr. Abu Ghayth was a member of Al Qaeda, and no indication that the Government intends to prove that he was.

      Although Kohlmann's *bona fides* have been upheld in the Second Circuit with regard to Al Qaeda and Azzam Publications, neither consideration are at issue in such a way here, as to require expert explanation in the matter of Abu Ghayth.  *See*, *U.S. v. Farhane*, 634 F.3d 127 (2d Cir. 2011).  To the extent that these organizations are relevant, Kohlmann can provide no probative information that is not already widely known.  On another occasion Kohlmann's testimony was upheld by the Second Circuit, not because of its reliability, but because the defendant was deemed to have waived his objection to it.  Again in that case, the testimony regarded the history and structure of Al Qaeda, which is here irrelevant, even were we to concede its reliability, which we do not.  *U.S. v. Paracha*, 313 Fed.Appx. 347 (2d Cir. 2008).  Finally, the Second Circuit found no error in admitting Kohlmann's testimony, where such testimony involved Kurdish groups unfamiliar to a lay audience.  In the case before the Court, there is no such esoteric information or connection, and thus, no need for expert testimony at all, let alone from a source whose credentials and expertise are so dubious.  *U.S. v. Aref*, 285 Fed.Appx. 784 (2d Cir. 2008).

In most cases in this Circuit where Kohlmann's testimony has been admitted, the district court was presented with issues pertaining to unique geographic areas, organizations, people or technology none of which is in issue in the case at bar.  Although on other occasions his testimony has involved the history and structure of Al Qaeda, it has uniformly been in the context of unique consideration of its communications, training, financing, and logistical support, which likewise are not here at issue.  On more than one occasion, his testimony has been carefully limited.  *See*, *e.g.*: *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 124 (D. Conn. 2008) (where Kohlmann was certified to give testimony bearing on Bosnian and Chechnyan groups and the use of a publishing organization to disseminate propaganda); *United States v. Kassir*, S204CR356(JFK), 2009 WL 910767 (S.D.N.Y. Apr. 2, 2009) (certified to testify about methods of financing, tradecraft, training camps and cells, safe houses, and the compartmentalization of information),*United States v. Sabir*, S4 05 CR. 673 (LAP), 2007 WL 1373184 (S.D.N.Y. May 10, 2007) (where testimony regarding Al Qaeda was intended to illuminate the unspoken understandings between people on audiotape evidence, and testimony on propaganda in the possession of defendants was intended to reveal their state of mind), *United States v. Aref*, 04 CR 402, 2007 WL 603508 (N.D.N.Y. Feb. 22, 2007) *aff'd*, 533 F.3d 72 (2d Cir. 2008))(testimony concerned the ideologies of political parties in Bangladesh), and *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 332 (E.D.N.Y. 2013) (admitting opinion testimony regarding attribution of various acts to Hamas), and *Strauss v. Credit Lyonnais, S.A.,* 925 F. Supp. 2d 414, 446 (E.D.N.Y. 2013) (strictly limiting testimony to background information about Hamas and its use of propaganda websites, and finding inadmissible the majority of Kohlmann's report) and *United States v. Paracha*, 03 CR. 1197 (SHS), 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) *aff'd*,

313 F. App'x 347 (2d Cir. 2008) (limiting Kohlmann's testimony to admissible background on the origins and leadership of Al Qaeda as necessary to explain their unique methods of providing and receiving logistical support, but otherwise excluding his proffered testimony with regard to individuals, which could best and properly be admitted through other fact witnesses).[3]

Kohlmann's testimony in this case, not informed by any particular expertise, or need for it, would amount to feeding jurors conclusions that they are well-equipped to reach on their own. Nothing here is so complicated or unique that it ought to prevent the jury from drawing its own independent determinations based upon fact witnesses and common sense. Most important, the Defendant's rights to due process and confrontation require that whatever conclusions reached by the jury must be based on evidence that has survived admissibility standards to which Mr. Kohlmann's own summaries are not subject. *See, e.g.*, *United States v. Jackson*, 208 F.3d 633, 637-38, (7th Cir. 2000) (upholding on numerous grounds the exclusion of web posting by radical

---

[3] Elsewhere Kohlmann's testimony was entirely excluded, *see United States v. Amawi*, 541 F. Supp. 2d 945, 948 (N.D. Ohio 2008) *aff'd,* 695 F.3d 457 (6th Cir. 2012), but subsequently admitted when the Government agreed to narrow significantly its scope. That testimony primarily involved "the use of the internet and other electronic media as recruitment and proselytization tools" *United States v. Ali*, CRIM. 10-187, 2011 WL 4583826 (D. Minn. Sept. 30, 2011); *United States v. Khan*, 309 F. Supp. 2d 789, 812 (E.D. Va. 2004) *aff'd in part, remanded in part,* 461 F.3d 477 (4th Cir. 2006). Otherwise it has been used to explain "a wide variety of ideas, terms, people, and organizations pertaining to radical Islam" that are unfamiliar to the lay audience, *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008); a profile he developed of people who have become violent extremists, (testimony admitted in *United States v. Mohamud*, 3:10-CR-00475-KI, 2013 WL 71806 (D. Or. Jan. 4, 2013), but excluded in *United States v. Mehanna,* 735 F.3d 32, 66 (1st Cir. 2013)), and interpretation of videos, though even this was largely excluded, in *United States v. El-Hindi*, 3:06CR719, 2009 WL 1373268 (N.D. Ohio May 15, 2009). Finally, his testimony has been admitted to explain the continuity of organizations acting under different names, in places irrelevant to the case at bar, *see, e.g.*: *United States v. Sadequee*, 1:06-CR-147-WSD, 2009 WL 3785566 (N.D. Ga. Nov. 10, 2009). Kohlmann's report on the origins of Al Qaeda appears to have been credited without critical inquiry during one of the Guantanamo military commissions, which is, like many aspects of the tribunals, more disappointing than surprising. *United States v. Al Bahlul*, CMCR 09-001, 2011 WL 4916373 (Sept. 9, 2011). In any case, the subjects on which Kohlmann has been authorized to speak are not relevant to this case, are not issues on which he is expected to testify in this case, or are going to be properly admitted through fact witnesses with personal knowledge.

group, and stating that 'any evidence procured off the internet is adequate for almost nothing, even under the most liberal interpretations of the hearsay exception rules.').

Given the imprimatur of the court, Kohlmann's testimony stands to intrude upon, if not foreclose, the jury's own critical assessment of the evidence, or lack thereof, and will necessarily undermine whatever determination it might reach.  Rule 702 exists precisely to ensure that the trier of fact is helped, not displaced, by expert testimony.

While Kohlmann may be an exceptionally well-informed layperson, in the context of the prosecution at bar, his conclusions and opinions are very much little more than lay opinions.  To the extent that Kohlmann will perform a summarizing function that is in no way beyond the capacity of the jury, his testimony must be excluded under Rule 702.

II. Kohlmann's Testimony Is Not Beyond the Ken of the Jury

Mr. Kohlmann's proposed testimony is properly considered lay opinion testimony.  It is, by his own description, a summary of readily available and widely disseminated public source material, some of which will be admitted at trial through other witnesses.  The very fact that Kohlmann does not speak any Middle Eastern languages, and has extremely limited first-hand knowledge, is evidence that his testimony is not beyond the ken of the layperson.  As noted above, Kohlmann himself is effectively a layperson with an overwhelming curiosity about what people on the internet say about terrorism.

As the Second Circuit recently held, admitting lay opinion in the guise of expert testimony is reversible error.  *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008).   Indeed, that precise result would occur in this case if Kohlmann, who has no certifiable and relevant

expertise, were called to the witness stand as an expert to opine about uncomplicated matters plainly not beyond the ken of the jury.

It is clear that the Government is calling Mr. Kohlmann for the purposes of testifying to the existence, structure, and leadership of Al Qaeda, an organization of which many laypersons are already aware. The acts for which they have taken credit are not in dispute, and require no explanation whatsoever, let alone one from the person proffered by the Government. In sum, as described, the Kohlmann testimony would be an intrusion into the purview of the trier of fact, and thus cannot be admitted.

III. <u>Kohlmann's Methods Are Not Sufficiently Reliable to Survive A Daubert Inquiry</u>

The Advisory Committee Notes to Rule 702 are at pains to insist that a reliability inquiry involves more than simple assurances from the expert. In fact, says the committee, "the more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." *See Kumho* at 1176. Mr. Kohlmann's testimony is nothing if not controversial, not only in terms of the subject matter and his conclusions, but due to the very haziness of his methodology.

Mr. Kohlmann essentially works as an information clearinghouse, screening all kinds of data – but not, to our knowledge, all *available* data—from the internet. Although it is well settled that Mr. Kohlmann's practices do not fit neatly into any recognized and reliable methodology within the scientific and academic communities, in itself that is no bar to expert certification. Nevertheless, expert methods and practices must be "properly grounded," so as to yield reliable conclusions, and "the expert must explain how the conclusion is so grounded." *Watkins v. Telsmith, Inc*., 121 F.3d 984, 991 (5th Cir. 1997), *cited* by the Advisory Committee Notes to

Rule 702. Rule 702 requires that there be some kind of testable methodology to support an expert's analysis and conclusions. *See generally United States v. Nacchio*, 555 F.3d 1234 (10th Cir. 2009).

In *Nacchio,* the expert's credentials were not called into question. Nevertheless, as here, his methodology necessarily involved relying upon abstract "experience" to form the basis of his proffered and challenged conclusions. In rejecting that process, the court noted that while personal inchoate "experience may be considered by a witness," the witness was still required to explain why he came to his conclusions and how his experience was reliably applied to the facts of the case. Simple intuition – even educated intuition – is simply not sufficient under the rule of Daubert.

Mr. Kohlmann describes his methods as involving a "comparative analysis" wherein he reads message boards and websites about terrorism, and then, by filtering them through his own subjective consciousness, creates a unitary master narrative that he then claims as "objective." It is respectfully submitted that these are methods which might make a first-year sociology student blush. The Kohlmann methodology is based on a frankly adolescent concept of a single sociological truth, which can be discerned by assimilating large amounts of publicly available information, which is itself of questionable provenance and reliability. Selectively reading and synthesizing public source material in no way constitutes a testable methodology or an expert skill. As the saying goes, *the plural of anecdote is not data.*

Mr. Kohlmann's methods, understanding, and conclusions are at best academically untested. Indeed, a 2010 article on Mr. Kohlmann referred to his lack of credibility in *academe*, quoting several of the premier academic researchers on issues of international terrorism, who described him as a rank opportunist, making "basic analytical errors on the stand," and even

calling his testimony "junk science." Wesley Yang, *The Terrorist Search Engine*, NEW YORK, Dec 5, 2010, *available at* http://nymag.com/news/features/69920/.

Because Kohlmann's methods are rejected by the academic community, and his self-published book has not been subject to peer review, there is no known rate of error regarding his conclusions. *See Wills v. Amerada Hess Corp.*, 379 F.Rd 32, 40 (2d Cir. 2004) (where a Doctor's theory "failed all of the *Daubert* factors, as it had not been tested or subjected to peer review, and consequently there was no known potential error rate."). In a criminal case, the stakes are simply too high to permit the use of the courts as a laboratory for Mr. Kohlmann's theories and patently partisan conclusions.

IV. Kohlmann's Proffered Testimony Is Not Relevant to the Instant Case

Rules 401(a) and 702 require the government to show by a preponderance of the evidence that the proffered expert testimony is relevant and will serve to aid the trier of fact. *Daubert* at 592-93.

The draft Kohlmann Report consists of twenty single-spaced pages of purported factual reportage that spans over thirty years, several organizations, and an international cast of players, many quite familiar to the layperson.

Kohlmann begins his report by attempting to create a tautology between having been certified in the past as an expert and thus being uniquely qualified in this case as an expert, notwithstanding the clear differences in subject matter and persons involved. In relevant part, the subject matter of Kohlmann's proposed testimony in this case appear to be largely the history and evolution of Al-Qaida [sic], including the importance of guest houses and training camps,

and the practice of swearing *bayat*, or allegiance to Al Qaeda.[4]   Not only are most of these issues not within Mr. Kohlmann's self-described expertise, but expert testimony on these issues is unnecessary for helping the trier of fact to determine Mr. Abu Ghayth's guilt or innocence as to the crimes charged.  There is no evidence or claim that Mr. Abu Ghayth administered or took *bayat*; there is no dispute as to his identity; there is no allegation that he was a member of Al Qaeda.  If anything, Mr. Kohlmann's testimony on this broad array of issues is likely only to inflame, confuse, and misdirect the jury.

V. <u>Kohlmann's Testimony Will Introduce Inadmissible Hearsay and Facts Not Admitted in Evidence In the Guise of Expert Testimony</u>

Expert testimony is subject to the strictures of FRE 801, with the slight caveat that experts may base their conclusions upon hearsay if it is of a type reasonably relied upon by other experts in the same field.  However, an expert may not simply act as a "conduit allowing inadmissible evidence and arguments to flow into the court."  *United States v. Locascio,* 6 F. 3d 924 (2d Cir. 1993).  Yet, as structured, that is precisely what is contemplated by the Kohlmann testimony in the case at bar.

An expert may also be used to summarize voluminous information that is properly admitted at trial under Rule 1006, however, the Government may not use an expert simply to summarize information that is readily available and understandable to the jury, but is not otherwise introduced into evidence.

To the extent that Mr. Kohlmann intends to summarize, refer to, or draw conclusions based upon inadmissible and independently un-admitted evidence, any such testimony is itself

---

[4] Although the Kohlmann report also refers to the Al-Wafa Humanitarian Organization which Kohlmann describes as a terrorist group with connections to Abu Ghayth and at least one Guantanamo detainee, the use of any such testimony is currently under discussion with the Government.

inadmissible and in clear violation of Federal Rules of Evidence 702, 801 and the Confrontation Clause.  To the extent that Kohlmann is called to testify regarding the history and structure of Al Qaeda, his testimony will involve events and people that predate Mr. Abu Ghayth's presence on the scene by years, and is likely to do little more than inflame a New York jury.  The probative value of any such testimony would be heavily outweighed by its prejudicial effect, and would warrant exclusion under FRE 403.

VI. <u>Kohlmann's Testimony Will Be Cumulative of Testimony That Will Be Offered By More Reliable Sources</u>

If Mr. Kohlmann is being called to testify to the identities of various people, his testimony will be duplicative of other testifying witnesses, any of whom could identify the relevant individuals.  Should the Government wish him to testify to the implications of the "code card" or "brevity card" (an area in which nothing in his history or training would confer special knowledge) his testimony will be cumulative of another witness who will testify that he belonged to Al Qaeda, as well as an anticipated witness from the Department of Defense with first-hand knowledge and training.  Each of these witnesses, it is submitted, would be better equipped than Kohlmann to explain the significance of the brevity card. On this point the Kohlmann's testimony with regard to the card is simply unhelpful to the trier of fact, as it is untested.  Moreover, Kohlmann's testimony on so-called training camps will also be duplicative of the anticipated testimony of other witnesses who will testify about first-hand knowledge of the very camps about which Kohlmann could merely opine.

In this light Mr. Kohlmann's testimony on the matters of identity, brevity cards and other artifacts, training camps, and practices are not only beyond the scope of his expertise, but

unnecessarily cumulative.

## *CONCLUSION*

For all of the foregoing reasons, it is respectfully requested that the proposed testimony of Evan Kohlmann be excluded in its entirety. In the alternative, it is requested that the Court conduct a pretrial *Daubert* hearing pursuant to FRE 401(a), to determine the admissibility of the proffered testimony.

Dated: January 31, 2014
New York, New York                                     Respectfully submitted,

_____
STANLEY L. COHEN, ESQ
Counsel for Suleiman Abu Ghayth
Stanley L. Cohen & Associates
119 Avenue D, Fifth Floor
New York City, New York   10009
(212) 979-7572  Fax: (212) 995-5574
stanleycohenlaw@verizon.net