UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA          :

                                       :

          v.                        :

                                       :

SULAIMAN ABU GHAYTH,          :

                    Defendant.        :
-----------------------------------------------------------------x

S14 98 Cr. 1023 (LAK)

**MEMORANDUM and EXHIBITS**

## **MEMORANDUM OF LAW, WITH ATTACHED EXHIBITS, IN SUPPORT OF DEFENDANT SULAIMAN ABU GHAYTH'S MOTION TO OFFER THE TESTIMONY OF KHALID SHAIKH MOHAMMAD VIA LIVE CLOSED-CIRCUIT VIDEO DURING TRIAL OR, IN THE ALTERNATIVE, FOR HIS DEPOSITION PURSUANT TO RULE 15 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.**

Stanley L. Cohen, Esq.
Geoffrey S. Stewart, Esq.
Ashraf Nubani, Esq.
Zoe Dolan, Esq.

*Attorneys for SULAIMAN ABU GHAYTH*

Moira Meltzer-Cohen, Esq.
*Of Counsel.*

## PRELIMINARY STATEMENT

Mr. Abu Ghayth was charged by Indictment on March 7, 2013 charged with one count of conspiracy to kill United States nationals in violation of 18 U.S.C. §§ 2332(b) (herein, "Count I"). *See* Dkt. #1154. On December 20, 2013, the Government filed a Superseding Indictment that, in addition to the original charge of violating 18 U.S.C. §§ 2332(b), charges Mr. Abu Ghayth with conspiracy to provide material support and resources to terrorists (18 U.S.C. § 2339A(b); herein, "Count II") and providing material support and resources to terrorists 18 U.S.C. § 2339A(b); herein, "Count III"). *See* Dkt. #1409.

The Superseding Indictment specifically alleges: 1) Mr. Abu Ghayth "served" al Qaeda by urging others to swear an oath of allegiance (or "bayat") to Usama Bin Laden ("Bin Laden") at a guesthouse in Kandahar, Afghanistan in or about May 2001; 2) Prior to September 11, 2001, Mr. Abu Ghayth personally told Bin Laden that he (Mr. Abu Ghayth) would assist Bin Laden by "giving speeches and appearing in al Qaeda propaganda for the purpose of recruiting additional al Qaeda personnel; 3) On September 11, 2001, Mr. Abu Ghayth was summoned for "assistance" of an unknown nature by Bin Laden; and 4) Mr. Abu Ghayth gave speeches and appeared in videos on behalf of al Qaeda in the wake of the attacks of September 11, 2001. *See* Dkt. #1409.

All of the events, activities, discussions, and other overt acts allegedly attributable to Mr. Abu Ghayth in this matter occurred over twelve years ago. In the interim, percipient and/or material witnesses have died or been killed, documents have gone missing, and memories have faded. The deaths of many of these witnesses are directly attributable to the Government – the same Government which now prosecutes Mr. Abu Ghayth. The majority of the living individuals who have any first-hand knowledge of the events underlying the instant charges, including Mr.

Mohammad, are in the custody of the United States military and are being held at Guantanamo.

Khalid Shaikh Mohammad[1] is alleged by the Government to be a "senior al Qaida [sic] recruiter, financier, and operational planner for al Qaida's [sic] global terrorist network."[2] He has also widely reputed to be the "mastermind" behind the terrorist attacks of September 11, 2001 in New York, Virginia and Pennsylvania.[3] He is the second-most senior living al Qaeda member from the time period relevant to the instant charges. Of those living al Qaeda figures, he is surpassed in seniority only by Ayman al Zawahiri, who remains at large. It is claimed that Mr. Mohammad was personally designated by Bin Laden as the "al Qaida [sic] Chief of External Military Operations."[4]

According to the government Mr. Mohammad's knowledge of al Qaeda's terrorist activities is unsurpassed. It assigns to him personal responsibility for the planning of and/or involvement in the majority of the world's most notorious terrorist attacks which have been realized and/or planned since at least 1993. These include, *inter alia*:[5]

- The 1993 World Trade Center bombing;

- A 1995 plot to assassinate Pope John Paul II.

- Various plots to assassinate current and former Presidents of the United States, including Presidents Carter and Clinton;

- The 1998 Twin Embassy bombings in Kenya and Tanzania;

---

[1] Mr. Mohammad apparently spells his name "Khalid Shaikh Mohammad," per Exhibit B. The undersigned notes that in prior submissions related to this matter, the detainee's name has been rendered "Khalid Sheikh Mohammed," as it is rendered, variously, in some government documents.

[2] *See* JTF-GTMO assessment of Khalid Sheik Mohammad; *JTF-GTMO Detainee Assessment*, 8 December 2006, at page 1.  Available at "The Guantanamo Docket," *The New York Times,* http://projects.nytimes.com/guantanamo.

[3] *See* JTF-GTMO assessment of Khalid Sheik Mohammad; *JTF-GTMO Detainee Assessment*, 8 December 2006, at page 1.

[4] *See* JTF-GTMO assessment of Khalid Sheik Mohammad; *JTF-GTMO Detainee Assessment*, 8 December 2006, at page 1.

[5] *See* JTF-GTMO assessment of Khalid Sheik Mohammad; *JTF-GTMO Detainee Assessment*, 8 December 2006; *see also* Exhibit D, Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISM10024 at 18, *available at* http://painees/0024-kSheiMohammad/documents/7; last viewed January 9, 2014.

- The attacks of September 11, 2001 in New York, Virginia and Pennsylvania as well as aborted attacks planned for the same day in East Asia and the west coast of the United States;

- Two "shoe bomb" attacks intended to destroy passenger airliners, including the December 22, 2001 attempt to do so by Richard Reid; and

- The murder of Wall Street Journal reporter Daniel Pearl.

Of particular relevance to the instant matter is Mr. Mohammad's knowledge of the "shoe bomb" attacks. On March 10, 2007, Mr. Mohammad submitted a declaration to the tribunal convened to review his status as a Guantanamo detainee in which he claimed "I was responsible for the Shoe Bomber Operation to down two American airplanes."[6] The Government has acknowledged Mr. Mohammad's role in the planning and execution of the Shoe Bomb Attack of December 22, 2001 involving Richard Reid.[7]

For these reasons, the defense began its effort to gain access to Mr. Mohammad well *before* the filing of the Superseding Indictment on December 20, 2013. *See* Dkt. #1409. After great effort, the defense moved this Court on February 4, 2014 to Order the United States Department of Defense (herein, 'DoD") to allow a member of Mr. Abu Ghayth's counsel with sufficient security clearance to interview Mr. Mohammad. *See* Dkt. #1468, 1469, 1471.[8] The Court approved of the interview subject to certain conditions in an Order[9] dated February 19, 2014. *See* Dkt. #1494. Also on that date, the Court, pursuant to a defense motion based on the

---

[6] *See* Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISM10024 at 18.
[7] *See* JTF-GTMO assessment of Khalid Sheik Mohammad; *JTF-GTMO Detainee Assessment*, 8 December 2006, at page 8. *The New York Times, Op. cit.*
[8] Subsequently, by agreement of the parties, a protocol was agreed to under which, and in lieu of a live interview, the defense submitted numerous questions for screening to a "walled off" prosecutor with the DOJ to be provided to Mohammad upon completion of the review. The questions were approved without any challenge as to their materiality or relevance by the DoJ and the DoD.
[9] The language in the proposed order was negotiated and agreed to by counsel for Abu Ghayth, the DoJ and the DoD.

effort to interview Mr. Mohammad, continued the commencement of the jury trial in this matter to March 3, 2014.

Pursuant to the Court's February 19 Order on the Motion to interview Mr. Mohammad, Abu Ghayth's written questions were submitted to him on or about the same day. *See* Dkt. #1494; *see also* March 13, 2014 Letter by AUSA Tara M. LaMorte, attached hereto as Exhibit A. On or about 7 March Mr. Mohammad's responses to the questions were provided to the Department of Defense for review.  That process, which took seven days to complete, produced an unedited, un-redacted and unclassified 14-page declaration of Mr. Mohammad, which was disclosed to the defense on March 13, 2014.  *See* Exhibit A; Written Responses of Khalid Shaikh Mohammad to Questions by Defense Counsel for Sulaiman Abu Ghayth, attached hereto as Exhibit B.

As anticipated by the defense in the various motions, memorandums of law, declarations and affirmations filed in seeking access to Mr. Mohammad, many of Mr. Mohammad's written responses directly refute the evidence introduced against Mr. Abu Ghayth on its case at trial and are therefore material to the question of guilt, and exculpatory as to Mr. Abu Ghayth within the meaning of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). Due to security concerns and the policies of the Government pertaining to Guantanamo detainees, Mr. Mohammad is unavailable to appear at the jury trial in this matter to present live testimony.  In light of his unique knowledge regarding the events and circumstances underlying the charges against Mr. Abu Ghayth, Mr. Mohammad's testimony cannot be obtained from any other source.

<u>**LAW AND ARGUMENT**</u>

**A.  <u>Mr. Abu Ghayth Wishes, and Under the Sixth Amendment Has a Right, To Present Mr. Mohammad as a Witness In His Defense.</u>**

Although at first blush Mr. Mohammad's responses to the defense's questions suggest a hesitancy to testify in the ongoing trial of Mr. Abu Ghayth, it is readily apparent that this hesitancy finds its genesis with his treatment at the hands of the Government, in particular the Department of Defense and the Central Intelligence Agency over the years of his confinement.

Mr. Mohammad was captured in 2003 and held in secret CIA detention for approximately three years. It has been well documented that during this period he was subjected to a severe program of "enhanced interrogation techniques."[10] In March, 2003 alone, Mr. Mohammad was subjected to waterboarding 183 times.[11]

Mr. Mohammad was transferred to Guantanamo Bay in September, 2006, where interrogation techniques include the use of repetitive questioning[12] and "False Flag"[13] interrogations, either of which may reasonably contributed to his concern that the questions posed by defense counsel could in fact have been from the CIA, or the FBI.

---

[10] "Certain interrogation techniques place the detainee in a more physical and psychological stress and therefore are considered more effective tools in persuading a resistant HVD to participate with CIA interrogators. These techniques – walling, water dousing, stress positions, wall standing, and cramped confinement – are typically not used in combination, although some combined use is possible. For example, an HVD in stress positions or wall standing can be water doused at the same time, Other combinations of these techniques may be used while the detainee is being subjected to the conditioning techniques discussed above (nudity, sleep deprivation, and dietary manipulation)." See pre-trial Omnibus Motion, Dckt. # 1265, at Exhibit B, 30 December 2004, Memorandum on "high value interrogation" techniques (a/k/a "capture shock") from the Central Intelligence Agency to the Department of Justice, Office of Legal Counsel, at page 7.

[11] *See,* United States Department of Justice, Office of Professional Responsibility, Investigation into the OLC's Memoranda Concerning Issues Relating to the CIA's Use of "Enhanced Interrogation Techniques" on Suspected Terrorists (2009).  See also 14 February 2007, report of the International Committee of the Red Cross, previously submitted as an attachment to pre-trial Omnibus Motion, Dckt. #1265 at Exhibit D.

[12] "Repetition Approach: Continuously repeating the same question to the detainee within interrogation periods of normal duration."  Attached to pre-trial Omnibus Motion, Dckt. #1265, at Exhibit C therein, 16 April 2003, "Memorandum for the Commander, US Southern Command." From Donald Rumsfeld, The Secretary of Defense. Subject: Counter-Resistance Techniques in the War on Terrorism, at page 3.

[13] "False Flag: Convincing the detainee that individuals from a country other than the United States are interrogating him." *Ibid*, at page 4.

Mr. Mohammad states that he wishes to help Mr. Abu Ghayth, but only if the request to do so comes directly from him and not his counsel. In this regard Mr. Mohammad notes that the format of the defense's questions reminded him of the questions posed to him by his American interrogators in that "they correspond precisely with the way the CIA and the FBI posed questions" and that the questions seemed "primarily directed to me." *See* Exhibit B at p. 1.

Although the Special Administrative Measures governing Mr. Abu Ghayth's confinement obviously prevent any such communication with Mr. Mohammad, either directly or through counsel, by this Motion Mr. Abu Ghayth expresses his personal desire to present Mr. Mohammad as witness in his defense. *See* Declaration of Stanley Cohen.   Based upon discussions with counsel for Mr. Mohammad it is believed that by the formal filing of this application, any hesitancy to appear on behalf of Mr. Abu Ghayth will be dispelled and that Mr. Mohammad will be otherwise ready willing and able to appear on behalf of Abu Ghayth with regard to the subject matters set forth in his declaration. *See* Declaration of Stanley Cohen. Notably, the defense does not herein seek *to compel* Mr. Mohammad's testimony by means of a subpoena pursuant to Rule 17 of the Federal Rules of Criminal Procedure or a *writ ad testificandum*, and Mr. Mohammad through his declaration has waived any Fifth Amendment rights he might otherwise have.

The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973); citing Webb v. Texas, 409 U.S. 95 (1972); Washington v. Texas, 388 U.S. 14, 19 (1967); In re Oliver, 333 U.S. 257 (1948).

"At a minimum," the Sixth Amendment guarantees that "criminal defendants have the

right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987) "The Sixth Amendment can give the right to compulsory process only where it is within the power of the federal government to provide it." United States v. Greco, 298 F.2d 247, 251 (1962). Failure to provide a defendant with access to the Court's compulsory process power may constitute reversible error on appeal. *See* United States v. Valenzuela-Bernal, 458 U.S. 858 (1982); Roviaro v. United States, 353 U.S. 53 (1957).

Indeed, the issue of whether or to what extent Khalid Shaikh Mohammad may be deposed as a witness pursuant to the Sixth Amendment rights of an accused is no stranger to the courts of this Circuit. Thus in United States v. Paracha, 2006 U.S. Dist. LEXIS 1 (S.D.N.Y. 2006) (unpublished),[14] the court found that although Mr. Mohammad's proffered testimony did not rise to the requisite level of materiality[15] to justify the use of the Court's process power to facilitate his testimony, it nonetheless recognized that in the appropriate circumstances an accused has a right to present testimony by Mr. Mohammad, or other off shore detainees, under the Sixth Amendment and to seek the court's intervention to accomplish that end.[16]

As discussed below, the case at bar presents an appropriate circumstance for the testimony of Mr. Mohammad as the materiality of his testimony on behalf of Abu Ghayth is beyond question.

---

[14] In Paracha, in addition to Khalid Shaikh Mohammad, the defense sought access to 3 other detainees – Majid Khan, Ammar al Baluchi and Saifullah Paracha –at least two of whom were not even at Guantanamo but rather still in CIA custody at "black sites" such that the US would not even "confirm or deny" they existed.

[15] In *Paracha*, the sole basis for the proffered testimony was that Mr. Mohammad did not recognize an individual in a photograph "taken in the early 1970's." United States v. Paracha, *2006 WL 12768 at *37* (S.D.N.Y. 2006) (unpublished).

[16] Ultimately the Rule 15 deposition was granted by the court as to Saifullah Paracha (though the defense chose not to pursue it) and unclassified summaries were admitted in lieu of depositions at trial as to Majid Khan and Ammar al Baluchi. See Also, United States v. Moussaoui, 365 F2d 292 (4th Cir. 2004), where, as an alternative to depositions pursuant to Rule 15, written summaries of five Guantanamo detainees were substituted for live testimony In addition to a summary of Khalid Shaikh Mohammad, the Court approved the use of written summaries of statements attributed to Mustafa Ahmed Al-Hawsawi, Mohammad Manea, Ahmad Al-Qahtani, Walid Muhammad Salih Bin Attaash ("Khallad", and Riduan Isamuddin ("Hambali") in lieu of live testimony.

**B. "Extraordinary Circumstances" Exist That Justify the Rule 15 Deposition of Mr. Mohammad**

The decision whether to Order Rule 15 depositions rests within the discretion of the trial court. United States v. Johnpoll, 739 F.2d 702 (2d Cir. 1984). Rule 15 of the Federal Rules of Criminal Procedure holds that the trial court "may grant the motion because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1). To establish "exceptional circumstances" within the meaning of Rule 15, the moving party must show: "1) the prospective witness is unavailable for trial, 2) the witness' testimony is material, and 3) the testimony is necessary to prevent a failure of justice." United States v. Cohen, 260 F.3d 68, 78 (2d Cir. 2001). The failure of a trial court to grant a motion for a Rule 15 deposition may constitute reversible error. *See* United States v. Ramos, 45 F.3d 1519 (11th Cir. 1995); United States v. Sanchez-Lima, 161 F.3d 545 (9th Cir. 1998).

For the reasons set forth below, the defense here contends that Mr. Mohammad is unavailable, his testimony is material and exculpatory as to the charges against Mr. Abu Ghayth, and a denial of this motion would create a failure of justice constituting reversible error on appeal.

**1.   The Testimony of Mr. Mohammad is Material.**

A defendant moving for Rule 15 depositions must make a showing of materiality "beyond unsubstantiated speculation that the evidence exculpates the defendant." United States v. Kelley, 36 F.3d 1118, 1125 (D.C. Cir. 1994) [internal quotation marks omitted]; citing Guam v. Ngirangas, 806 F.2d 895, 897 (9th Cir. 1986); United States v. Wilson, 601 F.2d 95, 97 (3d Cir. 1979); United States v. Ontiveros-Lucero, 621 F. Supp. 1037, 1038 (W.D. Tex. 1985), aff'd, 790 F.2d 891 (5th Cir. 1986). However, in making the requisite showing of materiality to support

a Rule 15 motion, "[i]t is not necessary that the defendant show the testimony will surely acquit him." United States v. Bronston, 321 F.Supp. 1269, 1272 (S.D.N.Y. 1971). Testimony is material if it is "highly relevant to a central issue in the case…." United States v. Drogoul, 1 F.3d 1546, 1556 (11th Cir. 1993). Rule 15 depositions may not be used as a discovery device, but "are only to be taken to preserve the testimony for use at trial." Ismaili v. United States, 828 F.2d 153, 159 (3d Cor. 1987). As evidenced by the ongoing state of the jury trial in this matter as well as the answers responses already given by Mr. Mohammad, the defense does not seek to depose Mr. Mohammad for the purpose of discovery. Rather, the defense seeks to preserve Mr. Mohammad's testimony only as to the topics discussed in his already-disclosed written responses set forth in Exhibit B.

The materiality of Mr. Mohammad's testimony goes well beyond "unsubstantiated speculation," is highly relevant to the central issues of the matter before this Court, and is exculpatory. Although the defense has long believed that Mr. Mohammad's testimony to be material and exculpatory with respect to Mr. Abu Ghayth, his responses, set forth in Exhibit B, remove all doubt. The materiality of Mr. Mohammad's responses is magnified by the recent testimony of Saajid Badat who, by all appearances, the Government presented as a witness only to implicate Mr. Abu Ghayth by association – even though Mr. Badat has never met Mr. Abu Ghayth and could not even confirm that he had heard of Mr. Abu Ghayth prior to this proceeding.

Specifically, Mr. Mohammad addresses the following topics currently at issue in the trial of Mr. Abu Ghayth:

### a) Mr. Abu Ghayth's Knowledge of al Qaeda Military Operations, Including the "Shoe Bomb" Plots.

Mr. Mohammad's putative testimony undermines the Government's assertions regarding

1) Mr. Abu Ghayth's role in al Qaeda or any conspiracy to kill United States nationals; 2) Whether Mr. Mohammad ever informed Mr. Abu Ghayth of the "shoe bomb" plots; 3) Whether Mr. Abu Ghayth had anything to do with al Qaeda military operations; 4) Whether Mr. Abu Ghayth, in fact, had any knowledge of al Qaeda terrorist operations, including the "shoe bomb" plots; 5) Whether Mr. Abu Ghayth ever met Richard Reid; 5) Whether Mr. Abu Ghayth would have had any knowledge of al Qaeda terrorist operations within the context of al Qaeda's military and security protocols.

According to Mr. Mohammad, Mr. Abu Ghayth had no knowledge of, or role in, any aspect of al Qaeda's terrorist or military operations. "[Mr. Abu Ghayth] did not play any military role [in al Qaeda] and to the best of my knowledge he did not receive any military training at any of the training camps for the Mujahideen in Afghanistan." *See* Exhibit B at p. 2.

Mr. Mohammad states that even those tasked by al Qaeda with making speeches on its behalf had no idea what actually went on with al Qaeda's military operations. *See* Exhibit B at p. 7. In fact, al Qaeda's military and security protocols were so strict that no one other than those actually involved in an operation (and then only on a need to know basis) were aware of a particular planned attack, and that those ultimately tasked with carrying out an attack did not know about the precise nature of what they would be asked to do until the last possible moment:

> The operations which the leadership [of al Qaeda] intends to undertake and the plans for them are known only to the leader of the operation and the military and security officials involved; those carrying out the operations are not privy to the specific plans until the goal or the time of the operation approaches for fear that the operation will be botched or miscarried.

*See* Exhibit B at p. 7.

Al Qaeda's military and security protocols were indeed so strict that Mr. Mohammad, the alleged "mastermind" of the terrorist attacks of September 11, 2001, did not know the true name

of fellow senior al Qaeda leader and "shoe bomb" plot co-planner Abu Hafs al Masri until "after he was killed." *See* Exhibit B at p. 2; *see also* Dkt. #1411-1 ¶ 9(b).

Mr. Mohammad, goes on to directly contradict the Government's assertions that Mr. Abu Ghayth had some prior knowledge of the "shoe bomb" plots when he allegedly made the speeches mentioned in the Superseding Indictment. *See* Exhibit B at p. 14. "I personally never spoke with Sheikh Sulaiman Abu Ghayth about the Shoe Bomb Operation . . . Sheikh Sulaiman Abu Ghayth is not a military man and had nothing to do with military operations." *See* Exhibit B at p. 14. In fact, Mr. Mohammad "do[es] not recall ever seeing Sheikh Sulaiman Abu Ghayth with my brother Abdul-Jabbar (Richard Reid, Allah preserve him)." *See* Exhibit B at p. 14.

As such, Mr. Mohammad's testimony on this point is material to the central issues of this case and is exculpatory with respect to Mr. Abu Ghayth.

### b) The Nature of *Bayat* and Mr. Abu Ghayth's Role In Urging Others To Swear Loyalty to Bin Laden.

According to Mr. Mohammad, "[b]ayat is an oath taken by a member in the introductory phase of obligating him to hear and obey [the one to whom he has sworn] as long as the orders do not contradict Islamic principles." *See* Exhibit B at p. 13.

With respect to whether Mr. Abu Ghayth ever urged others to swear loyalty or *bayat* to Bin Laden, Mr. Mohammad states, "There is no one in Al-Qaeda whose mission it is to give speeches pushing people to swear bayat." *See* Exhibit B at p. 13. Mr. Mohammad plainly states that he never saw Mr. Abu Ghayth "giving lectures or participating in activities to push Arab Mujahideen to swear bayat to Sheikh Osama bin Laden." *See* Exhibit B at p. 13. Mr. Mohammad "do[es] not even know if Sheikh Sulaiman Abu Ghayth personally swore bayat to Sheikh Osama bin Laden or not." *See* Exhibit B at p. 13.

In fact, according to Mr. Mohammad, the swearing of *bayat* to Bin Laden was optional

for individuals associated with al Qaeda. *See* Exhibit B at p. 13. Mr. Mohammad notes that while he personally swore *bayat* to Bin Laden, he did so only after a long period of working with and for Bin Laden and when he chose to swear *bayat*, he did so voluntarily and without prompting. *See* Exhibit B at p. 13. At the same time, Mr. Mohammad notes that "even the cook has sworn a bayat."  *See* Exhibit B at p. 13.

Especially in light of recent trial testimony, these statements directly contradict the Government's assertions that Mr. Abu Ghayth ever urged anyone so swear a loyalty oath, *bayat* or otherwise, to Bin Laden or al Qaeda. Furthermore, they undermine the Government's theory that the swearing of *bayat* is a prerequisite to membership in al Qaeda or any terrorist conspiracy involving members and non-members of al Qaeda. As such, Mr. Mohammad's testimony on this point is material to the central issues of this case and is exculpatory with respect to Mr. Abu Ghayth.

### c)  Mr. Abu Ghayth's Role as an Imam or Cleric With Respect to al Qaeda.

Mr. Mohammad's recollections of Afghanistan during the time period relevant to the Superseding Indictment show a nation struggling to recover in the wake of the Soviet occupation of that country and the power vacuum left after the Soviet withdrawal. According to Mr. Mohammad, the Taliban were viewed by many in the Islamic world as a positive and stabilizing influence, or at least engendered curiosity among sheikhs, scholars and other Muslims from other nations. *See* Exhibit B at pp. 3-6. According to Mr. Mohammad, this perception "motivated some Muslim scholars, preachers, and regular Muslims to travel to Afghanistan to confirm what was being told about this unique experience and to learn from it."  *See* Exhibit B at p. 5.

Mr. Mohammad suggests that this is how Mr. Abu Ghayth found himself in Afghanistan during the time period relevant to the Superseding Indictment. Mr. Mohammad knows Mr. Abu

Ghayth as "a pious man" who has "memorized the Holy Qur'an in its entirety." *See* Exhibit B at p. 2. Mr. Mohammad reports that, prior to his coming to Afghanistan, Mr. Abu Ghayth was "an imam and the Friday sermon speaker at one of the mosques in Kuwait." *See* Exhibit B at p. 2. Mr. Mohammad reports that he first came to know Mr. Abu Ghayth "through audiocassette tapes of Friday sermon prayers. These cassette tapes were widely distributed among the people and in Islamic libraries." *See* Exhibit B at p. 2. Mr. Mohammad further reports that generally, "the Mujahideen respected all the Imams or Sheikh hs [sic] and afforded them opportunities to give lectures at any time." *See* Exhibit B at p. 2.

Mr. Mohammad's testimony on these points shows that, contrary to the Government's claim that Mr. Abu Ghayth was some sort of "official" Imam or spokesman for al Qaeda, he was something of a celebrity among the many Imams and other clerics and intellectuals who would have been welcome to speak to the Mujahideen, al Qaeda and others without membership in any of their organizations or any conspiracy. As such, Mr. Mohammad's testimony is material as to these issues and exculpatory with respect to Mr. Abu Ghayth.

### d) The Significance of Mr. Abu Ghayth Visiting or Lecturing at a Mujahideen or al Qaeda Training Camp.

Mr. Mohammad's testimony will establish that there was nothing unusual about a cleric or Imam visiting a Mujahideen or al Qaeda training camp during the time period relevant to the Superseding Indictment and that visitation to or speaking at such a training camp did not signify a predisposition with violence or a belief in the views and values of al Qaeda. *See* Exhibit B at p. 6.

As stated above, Mr. Mohammad reports that generally, "the Mujahideen respected all the Imams or Sheikh hs [sic] and afforded them opportunities to give lectures at any time." *See* Exhibit B at p. 2. In fact, Mr. Mohammad reports that "[i]t was commonplace for visiting

scholars at these camps to give religious lectures warning [the audience] against radicalization, unlawful killing, and 'takfir' – the act of declaring someone an infidel." *See* Exhibit B at p. 6. However, Mr. Mohammad does not ever recall seeing Mr. Abu Ghayth at a training camp – Mujahideen, al Qaeda, or otherwise. *See* Exhibit B at p. 2.

Mr. Mohammad's testimony once again directly contradicts the Government's contentions and as such his testimony is material as to these points and exculpatory with respect to Mr. Abu Ghayth.

### e) The Significance of "Brevity Cards"

Mr. Mohammad reports that so-called "brevity cards" were not some sort of al Qaeda or Mujahideen-specific tool for committing acts of terrorism. Rather, they were a way for the people of Afghanistan to efficiently communicate in a country and during a time where that country did not have "an effective wired communication network" and "a mobile phone network was completely non-existent."  *See* Exhibit B at p. 10. As a result of the lack of this sort of infrastructure, "many Arab families and others would resort to using wireless radios or walkie-talkies." *See* Exhibit B at p. 10.

Mr. Mohammad further explains the logistical challenges for Afghanistan as a society which led to the systemization and use of the brevity cards by the people of Afghanistan during this time:

> Since wireless radio networks are open to all, it was necessary to arrange a schedule and codes to organize most of those using these devices whether they be Arabs or Afghanis in order to prevent overlapping signals and interference and to facilitate communications, as well as save power on these devices considering all the different channels being used during times of heavy communication.
>
> Accordingly, these cards were put into use because they included most of the important facilities such as hospitals, workshops,

schools, or other codes written on the chart along with a list of people who used them. This was not limited to Al-Qaeda or Arabs. One studying the cards would find that they are not related to Al-Qaeda members alone, but also contain the names of Taliban members and others.

When the Americans bombed the city of Kandahar and the number of killed and wounded was mounting, it became necessary to add appropriate terms in light of the bombings. In Kandahar there was no front line of battle since U.S. forces contented themselves with intense air strikes and wireless communication networks were used to transport the injured and evacuate families from homes that had been bombed. Thus, it was necessary to adopt appropriate codes for those situations.

*See* Exhibit B at p. 10.

The testimony of Mr. Mohammad with respect to the brevity cards shows clearly that, while they were used by al Qaeda and the Taliban, they also were used by civilians and served many important peaceful civilian purposes in a country with poor infrastructure and an unbroken history of ongoing warfare originating within and without its borders. As such, Mr. Mohammad's testimony rebuts the Government's assertion that the appearance of the name of an individual on a brevity card necessarily signifies membership in al Qaeda or the Taliban and is thus material and exculpatory with respect to Mr. Abu Ghayth.

The totality of Mr. Mohammad's testimony shows that Mr. Abu Ghayth, while present in Afghanistan during the relevant time period, was nothing more than a traveling cleric among many in Afghanistan during the time period relevant to the Superseding Indictment. Contrary to the Government's assertions that Mr. Abu Ghayth belonged to any conspiracy – much less al Qaeda - Mr. Mohammad's testimony establishes that the basis of this prosecution is Mr. Abu Gahyth's "mere association" with Bin Laden brought about by fate, place and time. As such, Mr. Mohammad's testimony is both exculpatory and highly relevant to the central issues in this case, and is therefore material within the meaning of Rule 15 of the Federal Rules of Criminal

Procedure as interpreted by <u>United States v. Cohen</u>, *supra*.

### 2.  Mr. Mohammad is Unavailable.

"Unavailability is to be determined according to the practical standard of whether under the circumstances [the movant] has made a good-faith effort to produce the person to testify at trial." <u>United States v. Johnpoll</u>, 739 F.2d 702, 709 (2d Cir. 1984); citing <u>Ohio v. Roberts</u>, 448 U.S. 56, 74 (1979); <u>California v. Green</u>, 399 U.S. 149, 189 n. 22 (1970). Courts may accept the assertions of counsel on the facts relating to unavailability, as long as those assertions are neither conclusory nor speculative. <u>United States v. Grossman</u>, 2005 WL 486735 at 7 (S.D.N.Y. 2005); citing <u>United States v. Sindona</u>, 636 F.2d 792, 803-04 (2d Cir. 1980). The party moving for the taking of Rule 15 depositions must show that it made a "'good-faith effort to produce the person to testify at trial.'" <u>United States v. Stein</u>, 482 F.Supp.2d 360, 365 (S.D.N.Y. 2007); quoting <u>United States v. Johnpoll</u>, 739 F.2d 702, 709 (2d Cir. 1984).

As set forth in the Declaration supporting this Motion, the defense has made the requisite good faith effort required by this Court in prior cases such as <u>Stein</u>, *supra*. It is undisputed that Mr. Mohammad may not travel to New York to testify in person at the trial in this matter due to security concerns as well as the Government's protocols with respect to Guantanamo detainees. In fact, the Government once planned to try Mr. Mohammad in the Southern District of New York, but abandoned that plan after determining that his mere presence in Manhattan created unacceptable security concerns.[17]

Furthermore, Mr. Mohammad's entry into the United States is barred by statute due to his status as a Guantanamo detainee as of June 24, 2009.  Section 552 of the 2010 Homeland

---

[17] *See* Exhibit E, U.S. Drops Plan for a 9/11 Trial in New York City.

Security Appropriations Act[18] specifically bars the Government from transporting any person who remained a Guantanamo detainee after June 24, 2009 from entering the United States for any purpose other than the prosecution and detention of the detainee. Even when the Government insists on doing so, section 552 sets forth an extensive set of requirements including notice to Congress by the President which must be met at least 45 days prior to the transfer of the detainee into the United States.

For these reasons, Mr. Mohammad is unavailable to testify at trial in this matter within the meaning of Rule 15 of the Federal Rules of Criminal Procedure as interpreted by United States v. Cohen, *supra*.

### 3. A Denial of This Motion Would Create a Failure Of Justice and Constitute Reversible Error.

"In general, testimony 'is necessary to prevent a failure of justice' when the witness is unavailable, his testimony is material, and there are no substantial countervailing factors militating against the taking of the deposition." United States v. Grossman, 2005 WL 486735 at *7 (S.D.N.Y. 2005); citing Johnpoll, *supra,* 739 F.2d at 709; *see also* Drogoul, *supra,* 1 F.3d 1546, 1552-56; United States v. Sun Myung Moon, 93 F.R.D. 558, n.1 (S.D.N.Y. 1982). The burden is on the non-moving party to show that countervailing factors exist which would render the taking of depositions unjust or prejudice that party. *See e.g.,* United States v. Grossman, 2005 WL 486735 at 11 (S.D.N.Y. 2005); citing United States v. Dunseath, 1999 WL165703 (S.D.N.Y. 1999).

As discussed above, the defense has established that the Mr. Mohammad's testimony is material and he is unavailable to appear at trial. Additionally, there are no "substantial countervailing factors militating against" either the live closed-circuit testimony or deposition of

---

[18] Pub. L. 111-83 (Oct. 2009).

Mr. Mohammad. Such procedures would not place an undue burden on this Court, the Government, or the defense. The cost would not be exorbitant and the testimony or deposition would not prejudice the Government in any way. Mr. Mohammad is already in the custody of the Government and neither procedure would require moving Mr. Mohammad from his place of detention at Guantanamo Bay. Likewise, the testimony of Mr. Mohammad, if taken by one of the means sought herein, would not create any additional security concerns such as those that halted the trial of Mr. Mohammad in this District in 2010.

As such, a denial of this Motion would constitute a "failure of justice" within the meaning of Rule 15 of the Federal Rules of Criminal Procedure as interpreted by <u>United States v. Cohen</u>, *supra,* and would likely require a reversal of any conviction of Mr. Abu Ghayth on appeal.

### 4.  Mr. Mohammad's Testimony is Not Cumulative and Does Not Consist of Inadmissible Hearsay.

Although a Rule 15 movant may make the required showings of materiality, unavailability and that a failure to grant the motion may constitute a failure of justice, "a court may properly deny the motion if the proposed testimony would be cumulative or consists of hearsay." <u>United States v. Grossman</u>, 2005 WL 486735 at *8.

Mr. Mohammad's testimony does not consist of hearsay. As set forth above, he will offer direct and first-hand observations of the times, places, and events underlying these charges and testify to his knowledge of Mr. Abu Ghayth, Mr. Abu Ghayth's lack of participation in any conspiracy to kill United States nationals or to provide material support to terrorists, and other material issues.

Nor is Mr. Mohammad's' testimony cumulative. In <u>United States v. Stein</u>, this Court (Hon. Lewis A. Kaplan, presiding) held that the testimony of two witnesses sought to be deposed

by the Government should be denied because, *inter alia*, they would merely repeat the testimony of two other witnesses who would testify at trial. United States v. Stein, 482 F.Supp.2d 360, 365 (S.D.N.Y. 2007); citing United States v. Grossman, 2005 WL 486735 (S.D.N.Y. 2005). Mr. Mohammad's authority on all matters relating to al Qaeda is uniquely authoritative and unsurpassed in its breadth. Even where Mr. Mohammad's testimony overlaps that of other witnesses, it provides insights and perspectives unavailable from any other source.

### C. Allowing Live Testimony By Closed Circuit Television is Preferable Under the Circumstances

It is undisputed that where a witness whose testimony is material to a central issue in a case is physically unavailable to appear at trial, allowing the testimony of that witness to be taken via live CCTV is permissible. *See* United States v. Gigante, 166 F.3d 75, 81 (2d Cir. 2001). In Gigante, the Second Circuit held that the criteria for whether to allow a Rule 15 deposition are essentially a prerequisite to allowing testimony via CCTV. The Second Circuit Court of Appeals also held, however, that the decision of whether to allow live testimony by CCTV rather than a Rule 15 deposition rested on a fact-based inquiry as to whether "exceptional circumstances" exist justifying such a measure. United States v. Gigante, 166 F.3d 75, 81 (2d Cir. 2001). In Gigante, the Second Circuit approved of the district court's decision to allow live CCTV testimony because 1) the defendant could not be physically present at the deposition; and 2) the release of identifying information and the location of the witness (who was in the witness protection program) would have created a danger to the witness.

Importantly, the Second Circuit upheld the district court's finding that where a defendant is unable to be physically present at a Rule 15 deposition, "contemporaneous testimony via closed circuit televising affords greater protection of [the defendant's] confrontation rights than

would a deposition." <u>United States v. Gigante</u>, 166 F.3d 75, 81 (2d Cir. 2001); quoting <u>United States v. Gigante</u>, 971 F.Supp. 755, 758-9 (E.D.N.Y. 1997).

While Mr. Abu Ghayth is not physically unable to travel due to illness as was the defendant in <u>Gigante</u>, Mr. Abu Ghayth is nonetheless unable to travel to Guantanamo for any deposition of Mr. Mohammad. As such, the confrontation clause and <u>Gigante</u> demand that Mr. Mohammad be allowed to testify via live CCTV.

### D.  A Deposition of Mr. Mohammad Would Be Conducted In a Manner Consistent With Rule 15 of the Federal Rules Of Criminal Procedure.

"The taking of a deposition, especially on the eve of trial, and the setting of conditions for it, [is] clearly within [the trial court's] discretion." <u>United States v. Hayutin</u>, 398 F.2d 944 (2d Cir. 1968) (overruled on other grounds in <u>United States v. Reed</u>, 790 F.2d 208 (2d Cir. 1986)).

Obviously, it would be permissible for a Rule 15 deposition be taken in person and recorded by an authorized court reporter. *See* <u>Hendricks v. Swenson</u>, 456 F.2d 503 (8th Cir. 1972). It has also been held that Rule 15 depositions may be taken in written form by means of interrogatories and cross-interrogatories. *See* <u>United States v. Figueroa</u>, 298 F.Supp. 1215 (S.D.N.Y. 1969). Video has also been held to be an acceptable means of recording a Rule 15 deposition. *See* <u>United States v. Benfield</u>, 593 F.2d 815 (8th Cir. 1979); <u>United States v. Tunnell</u>, 667 F.2d 1182 (5th Cir. 1982); <u>United States v. Keithan</u>, 751 F.2d 9 (1st Cir. 1984).

It has further been held that videotaped depositions are acceptable where an incarcerated defendant is not present, so long as the defendant is able to follow the proceedings and communicate with counsel in real time. *See* <u>United States v. Gifford</u>, 892 F.2d 263 (3rd Cir. 1989), cert. den. 497 U.S. 1006 (1990).

Should the Court determine that Rule 15 depositions are preferable to live testimony via

CCTV, the defense is amenable to the taking of Mr. Mohammad's deposition through such procedures which may be agreed upon by the Court, the Government, and the defense.

## CONCLUSION

For the reasons set forth above, Mr. Abu Ghayth hereby respectfully asks that this Court grant this Motion to Offer the Testimony of Mr. Mohammad via CCTV during trial or, in the alternative, for his deposition pursuant to Rule 15 of the Federal Rules of Criminal Procedure.

Dated: March 16, 2014                    Respectfully submitted,

Stanley L. Cohen, Esq.
Geoffrey S. Stewart, Esq.
Ashraf Nubani, Esq.
Zoe Dolan, Esq.

*Attorneys for SULAIMAN ABU GHAYTH*

Moira Meltzer-Cohen, Esq.
*Of Counsel.*