UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,


       -against-                                      S14 98 Crim. 1023 (LAK)


SULAIMAN ABU GHAYTH,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION


Appearances:

> John P. Cronan
> Michael Ferrara
> Nicholas Lewin
> Assistant United States Attorneys
> PREET BHARARA
> UNITED STATES ATTORNEY
>
> Stanley L. Cohen
> STANLEY COHEN & ASSOCIATES, LLC
>
> Geoffrey S. Stewart
> Zoe Dolan
> Ashraf Nubani
>
> *Attorneys for Defendant Sulaiman Abu Ghayth*

LEWIS A. KAPLAN, *District Judge*.

Defendant Sulaiman Abu Ghayth, a spokesman for Usama bin Laden and al Qaeda in the wake of the September 11, 2001 attacks on the World Trade Center and the Pentagon, was arrested abroad by U.S. authorities in 2013 and brought to this district. He ultimately was convicted by a jury of conspiring to kill United States nationals, conspiring to provide material support or resources, knowing or intending that they would be used in preparation for, or in carrying out, a conspiracy to kill United States nationals, and providing such material support or resources.

During trial, and after the government had rested, Abu Ghayth moved to take the testimony of Khalid Sheikh Mohammed ("KSM"), who is detained as an enemy combatant at Guantanamo Bay, via live, closed circuit television ("CCTV") or, in the alternative, that his testimony be preserved through deposition pursuant to Rule 15 of the Federal Rules of Criminal Procedure.[1] He argued principally that the so-called Richard Reid shoe-bomb plot[2] played an important role in the government's case and that KSM could provide material, exculpatory evidence, *viz.* that Abu Ghayth did not have any foreknowledge of the plot.[3] The Court denied the motion from the bench.[4] Within hours of the denial, Abu Ghayth moved to renew and reargue.[5] That

---

[1]  Def. Mot. [DI 1545].

[2]  On December 22, 2001, Richard Reid, an al Qaeda member, attempted to detonate explosives packed into his shoes while aboard an American Airlines flight from Paris to Miami. He was subdued by passengers and arrested. In 2002, he pleaded guilty to eight terrorism-related counts and later was sentenced to life imprisonment. *See generally United States v. Reid*, 369 F.3d 619, 619-20 (1st Cir. 2004).

[3]  Def. Mem. [DI 1597] at 4, 10-12.

[4]  Tr. at 1125:3-1129:24.

[5]  Def. Mot. to Renew and Reargue [DI 1562].

motion too was denied from the bench.[6]  This opinion sets out the context of and bases for those

rulings.

*Facts*

I.      *Al Qaeda and Abu Ghayth's Involvement*

A.      *Early al Qaeda Attacks*

As is well known, Usama bin Laden, the leader of al Qaeda until his death in 2011,

orchestrated numerous terrorist attacks against the United States.  In 1998, bin Laden and al Qaeda

planned and executed bombings of the United States Embassies in Dar es Salaam, Tanzania, and

Nairobi, Kenya, in which 224 were killed and over a thousand injured.  In 2000, they bombed the

U.S.S. COLE in the port of Aden in Yemen.  Most notably, bin Laden and other al Qaeda members

orchestrated the tragic attacks of September 11, 2001 in which airplanes were hijacked and flown

into the World Trade Center in New York and the Pentagon, killing thousands of Americans.

B.      *The Shoe-Bomb Plot*

The World Trade Center and Pentagon attacks were only two of the contemplated

al Qaeda terrorist attacks involving airplanes.  "At the end of September or beginning of October

2001," it hatched the so-called shoe-bomb plot, which involved packing explosives into shoes to be

worn by suicide bombers who would board civilian aircraft within or bound for the United States,

detonate the shoe bombs in flight, and kill themselves and all aboard.[7]  Abu Hafs al Masri, who then

---

[6]      Tr. at 1266:13-15.

[7]      *Id.* at 417:12-420:16, 551:21-25; *see also supra* note 2.

was responsible for al Qaeda's terrorist operations abroad and was the group's second in command, was in operational charge.[8]  He or others working with him recruited at least two such bombers – Richard Reid and Saajid Badat.[9]  Abu Hafs, however, was killed in late 2001.[10]  KSM, who had been working in Pakistan, then took over.[11]  Badat and Reid traveled to Pakistan and discussed specific plans for executing the shoe-bomb plot with KSM.[12]  Ultimately, the plot failed.  Badat backed out.[13]  And while Reid tried to go through with his part on December 22, 2001, his fellow passengers subdued him before Reid succeeded in detonating his bomb.[14]

C.      *Abu Ghayth*

Abu Ghayth appears to have become involved with al Qaeda in the summer of 2001 – that is, after the 1998 Embassy bombings and the 2000 attack on the U.S.S. COLE, during the run up to the September 11, 2001 attacks, and the early stages of the shoe-bomb plot, but before September 11, 2001 and before the shoe-bomb plot was put in motion.  In June 2001, he traveled

---

[8]
    *Id.* at 421:16-22, 470:11-14.

[9]
    *Id.* at 532:19-533:9, 423:20-424:20.

[10]
    *See infra* note 91.

[11]
    Tr. at 538:22-539:22.

[12]
    *Id.* at 539:4-540:4.

[13]
    *Id.* at 420:17-20.

[14]
    *Id.* at 543:25-544:3.

to Afghanistan from his home in Kuwait, where he was a religious leader and teacher.[15]  Abu Ghayth

admitted at trial that he met with bin Laden six or seven times during the summer of 2001, knowing

all the while that bin Laden was believed to be responsible for the Embassy bombings and the attack

on the U.S.S. COLE.[16]  Although Abu Ghayth denied having pledged bayat (an oath of allegiance)

to bin Laden, he admittedly agreed to help him as a religious scholar and orator.[17]  He gave speeches

to groups of men at al Qaeda training camps and spoke to a small group at an al Qaeda guesthouse

about the concept of giving bayat, explaining that pledging bayat to bin Laden would be the

equivalent of pledging bayat also to Mullah Omar, the leader of the Afghani Taliban.[18]

In the course of that summer, Abu Ghayth returned briefly to Kuwait to retrieve his

pregnant wife and seven children.[19]  He resettled his family in Kandahar, but it did not long remain

in Afghanistan.[20]  Abu Ghayth claimed that his wife was pregnant and needed medical treatment and

that he therefore took her and his children to Pakistan.  Allegedly unsatisfied with the care available

there, he then sent them back to Kuwait on approximately September 5, 2001.[21]  Knowing that

---

[15]

> *Id.* at 1150:12-13, 1151:2-19, 1160:13-15.

[16]

> *Id.* at 1162:24-1163:24, 1184:4-6.

[17]

> *Id.* at 713:6-16.

[18]

> *Id.* at 715:8-717:3; *see also id.* at 273:7-21.  There was no testimony that Abu Ghayth encouraged others to pledge bayat to bin Laden.

[19]

> *Id.* at 1170:6-1171:6.

[20]

> *Id.* at 1171:18-20, 1179:10-19.

[21]

> *Id.* at 720:18-25; *see also id.* at 1179:13-19.

"something big was going to happen" with al Qaeda and believing that he "had something to offer in the time to come," Abu Ghayth returned to Afghanistan on September 7, 2001,[22] and did not accompany his family to Kuwait.

Four days later, al Qaeda suicide bombers flew hijacked airplanes into the World Trade Center and the Pentagon. Abu Ghayth claims to have learned about the attacks after they occurred from the media while staying at a Kuwaiti acquaintance's house in Kabul.[23] Later that night, a messenger dispatched by bin Laden arrived at the house to retrieve Abu Ghayth.[24] Bin Laden's driver drove Abu Ghayth for several hours from Kabul into the mountains of Afghanistan.[25] When he arrived at bin Laden's hideout, bin Laden beckoned Abu Ghayth to speak with him and spared no time in claiming responsibility for the attacks.[26] The two men talked late into the night.[27] The next morning, Abu Ghayth woke to find bin Laden flanked by two of his senior deputies – Ayman al Zawahiri and Abu Hafs al Masri.[28] Bin Laden invited Abu Ghayth to join them and then

---

[22] *Id.* at 720:5-10, 1179:20-25, 1181:10-11, 1243:8-21.

[23] *Id.* at 721:7-15, 1182:6-16.

[24] *Id.* at 721:7-15, 1183:5-13.

[25] *Id.* at 722:9-14, 1183:5-1184:3.

[26] *Id.* at 1185:3-10.

[27] *Id.* at 1186:1-3.

[28] *Id.* at 1186:7-9.

asked him to help deliver al Qaeda's message to the world.[29]  Abu Ghayth admitted that he agreed, allegedly after some equivocation.[30]  He, bin Laden, Zawahiri, and Abu Hafs then proceeded to make a video later published around the globe in which Abu Ghayth offered justifications and praise for the September 11 attacks.[31]

Following the September 12, 2001 video, Abu Ghayth appeared as an al Qaeda spokesperson in videos dated October 2001,[32] October 9, 2001,[33] and October 13, 2001,[34] and made several audio recordings in 2001 and 2002.  Two of the videos contain language threatening the United States with a "storm of airplanes."[35]

In the wake of the September 11 attacks, the U.S. military entered Afghanistan to combat al Qaeda and the Taliban.  In the course of those operations, the military recovered several

---

[29]

*Id.* at 1186:10-21.

[30]

*Id.* at 1186:7-1187:12.

[31]

*See* GX 1-S.

[32]

GX 7-S.  The specific day in October 2001 appears to be unknown.

[33]

GX 8-S.

[34]

GX 5-S.

[35]

*See* GX 5-T at 4 ("Finally, I want to send a message to the U.S. Secretary of State, who expressed doubt about our previous statement and who underestimated what we said that there are thousands of young Muslims who look forward to die for the sake of Allah and that the Storm of Aircrafts will not stop, by the permission of God the Almighty."); GX 8-T at 2 ("America must know that the Storm of Airplanes will not abate, with God's permission.").

so-called brevity cards that were introduced into evidence.[36]  Some of those cards contain the name "Salman Abu Ghayth," which the government argued was a reference to Sulaiman Abu Ghayth.  Of particular importance here, the brevity cards contain numbers for persons and places affiliated with al Qaeda, such as "Sheik Usama" and "Al-Faruq Camp," and unaffiliated persons and places, such as "Amir Al-Mu'minyn" and "Al-Tayyib Agha."[37]  Sergeant Major Karnes further testified to the fact that the brevity cards contain some words with no apparent relationship to violence or al Qaeda.[38]

## II.  *Events Preceding the Court's Rulings*

Abu Ghayth first was indicted in the thirteenth superseding indictment in this case ("S13"), filed on March 1, 2013.[39]  S13 contained a single count, which charged Abu Ghayth with conspiring to kill United States nationals.  It alleged as an overt act that Abu Ghayth gave a speech in which he threatened that "'the storms shall not stop, especially the Airplanes storm,' and advised Muslims, children, and opponents of the United States 'not to board any aircraft and not to live in

---

[36]

See GX S2.  A brevity card is a code card that contains numbers that correspond to names, places, and other words.  The numbers were used in lieu of the corresponding names and other words in radio communications in order to maintain secrecy.

[37]

*See generally* GX 206-1R; GX 206-2R; GX 206-3R; GX 207-1R; GX 207-2R; GX 207-3R; GX 208-R; Tr. at 523:24-524:13 (Badat testified that the names Amir Al-Mu'minyn and Al-Tayyib Agha refer to members of the Taliban, not al Qaeda).

[38]

Tr. at 176:1-177:6, 211:24-214:2.

[39]

S13 Indictment [DI 1154].

high rises.'"[40] Thus, the government explicitly alleged from the outset of the case that Abu Ghayth threatened storms of airplanes and that the threats were in furtherance of the alleged conspiracy to kill U.S. nationals. It could have sought to prove Abu Ghayth's complicity in the charged conspiracy in any number of ways, including by proving that the above quoted threats betrayed his knowledge of the shoe-bomb plot.

Abu Ghayth was on notice for many months prior to trial that KSM might possess information relevant to his defense. Defense counsel conceded that, in or shortly following the summer of 2013, they identified several Guantanamo detainees – including KSM – who might possess information useful to their client as a result of discovery provided by the government.[41] They claimed to have sought access to those detainees through the Department of Defense without success during fall 2013.[42] The Court has not been made privy to the specific nature or extent of those efforts, aside from an unsworn representation by defense counsel that someone in his office attempted unsuccessfully to contact the Department of Defense's general counsel.[43] Notwithstanding these professed difficulties, Abu Ghayth did not seek any assistance from the Court in securing access to those possible witnesses until February 2014, many months later and on the eve of trial.

On December 20, 2013, the government filed a second superseding indictment

---

[40]

     *Id.* ¶ 6e.

[41]

     Cohen Decl. [DI 1469] ¶ 6; *see also id.* ¶ 7.

[42]

     *Id.* ¶¶ 6-7.

[43]

     *See* Tr. at 1110:20-1111:18.

against Abu Ghayth ("S14"). It contained two additional counts that were based on the same core factual allegations as Count One.[44] The next day, the government moved to take Badat's testimony via CCTV or, in the alternative, for a Rule 15 deposition.[45] While there was no claim that Badat ever had interacted with Abu Ghayth in relation to the shoe-bomb plot, the government said that Badat's testimony would establish that the shoe-bomb plot existed during the same period in which Abu Ghayth threatened further "storms of airplanes."[46] The coexistence of Abu Ghayth's "storm of airplanes" threats with the shoe-bomb plot, it contended, would support the inference that Abu Ghayth "*knowingly* participated in al Qaeda's overall conspiracy to kill Americans."[47]

S14 and the government's Rule 15 motion were filed six weeks before the scheduled start of trial, which at that time was February 3, 2014. Abu Ghayth moved for a sixty-day continuance.[48] In a supporting affirmation, defense counsel identified several "critical" witnesses whom they claimed they wished to interview in order to defend against the two new counts.[49] These

---

[44]

S14 Indictment [DI 1409]. The superseding indictment added the material support and conspiracy to provide material support counts.

[45]

Gov. Mot. [DI 1411].

[46]

*Id.* at 8-11.

[47]

*Id.* at 7-12 (emphasis in original).

[48]

Dec. 23, 2013 Hr'g Tr. at 28:19-24.

Abu Ghayth argued that S14 and Rule 15 application concerning Badat showed that the government's "theory has changed" and that it "now claims that Mr. Abu Ghayth was in fact aware of the so-called shoe-bomb incident in advance of Richard Reid's arrest." *Id.* at 20:23-21:4.

[49]

Cohen Aff. [DI 1426] ¶¶ 13-14.

witnesses included Richard Reid, certain unnamed individuals located abroad, most of whom they already had interviewed, and one witness located abroad whose name was provided to the Court under seal.[50] KSM was not mentioned by name or otherwise referred to, although defense counsel later told the Court that they resumed efforts to secure permission from the Department of Defense to interview KSM as soon as S14 was filed.[51] In any event, the Court granted the motion to the extent of continuing the trial until February 24, 2014,[52] although it did not appear that the government's case would change in any material respect in light of S14.

On February 4, 2014 – approximately six weeks after S14 was filed and three weeks before the adjourned start of the trial – Abu Ghayth moved to compel the Department of Defense to grant access to KSM for an interview.[53] That was the first that the Court had heard of Abu Ghayth's interest in KSM despite the fact that his counsel supposedly had been interested in talking to KSM since at least as early as summer 2013.

On February 11, the United States Attorney's Office agreed in writing to an in-person interview of KSM at Guantanamo by a member of the defense team, with certain enumerated

---

[50]

Id. ¶¶ 17-23.

[51]

The Court so learned on February 4, when Abu Ghayth included as exhibits to his motion for access to KSM several emails with the Department of Defense. *See* Def. Mem. [DI 1471], Ex. D (Dec. 20, 2013 Ltr. from S. Cohen to A. Liotta, Department of Defense); Ex. E (Jan. 2, 2014 Ltr. from S. Cohen to A. Liotta); Ex. F (Jan. 23, 2014 Email from S. Cohen to L. Apostol); Ex. G (Jan. 27-28, 2014 Email Chain between S. Cohen and L. Apostol); Ex. C (Jan. 27, 2014 Ltr. from D. Nevin, Counsel to KSM, to S. Cohen); Ex. B (Jan. 28, 2014 Ltr. from S. Cohen to A. Liotta).

[52]

Order [DI 1440].

[53]

Def. Mot. [DI 1468].

conditions.[54]   After initially indicating that they would proceed under the plan laid out in the

February 11 letter, defense counsel on February 14 changed course and insisted that they would send

written questions to KSM in lieu of conducting an in-person interview.[55]

Abu Ghayth then drafted 452 questions to send to KSM.[56]   The questions first were

approved by a designated Assistant United States Attorney who was walled off from the prosecution

team.[57]   The parties agreed to certain governing conditions and, on February 18, the questions were

sent to Guantanamo Bay.[58]   That same day, Abu Ghayth moved for a forty-five day continuance.[59]

The government consented to a one-week continuance and the Court, though it expressed serious

doubt as to Abu Ghayth's right to access to KSM based on the showing he had made, granted a one-

week continuance – from February 24 to March 3.[60]   It further ordered that any Rule 15 motion

---

[54]

Feb. 11, 2014 Ltr. from M. Ferrara to S. Cohen and Z. Dolan [DI 1566].

[55]

Feb. 17, 2014 Ltr. from M. Ferrara to Court [DI 1512]

[56]

*See* DI 1608, Ex. 1.

[57]

DI 1512 at 2.

[58]

Feb. 18, 2014 Ltr. from M. Ferrara to Court [DI 1513].

The conditions were stipulated to by the parties and set out in the Court's February 19 order.
[DI 1494].  They included: (1) The written questions would be limited to issues related to
Abu Ghayth's defense; (2) U.S. government personnel walled off from Abu Ghayth's
prosecutors would review and approve the questions to be posed to KSM; (3) Walled off
U.S. government personnel would review KSM's responses before they would be made
available to any third parties; (4) Absent a court order, defense counsel would not
disseminate publicly KSM's responses.

[59]

Def. Mot. [DI 1487].

[60]

Feb. 19, 2014 Hr'g Tr. at 14:4-15:15.

regarding KSM be filed by February 26.[61]

As of February 25, KSM had not provided a response to defendant's 452 written questions to the designated, walled off U.S. government personnel for its review.[62] Abu Ghayth accordingly requested another one-week trial continuance and a one-week extension of the February 26 Rule 15 motion deadline.[63] On February 27, 2014, defense counsel confirmed that KSM's response – which had been sent to KSM's attorneys – had been returned to KSM by KSM's attorneys for a final review.[64] The next day, however, the government informed the Court that KSM was refusing to turn over the material unless and until the Department of Defense agreed to an additional condition that had not been included in the original agreement – *i.e.*, that the team prosecuting KSM before a military commission would be walled off from his responses.[65] Abu Ghayth's counsel admitted that they had been aware of that condition for nine days, but had failed to raise it with the prosecution in this case or the Court.[66] The Court denied both requests, noting that it was speculative whether KSM ever would provide the written responses to defense counsel

---

[61]

*Id.* at 14:18-23.

[62]

Feb. 25, 2014 Ltr. From S. Cohen to Court [DI 1568].

The purpose of the review evidently was to ensure that no classified information would be revealed.

[63]

*Id.*

[64]

Feb. 27, 2014 Ltr. from S. Cohen to Court [DI 1569].

[65]

Feb. 28, 2014 Ltr. from M. Ferrara to Court [DI 1510], at 1.

[66]

Feb. 28, 2014 Hr'g Tr. at 3:7-17, 7:15-8:4.

or anyone else.[67]

Approximately one week later – after the jury had been selected and the trial begun – defense counsel informed the Court that KSM had agreed to provide a written response to the walled off Assistant United States Attorney for review.[68]

KSM never did answer defendant's 452 questions. The defense team instead received thirteen pages of a fourteen-page narrative statement on March 13, 2014.[69] The statement said that KSM refused to "answer all of the questions" and admitted that "there are extensive areas about which [KSM had] no knowledge because of the nature of [his] work with Al-Qaeda" and thus his "answers in these areas w[ould] be based upon [his] general knowledge."[70] KSM made little or no effort to distinguish between information of which he claimed personal knowledge and other material based on "general knowledge," whatever exactly that may have meant. He further expressed an unwillingness to provide "any video or audio recorded testimony [in this case] at the request of the government or the defense."[71]

The statement provided a few facts about Abu Ghayth, including his position as an imam, and then launched into a lengthy essay detailing "the relationship between Al-Qaeda and the

---

[67]

    *Id.* at 6:2-7:4.

[68]

    Tr. at 119:22-120:3.

[69]

    *See id.* at 693:13-16. Page twelve initially was omitted from the document.

[70]

    DI 1597, Ex. B at 1.

[71]

    *Id.*

government of the Islamic Emirate of Afghanistan."[72]  It returned briefly to Abu Ghayth and his role as a spokesperson for al Qaeda, explaining that "we would have to resort to a long war of attrition to which the military and media alike contribute" and opining that Abu Ghayth had been chosen to assist bin Laden due to his "rhetorical ability . . . or the strength and discipline of his speech or his literary fortitude,"[73] before touching on charitable donations, brevity cards, the process of leaving Afghanistan after the U.S. invasion,[74] and bayat.[75]  Specifically, he explained the purposes for which brevity cards had been used and who used them, but failed to answer any of the questions relating to the appearance of Abu Ghayth's name on several recovered cards.[76]  He disclaimed knowledge of whether Abu Ghayth swore bayat to bin Laden.[77]

Finally, KSM included one short paragraph in which he asserted that he never spoke with Abu Ghayth about the shoe-bomb plot and added that "those tasked with giving statements to the media do not necessarily know all the details of an operations [*sic*] and are sometimes even

---

[72]  *Id.* at 2-6.

[73]  *Id.* at 7-8.

[74]  *Id.* at 11.

[75]  *Id.* at 13.

[76]  *Compare id.* at 10, *with* DI 1608, Ex. 1 at 4 ("Do you know who decided to include the name of Sulaiman Abu Ghayth to each card and how a number was assigned to his name?  Do you know how many cards contained the name of Sulaiman Abu Ghayth?  Were you aware while in Afghanistan or Pakistan that the name of Sulaiman Abu Ghayth was listed on any card?").

[77]  DI 1597, Ex. B at 13.

unaware of the very existence of the operation."[78]  He ignored almost all of the questions that asked specifically about Abu Ghayth, Abu Ghayth's associates, and Abu Ghayth's role in making videos and with al Qaeda's media center.[79]

Abu Ghayth filed the first motion at issue here – the motion to take KSM's testimony by CCTV or by deposition – on Sunday, March 16.[80]  The Court denied that motion – without having seen page twelve of KSM's statement – on March 18.[81]  It based its ruling on Abu Ghayth's failure to demonstrate materiality and on the motion's untimeliness.[82]  Nonetheless, Abu Ghayth several hours later moved to renew and reargue on the basis that KSM's attorney allegedly had asserted, contrary to KSM's written response, that KSM was "in fact willing to appear in this court by video to answer any and all questions with regard to" Abu Ghayth and "to be examined without limitation

---

[78]

*Id.* at 14.

[79]

*See* DI 1608, Ex. 1 at 11-22.  This includes questions 410 through 416, which ask whether Abu Ghayth's statements in Government Exhibit 8 referred to the shoe bomb plot and who, if anyone, instructed him to make statements threatening a "storm of airplanes."  *Id.* at 18-19.

[80]

Def. Mot. [DI 1545].

Abu Ghayth appeared to argue, or at least suggest, that he had a right under the Sixth Amendment to compulsory process to obtain testimony from KSM.  At the same time, however, Abu Ghayth represented that he would not seek to compel KSM's testimony.  *Id.* at 7.  Thus, Abu Ghayth's apparent attempt to invoke the Sixth Amendment's protections was misguided.  Moreover, although this was not argued explicitly in the motion, the Court notes that there is no Sixth Amendment right to present testimony in a case such as this absent some showing that such testimony would be material.  *E.g.*, *United States v. Paracha*, No. 03 Crim. 1197 (SHS), 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982).

[81]

Tr. at 1125:4.

[82]

*Id.* at 1125:4-1130:1.

on all relevant topics."[83]  The Court denied that motion also.

### III.    *Events Subsequent to the Court's Rulings*

On March 19, after the Court first denied the Rule 15 motion, Abu Ghayth took the witness stand.  In relevant part, he denied having had any foreknowledge of the shoe-bomb plot[84] or any specific advance knowledge of the September 11 attacks, although he admitted that he knew that "something big was coming from al Qaeda."[85]  He testified to having given religious lectures at two different training camps to over 100 young men[86] and denied ever having pledged bayat to bin Laden.[87]  He further stated that he met KSM in Afghanistan while giving a speech at a mosque and denied ever having discussed the shoe-bomb or any other terrorist plot with him.[88]  This testimony largely was consistent with testimony that FBI Special Agent Michael Butsch had given several days earlier based on the statements that Abu Ghayth made after his arrest and while en route

---

[83]

Def. Mot. to Reargue [DI 1562].

[84]

Tr. at 1198:18-1199:13.

[85]

*Id.* at 1182:6-19, 1243:8-17.

[86]

*Id.* at 1168:2-1170:5.  Abu Ghayth described the first lecture as "a religious speech right after the middle prayer of the day in the mosque. And in the mosque they were sitting on the floor, and I was standing. And the lecture was about to prepare the person to be merciful, and prepare the person to go back to his spirits and his soul."  *Id.* at 1168:23-1169:2.

[87]

*Id.* at 1178:15-16.

[88]

*Id.* at 1200:2-1201:21.

to the United States.[89]

      The Court received page 12 of KSM's statement that same day. The contents of that page did not counsel in favor of reconsideration. KSM, consistent with Abu Ghayth's own testimony, there denied that Abu Ghayth played a role in our knew about the September 11 attacks in advance, other than "that there was an impending operation that would be big."[90] He reiterated also that Abu Ghayth did not play a military role in al Qaeda.

      Finally, during closing statements, defense counsel acknowledged that Abu Hafs al Masri, as opposed to KSM, had been the primary architect of the shoe-bomb plot until Abu Hafs was killed in late November or early December 2001.[91] His death and the subsequent change in responsibility for the plot thus came after Abu Ghayth made the two videotaped speeches in which he threatened future "storms of airplanes."

---

[89]

      Special Agent Butsch testified consistently about Abu Ghayth's lack of specific foreknowledge of the September 11 attacks, the speeches he gave at al Qaeda training camps, and bayat. *E.g.*, *id.* at 713:6-16, 715:8-717:3, 720:5-10. Agent Butsch did not testify as to whether Abu Ghayth had or had not met KSM or the nature of any such meetings.

[90]

      DI 1597, Ex. B at 12.

[91]

      Tr. at 1438:4-8 (Cohen closing) ("Remember what Mr. Badat said about the shoe bombing conspiracy. It was put together by Abu Hafs Masri, who was the number three guy in Al Qaeda, who was killed in a bombing in his house after the United States invasion.").

      The record leaves unclear the exact date on which Abu Hafs was killed. Badat testified that Abu Hafs was killed at "the end of November or beginning of December [2001]," Tr. at 538:10-21, while the government's expert, Evan Kohlmann, testified that he "was killed in October or November of 2001," *id.* at 951:1-5. The Court credits Badat's testimony. Badat recalled first having seen the shoe bombs, which were kept in Abu Hafs' possession, in mid-November. He testified that they were retrieved from Abu Hafs' safe in late November or early December, after Abu Hafs had been killed. *Id.* at 535:15-537:9.

*Discussion*

I.    *Legal Standard*

      The Second Circuit has held that witnesses may testify through CCTV where the government satisfies the standard for taking a deposition under Rule 15.[92]   Thus, the standard governing the alternative requests to take live testimony by CCTV or a deposition was and remains identical.   The defendant must show that there are exceptional circumstances and that such a course would be in the interest of justice.[93]   This standard is met where the "testimony is material to the case and . . . the witness is unavailable to appear at trial."[94]   To satisfy the materiality requirement, the moving party must make some showing that the proposed testimony exculpates or, in the event that the government is the moving party, inculpates, the defendant.[95]   It need not be definitive proof of guilt or innocence,[96] but the testimony should be more than merely relevant.[97]   Furthermore, the proposed testimony should be admissible and non-cumulative of other evidence.[98]   To be sure, in

---

[92]

    *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir.1999); *United States v. Abu Ghayth,* No. S14 98 Crim. 1023 (LAK), 2014 WL 144653, at *2 (S.D.N.Y. Jan. 15, 2014).

[93]

    FED. R. CRIM. P. 15(a)(1).

[94]

    *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir.1984).   Unavailability is not disputed here.

[95]

    *United States v. Kelly*, 36 F.3d 1118, 1125 (D.C. Cir.1994).

[96]

    *United States v. Bronston*, 321 F. Supp. 1269, 1272 (S.D.N.Y.1971) ("It is not necessary that defendant show the testimony will surely acquit him.").

[97]

    *See United States v. Ismaili*, 828 F.2d 153, 161 (3d Cir.1987).

[98]

    *Abu Ghayth*, 2014 WL 144653, at *2; *United States v. Stein*, 482 F. Supp. 2d 360, 365 (S.D.N.Y. 2007); *United States v. Grossman*, No. S2 03 Cr. 1156 (SHS), 2005 WL 486735,

close cases, doubts as to admissibility should be reserved for determination when the deposition testimony is offered. But the defendant here had an ample opportunity going back many months to ascertain the content of any testimony that KSM might have been prepared to give.

The district court need not grant a motion under Rule 15 that is made after unexcused delay or on the eve of trial.[99] Such motions "must be made promptly and certainly are denied properly where the depositions sought would delay the trial."[100] The Second Circuit has upheld the denial of motions made even several weeks before trial.[101]

## II.    The Proposed Testimony Would Not Have Been Material

Abu Ghayth's failure to satisfy the exceptional circumstances standard in this case is quite clear, even putting aside his failure to pursue the possibility of testimony from KSM on a

---

at *3 (S.D.N.Y. Mar. 2, 2005); *see also United States v. Drogoul*, 1 F.3d 1546, 1557 (11th Cir. 1993) ("if there is very little chance that a deposition will be admissible . . . the district court need not engage in the wasteful practice of authorizing useless depositions"); *United States v. Tolliver*, 61 F.3d 1189, 1205-06 (5th Cir. 1995) *cert. granted, judgment vacated sub nom. Sterling v. United States*, 516 U.S. 1105 (1996) and *cert. granted, judgment vacated sub nom. Moore v. United States*, 519 U.S. 802 (1996); *United States v. Warren*, 713 F. Supp. 2d 1, 4 (D.D.C. 2010); Fed. R. Crim. P. 15(f) (use of deposition or part thereof subject to Federal Rules of Evidence).

[99]    *United States v. Robinson*, No. 99 Cr. 1007, 1999 WL 1254436 (Table), at *1 (2d Cir. Dec. 1, 1999); *United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962) (Marshall, J.); 2 Charles Alan Wright et al., Federal Practice and Procedure: Criminal § 243 (4th ed. 2008).

[100]    *United States v. Chusid*, 00 Crim. 0263 (LAK), 2000 WL 1449873, *1 (S.D.N.Y. 2000).

[101]    *See, e.g.*, *United States v. Vargas*, 279 F. App'x 56, 60-61 (2d Cir. 2008) (upholding the district court's denial of a Rule 15 motion where the defendant's "motion came a year after discovery commenced and approximately three weeks before the scheduled start of the trial" and "the materiality of the testimony sought was remote, because the fact that two low-level couriers did not know who Martinez or his alleged supplier was did not contradict any of the government's evidence").

timely basis, which is discussed below.  This is because Abu Ghayth had failed to show that the proposed testimony would be material, admissible, non-cumulative, and competent.

As an initial matter, KSM prefaced the written statement with the following disclaimer:

> "There are extensive areas about which I have no knowledge because of the nature of my work with Al-Qaeda during which I held many different positions during different periods of time and under different conditions.  *Therefore, my answers in these areas will be based upon my general knowledge.*"[102]

In other words, a great deal of what appears in the written statement consists of assertions and understandings that are not based on personal knowledge.  Moreover, it is difficult to discern what is based on personal knowledge and what is based on so-called general knowledge.  But Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Thus, by his own admission, much of what KSM said in the written statement would not be admissible even if he testified in person.

This is compounded by the fact that defense counsel, during oral argument, acknowledged that a majority of the KSM statement has "absolutely nothing to do with this trial at all.  They're [*i.e.*, the pages of the statement] Khalid Sheikh Mohammed opining about geopolitical issues, geopolitical politics, and the history of Al Qaeda."[103]  Counsel identified only five points on which, he claimed, KSM had something to say that counsel characterized as exculpatory.[104]  But

---

[102]

DI 1597, Ex. B at 1.

[103]

Tr. at 1114:16-21.

[104]

*Id.* at 1117:18-1118:10.

examination of these five (actually four)[105] points demonstrates that the proposed testimony even on those points would not have satisfied the exceptional circumstances requirement.

First, Abu Ghayth claimed that KSM "provides an explanation that is directly at odds with the government's theory as to what the brevity cards mean."[106] The reference was to page 10 of KSM's statement, where he asserted (perhaps from personal knowledge, perhaps not) that the lists of people on the cards were not limited to al Qaeda members or even Arabs. But the testimony of government witnesses made it entirely clear that the code or brevity cards included names of persons who were not members of al Qaeda.[107] Thus, testimony by KSM on this point would have been cumulative.

Second, Abu Ghayth claimed that KSM would "provide an explanation that is directly at odds with what the government's theory of *bayat* is."[108] This presumably is a reference to page 13 of the KSM statement, where he stated that "[b]ayat is an oath taken by a member in the introductory phase obligating him to hear and obey [the one to whom he has sworn] as long as the orders do not contradict Islamic principles," that "[t]here is no one in al Qaeda whose mission it is to give speeches pushing people to swear bayat," and that KSM does not know if Abu Ghayth personally swore bayat to Usama bin Laden.[109] But the trial evidence reflects no dispute that *bayat*

---

[105] Two of the five points related to Abu Ghayth's knowledge of al Qaeda plots. *See also* DI 1597 (describing the same purported bases for materiality).

[106] Tr. at 1117:18-20.

[107] *Supra* notes 37-38.

[108] Tr. at 1117:21-23.

[109] DI 1597, Ex. B at 13.

is just what KSM said, thus making that part of the proposed testimony cumulative.[110]

The fact, if it be so, that KSM does not know whether Abu Ghayth swore bayat to bin Laden simply was not material, particularly in light of Agent Butsch's testimony that Abu Ghayth told him that he did not make bayat to bin Laden, but nevertheless promised that he would assist bin Laden as a religious scholar and orator.[111] Whether there was anyone in al Qaeda whose "mission" was to "push[] people to swear bayat," assuming that KSM would be competent so to state, simply was not important. The government's point was not that there were people who had been given that mission, but that Abu Ghayth on a particular occasion explained the concept of bayat to a group of five or six men at an al Qaeda guesthouse and added that if one gave bayat to bin Laden, one was giving bayat also to Mullah Omar, the leader of the Taliban, because bin Laden himself had given bayat to Mullah Omar.[112] The proposed testimony from KSM did not address that point.

Third, counsel asserted that KSM would have "deal[t] directly with the fact that Sulaiman Abu Ghayth had no knowledge, was not involved with, played no role in the Richard Reid shoe bombing whatsoever" and addressed al Qaeda's practice of compartmentalization of information, which counsel argued meant that Abu Ghayth would have been ignorant of the shoe-

---

[110]

    *E.g.*, *id.* at 713:4-11.

[111]

    *Id.* at 713:8-16. Although this testimony came after Abu Ghayth's initial motion, Abu Ghayth himself testified also that he did not swear bayat to bin Laden or encourage others to do so. *Id.* at 1178:15-25.

[112]

    *Id.* at 271:6-273:21.

bomb plot.[113] But that considerably exaggerated what KSM's statement actually said. KSM, at one point, stated that those commissioned with making public statements "do not know the extent of them or what is behind them or that this is only a war of attrition."[114] But he qualified that quite significantly later in the statement, explaining that "those tasked with giving statements to the media do not *necessarily* know all the details of an operations [*sic*] and are *sometimes* even unaware of the very existence of the operation."[115] In other words, those tasked with giving statements sometimes do know the details of an operation and sometimes are aware of its existence. Such a fact would not have been exculpatory. Indeed, quite the contrary.

Moreover, Abu Ghayth failed to address the lack of any basis in the KSM statement from which to conclude that KSM was in a position to know what Abu Ghayth knew and did not know. Defense counsel admitted during closing arguments – which occurred after the Court's rulings – that Abu Hafs al Masri, and not KSM, was the primary architect of the plot during the time at which Abu Ghayth made the "storm of airplanes" videos.[116] Abu Hafs appeared in the September 12, 2001 video with Abu Ghayth.[117] KSM, in contrast, appears to have spent much of his time during the relevant period in Pakistan and only assumed a prominent role in the shoe-bomb plot well

---

[113]

     *Id.* at 1117:24-1118:5; *see also* DI 1597 at 10-12.

[114]

     DI 1597, Ex. B at 7.

[115]

     *Id.* at 14 (emphasis added).

[116]

     *See supra* note 91.

[117]

     GX 1-S.

after Abu Ghayth made the statements at issue here.[118]  These facts simply do not yield the conclusion that KSM would or could have known what Abu Hafs, bin Laden, or anybody else might have disclosed to Abu Ghayth.[119]

Fourth, defense counsel pointed to KSM's contention that there were religious figures and speakers who went to Afghanistan but did not join al Qaeda,[120] a reference to page pages 4-6 of the KSM statement.  Assuming that there would have been a foundation for such testimony, it still would not have been exculpatory.  The fact that some speakers traveled to Afghanistan and did not assist or conspire with al Qaeda simply is not probative of whether or not Abu Ghayth did so.

Fifth, Abu Ghayth attempted to avoid the basis for the Court's holding by suggesting in his motion to reargue, albeit only in a footnote, that "the Court is not positioned at this time to determine the materiality of a video deposition of KSM until the conclusion of that deposition."[121] That put the cart before the horse.  Depositions are not permitted in criminal cases except in exceptional circumstances.  The party seeking one must demonstrate in advance that the testimony would be material, at least probably admissible, and non-cumulative, a showing that Abu Ghayth

---

[118]

Tr. at 538:7-539:3.

[119]

On page 12 of the statement, KSM asserted also that Abu Ghayth did not have foreknowledge of the September 11 attacks and that he was not a militant.  Abu Ghayth does not argue that testimony concerning those topics would be material, perhaps because that page was delivered after Abu Ghayth submitted his motion.  In any event, the Court finds that any such testimony would not be material.  The government never claimed that Abu Ghayth knew specifically about the September 11 attacks in advance and, in any event, Abu Ghayth provided testimony virtually identical to KSM's statement.  Moreover, KSM's statement about Abu Ghayth's non-military role would have been quite consistent with the government's evidence.

[120]

Tr. at 1118:6-10; *see also* DI 1597 at 13-14.

[121]

DI 1562 at 2, n.3.

– despite having put 452 written questions to KSM and having obtained a fourteen page single-spaced written statement from him – did not make. A court is not bound, in a criminal case, to authorize a deposition against the possibility that something material, admissible, and non-cumulative will turn up.[122]

Finally, although this point, unlike what precedes it, is *ex post* in nature, it bears mention that the proof of defendant's guilt in this case was overwhelming for reasons entirely independent of any awareness of the shoe-bomb plot.

## III.    *The Application Was Untimely*

In addition to failing to demonstrate the materiality of the proposed testimony, Abu Ghayth's motion was untimely. The Court has set out above the lengthy sequence of events that preceded the motions at issue here. From that sequence, the Court distills three important points.

First, Abu Ghayth was aware that KSM might have useful information from as early as summer 2013 but he failed during the months that followed to make any serious effort to obtain access to KSM. While the Court assumes without deciding that he sought access from the Defense Department, his failure promptly to seek relief from this Court if his efforts were not successful was inconsistent with due diligence – unless of course counsel never sincerely regarded KSM as a potentially helpful witness.

Second, Abu Ghayth made no mention whatsoever of KSM when moving for a continuance after S14 and the government's motion to take Badat's testimony were filed. He listed

---

[122] The Court understands that Abu Ghayth has not had the kind of access to or, perhaps, cooperation from KSM that he would have liked. But that has not affected his ability to explore the sort of testimony that KSM might have given to the full extent that KSM was willing to cooperate with him.

numerous others whose testimony he might seek, but not KSM.  That issue was not raised until over one month later despite the fact that defense counsel professes to have encountered difficulty with the Department of Defense during the fall.

Third, the Court granted Abu Ghayth continuances totaling twenty-eight days after the government filed S14 and the Rule 15 motion regarding Badat.  But defense counsel waited to raise the KSM issue with the Court and then repeatedly changed course, first by shifting the request from one for an in-person interview – which was promptly agreed by the government – to one for written questions and then by revealing at the eleventh hour KSM's demand that his answers be walled off from his prosecutors.  These actions contributed considerably to the delay in receiving KSM's statement and in making a Rule 15 motion.

In sum, the motion was untimely.  Rather than seek relief from this Court well in advance of trial, and rather than act expeditiously to secure the desired information from KSM once relief was sought, Abu Ghayth dragged this process out until the last days of trial, moving to take a deposition or for CCTV testimony nearly three weeks past the Court's February 26 deadline and after the government already had rested.  While the Court need not reach a conclusion on the point, one might well conclude that the object of the KSM exercise was not to obtain testimony from KSM, but to avoid that result while generating a point possibly thought useful on appeal in the event of a conviction.

*Conclusion*

The Court denied Abu Ghayth's motions for CCTV testimony by or a Rule 15 deposition of Khalid Sheikh Mohammed and to renew or reargue the CCTV-Rule 15 motion [DI 1545, DI 1562] on the merits and, in the case of the former, as untimely, all as more fully explained

above.[123]  The motion to compel access to KSM [DI 1468] is denied as moot.

SO ORDERED.

Dated:          April 22, 2014

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[123]

In view of the bases for this decision, it was unnecessary to address whether this Court could have compelled the Department of Defense to permit, or KSM to give, testimony in this case.