UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :

    - v. -              :

                        S14 98 Cr. 1023 (LAK)

SULAIMAN ABU GHAYTH,     :
    a/k/a "Salman Abu Ghayth,"

                        :

        Defendant.

                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>SENTENCING MEMORANDUM</u>

 

PREET BHARARA
United States Attorney
Southern District of New York

John P. Cronan
Nicholas J. Lewin
Michael Ferrara
    Assistant United States Attorneys
    - Of Counsel –

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................1

II.    FACTUAL BACKGROUND....................................................................................2

    A.    The Evidence at Trial ................................................................................2

        1.    Background on al Qaeda ................................................................3

            a.    Al Qaeda's Conspiracy to Kill Americans ...............................3

            b.    Al Qaeda's Recruitment Efforts ................................................5

        2.    Abu Ghayth's Participation in al Qaeda's Conspiracy to Kill Americans .........6

            a.    Prior to September 11, 2001 .......................................................6

            b.    The Events of September 11, 2001 ............................................9

            c.    Subsequent to September 11, 2001............................................12

                i.    The "Storm of Airplanes" Threats ..............................12

                ii.    The October 9, 2001 al Jazeera Statement ..................13

                iii.    The October 13, 2001 al Jazeera Statement ................14

                iv.    The "Convoy of Martyrs" Video.................................16

                v.    The June 2002 As Sahab Interview ..............................18

                vi.    The December 2002 Statement .....................................22

            d.    Additional Evidence of Abu Ghayth's Participation in al Qaeda's Conspiracy to Kill Americans ................................................23

                i.    The November 2001 video with Bin Laden and Zawahiri................23

                ii.    The al Qaeda Code Cards................................................24

                iii.    Abu Ghayth's Arrest with Senior al Qaeda Leaders in Iran .............26

    B.    The Jury Verdict................................................................................27

    C.    The Presentence Investigative Report ................................................27

III.   THE COURT SHOULD IMPOSE A SENTENCE OF LIFE IMPRISONMENT ...................................28

    A.    Applicable Law ..........................................................................................28

    B.    The Statutory Sentencing Factors Call for Life Imprisonment ..............................29

          1.   The Nature and Circumstances of the Offense and the History and
               Characteristics of the Defendant ...................................................29

               a.   Abu Ghayth's Role in al Qaeda's Conspiracy to Kill Americans ............30

               b.   Abu Ghayth's Lies While Testifying .......................................37

               c.   Abu Ghayth's Family Circumstances .......................................40

          2.   The Need for Deterrence, Just Punishment, and Promotion of Respect
               for the Law .............................................................................41

          3.   Imposing a Guidelines Sentence Would Advance the Goals of
               § 3553(a) ...............................................................................42

          4.   The Defendant's Detention in Iran Does Not Warrant Leniency Under
               § 3553(a)................................................................................44

    C.    The Court Should Order Forfeiture of All of the Defendant's Assets ...................46

IV.   CONCLUSION................................................................................................47

# TABLE OF AUTHORITIES

**Cases**

*Brizard* v. *United States*, No. 11 Civ. 6033 (JGK), 2013 WL 1809636
  (S.D.N.Y. Apr. 30, 2013)..................................................................................44-45

*Gall* v. *United States*, 552 U.S. 38 (2007) ...................................................... 28-29, 44

*Rita* v. *United States*, 551 U.S. 338 (2007)...................................................................29

*United States* v. *Booker*, 543 U.S. 220 (2005)..............................................................28

*United States* v. *Carty*, 264 F.3d 191 (2d Cir. 2001) (per curiam) ......................... 44-46

*United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005)..................................................28

*United States* v. *Fernandez*, 443 F.3d 19 (2d Cir. 2006) ......................................... 43-44

*United States* v. *Johnson*, 413 Fed. Appx. 320 (2d Cir. 2011) .....................................45

*United States* v. *Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004).....................................44

*United States* v. *Meskini*, 319 F.3d 88 (2d Cir. 2003) ...................................................41

*United States* v. *Naranjo-Ramirez*, 402 Fed. Appx. 576 (2d Cir. 2010) .......................44

*United States v. Odeh*, 552 F.3d 93 (2d Cir. 2008)................................................... 42-43

*United States* v. *Rattoballi*, 452 F.3d 127 (2d Cir. 2006) .............................................43

*United States* v. *Rubenstein*, 403 F.3d 93 (2d Cir. 2005) ......................................... 43-44

*United States* v. *Stewart*, 590 F.3d 93 (2d Cir. 2009)...................................................42

*United States* v. *Teyer*, 322 F. Supp. 2d 359 (S.D.N.Y. 2004)................................. 44-45

*United States* v. *Valdez*, 426 F.3d 178 (2d Cir. 2005) ..................................................45

**Statutes**

18 U.S.C. § 2332..........................................................................................................1, 42

18 U.S.C. § 2332b......................................................................................................43, 46

18 U.S.C. § 2339A ........................................................................................................................1

18 U.S.C. § 3553 ...........................................................................................................27-29, 41-46

U.S.S.G. § 2A1.1 ..................................................................................................................27, 42

U.S.S.G. § 2A1.5 ..................................................................................................................27, 42

U.S.S.G. § 2M5.3 ........................................................................................................................27

U.S.S.G. § 2X2.1 .........................................................................................................................27

U.S.S.G. § 3A1.1 ..................................................................................................................27, 42

U.S.S.G. § 3A1.4 ..................................................................................................................27, 43

U.S.S.G. § 3B1.1 ..................................................................................................................27, 43

U.S.S.G. § 3D1.2 .........................................................................................................................27

U.S.S.G. § 5E1.2 .........................................................................................................................43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

   - v. -                                  :
                                                              S14 98 Cr. 1023 (LAK)

SULAIMAN ABU GHAYTH,                        :
     a/k/a "Salman Abu Ghayth,"

                                            :

       Defendant.

                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of

defendant Sulaiman Abu Ghayth, a/k/a "Salman Abu Ghayth," which is scheduled for September

23, 2014. On March 26, 2014, following a three-week trial, Abu Ghayth was found guilty of

conspiring to murder Americans, in violation of 18 U.S.C. § 2332(b), and conspiring to provide,

as well as providing and attempting to provide, material support and resources to a conspiracy to

murder Americans, in violation of 18 U.S.C. § 2339A. The Government agrees with the

Probation Department that there is "no fathomable reason to justify a sentence other than life."

Presentence Investigative Report ("PSR") at 22.

As a close associate of Usama Bin Laden and al Qaeda's spokesman, Abu Ghayth played

a critical role for the terrorist group in the months leading up to and following al Qaeda's

deadliest attacks on America. He spoke to young al Qaeda recruits at an al Qaeda guesthouse in

the spring of 2001, urging them to swear allegiance to Bin Laden. He lectured al Qaeda trainees

at terrorist training camps in Afghanistan in the months leading up to September 11, 2001,

instilling in these would-be terrorist operatives the importance of the training they were

receiving. Then, on the morning after the September 11th attacks, Abu Ghayth sat alongside al

Qaeda's three most senior leaders, celebrating the attacks on America the day before, threatening

more attacks, and calling on all Muslims to join al Qaeda's fight. And in the months that

followed—indeed, through at least late 2002—Abu Ghayth continued to serve as al Qaeda's

public voice, vowing that more attacks by al Qaeda would be coming, including a continuing

"storm of airplanes," and using his oratory skills to try to inspire more men to join al Qaeda's

ranks. Abu Ghayth's objectives throughout were simple: to motivate al Qaeda's operatives

before and after September 11, 2001, to continue the terror that al Qaeda perpetrated on that

tragic day, and to drive more fighters to join al Qaeda's mission to kill Americans—a savage

mission that has resulted in the murders of thousands of innocent Americans.

## II. FACTUAL BACKGROUND

### A.    The Evidence at Trial

Jury selection began with the distribution of questionnaires to prospective jurors on

February 18, 2014, followed by in-person *voir dire* on March 3 and 4, 2014. The Government

called seven witnesses at trial: Federal Bureau of Investigation ("FBI") Special Agent James

Fitzgerald, Sergeant Major David Karnes, Sahim Alwam, Saajid Badat,[1] FBI Special Agent

Michael Butsch, Evan Kohlmann, and Criminal Investigator George Corey. The defense called

three witnesses: FBI Special Agent John McKinley, FBI Special Agent Louis Luciano, and the

defendant himself.

---

[1] Saajid Badat testified at trial from the United Kingdom by closed-circuit television.

1.      **Background on al Qaeda**

    a.      **Al Qaeda's Conspiracy to Kill Americans**

Al Qaeda is an international terrorist organization dedicated to opposing non-Islamic

governments with force and violence. PSR ¶ 20. Bin Laden was the leader, or *emir*, of al Qaeda

until his death on May 2, 2011. Trial Transcript, *United States* v. *Abu Ghayth*, S14 98 Cr. 1023

(LAK) (Mar. 5, 2014 to Mar. 24, 2014) ("Trial Tr.") at 49, 813; PSR ¶ 20. By 2001, al Qaeda

had established training camps, guesthouses, and other business operations in Afghanistan for the

purposes of training its operatives and supporting its agenda of violence and murder. PSR ¶ 20;

Trial Tr. at 241-65, 271-87; *id.* at 475-86, 494-502. The core purpose of al Qaeda, as stated by

Bin Laden and other leaders, is and has been to support violent attacks against property and

nationals, both military and civilian, of the United States and other countries. GX 203-T at 2

(February 1998 *fatwah*); Trial Tr. at 64-66; PSR ¶ 20.

Bin Laden articulated al Qaeda's core purpose of attacking America in a number of

public declarations. On August 23, 1996, Bin Laden issued a "Declaration of Jihad Against the

Americans Who Occupy the Land of the Two Holy Sites" (the "August 1996 Declaration of

Jihad). GX 202. The August 1996 Declaration of Jihad, which was signed by Bin Laden and

Ayman al-Zawahiri (Bin Laden's deputy), demanded that the U.S. military leave the Arabian

Peninsula, specifically, Mecca and Medina in Saudi Arabia. GX 202-T; Trial Tr. at 50-53. The

August 1996 Declaration of Jihad stated that Muslim youths were eager to kill infidels to ensure

their reward in the afterlife: "Those youths know that fighting you will double their reward,

unlike fighting others, who are not People of the Book. The youths only want one thing, to kill

you so they go to Paradise. An infidel cannot be in the same hell with his righteous executioner."

GX 202-T at 26. The August 1996 Declaration of Jihad further decreed that carrying out acts of

terror against non-Muslims on Muslim land was "a legal obligation, and reasonable reaction." *Id.* at 26.

Bin Laden also announced al Qaeda's murderous mission to the world in interviews with American journalists. In March 1997, in an interview with Peter Arnett, and less than a year after issuing the August 1996 Declaration of Jihad, Bin Laden made clear that al Qaeda's primary enemy was the United States Government: "[O]ur main problem is the U.S. government while the Saudi regime is but a branch or an agent of the U.S." GX 2-T at 1. Bin Laden reiterated his declaration of jihad against the United States during this interview: "We declared jihad against the U.S. government, because the U.S. government is unjust, criminal, and tyrannical." *Id.* at 3. Bin Laden further assured that attacks against American troops and civilians in Saudi Arabia would be coming: "The people and the young men are concentrating their efforts on the sponsor and not on the sponsored. The concentration at this point of Jihad is against the American occupiers." *Id.* at 11.

Less than a year later, in February 1998, Bin Laden issued a purported *fatwah* that was published in the media and signed by Bin Laden, Zawahiri, and others (the "February 1998 *fatwah*"). GX 203. In the February 1998 *fatwah*, Bin Laden issued a bone-chilling directive calling on Muslims to kill Americans, civilian and military, anywhere on the globe where they were found: "[W]e are issuing the following fatwa to all Muslims: The judgement [sic] to kill Americans and their allies, both civilian and military, is the individual duty of every Muslim able to do so, and in any country where it is possible . . . ." GX 203-T at 2.

In May 1998, just three months after calling for the killing of American civilians all around the world, Bin Laden sat down for an interview with another American journalist, John Miller. Bin Laden reiterated the mandate of the February 1998 *fatwah* to kill all Americans,

including civilians: "[W]e do not differentiate between those dressed in military uniforms and civilians; we consider them all as targets in this fatwa." GX 3-T at 4. During this May 1998 interview, Bin Laden also grimly foreshadowed future attacks against the United States: "So we do expect a black day for America and for the United States to end as united states and to become The Separated States, and to come back and retreat and drag the corpses of their sons back to America, by the will of Allah." *Id.* at 8. In August 1998, about three months after Bin Laden predicted a "black day for America," 224 innocent people—Americans and citizens of other countries—were murdered by al Qaeda operatives who detonated bombs at the U.S. Embassies in Dar Es Salaam, Tanzania, and Nairobi, Kenya. Trial Tr. at 64, 1236.

> **b.     Al Qaeda's Recruitment Efforts**

In 2001 and 2002, the vast majority of al Qaeda's fighters were between the ages of 18 and 25, having traveled to Afghanistan from a variety of countries that included Yemen, Saudi Arabia, Algeria, Tunisia, Egypt, the Palestinian territories, Jordan, Iraq, and Syria. *Id.* at 798-99. During this period of time, al Qaeda's principal means of recruiting young fighters was through video- and audio-recordings that the terrorist group would disseminate, largely through satellite television networks, primarily al Jazeera. *Id.* at 799, 803. Al Qaeda's recorded speeches, disseminated over al Jazeera, typically featured four senior al Qaeda figures: Bin Laden, Zawahiri, Abu Hafs al-Masri (al Qaeda's military commander), and the defendant. *Id.* at 803-04.

Starting in early 2002, al Qaeda began disseminating its propaganda on the Internet using websites that al Qaeda had established. *Id.* at 804. One such website was called the Al Neda Center for Islamic Studies and Research ("Al Neda"), which al Qaeda operated between 2001 and 2003 under a variety of Internet domain names. *Id.* at 811. Anyone with Internet access was able to download material contained on the Al Neda website. *Id.* at 840.

Al Qaeda also operated a media wing, called the As Sahab Foundation for Islamic Media Publication ("As Sahab"). *Id.* at 809. As Sahab produced and released video recordings featuring senior al Qaeda leaders, as well as footage from al Qaeda training camps and of operations that al Qaeda carried out. *Id.* at 810. Al Qaeda's purpose for releasing material publicly was twofold: (1) to terrorize its enemies by airing horrifying footage; and (2) to recruit individuals who might be sympathetic to al Qaeda's cause, thereby inducing them to contribute money to al Qaeda or travel to al Qaeda's training camps in Afghanistan. *Id.*

### 2.     Abu Ghayth's Participation in al Qaeda's Conspiracy to Kill Americans

From mid-2001 through 2002, Abu Ghayth worked alongside al Qaeda's most senior leaders, playing an important role in the terrorist group's conspiracy to kill Americans. Abu Ghayth used his oratory skills to motivate al Qaeda's recruits and trained fighters, and to draw more terrorists to al Qaeda's ranks. With his impassioned rhetoric, Abu Ghayth urged al Qaeda's recruits to swear allegiance to Bin Laden, indoctrinated young men at al Qaeda's training camps about the purpose of their training, spoke on behalf of and in support of al Qaeda's mission, and repeatedly threatened that attacks similar to those of September 11, 2001 would continue. PSR ¶ 21.

#### a.     Prior to September 11, 2001

In the spring of 2001, Abu Ghayth traveled from his home country of Kuwait to Afghanistan. Trial Tr. at 709. Abu Ghayth explained in his post-arrest interview that he had traveled to Afghanistan because he had an interest in jihadist movements and, in particular, the Taliban's assumption of control in Afghanistan. *Id.*

Abu Ghayth, who was a well-known teacher and imam in Kuwait, was seen as a prominent religious figure upon his arrival in Afghanistan. *Id.* at 1161; PSR ¶ 22. Very shortly

after Abu Ghayth arrived in Afghanistan, Bin Laden reached out to Abu Ghayth and they met at

a location called Complex Six. Trial Tr. at 709-10. Bin Laden told Abu Ghayth that he had

wanted to meet Abu Ghayth after hearing about Abu Ghayth as a Kuwaiti preacher and seeing a

tape of Abu Ghayth. *Id.* at 710. Prior to this meeting, Abu Ghayth had known about al Qaeda

through the media, *id.,* and was aware that Bin Laden was someone who had engaged in jihadi

activities and was suspected of being involved in the attacks on the U.S. Embassies in Nairobi

and Dar Es Salaam and the attack on *USS Cole*, *id.* at 1163. Nonetheless, Abu Ghayth claimed he

agreed to meet with Bin Laden because, as he testified at trial, it would have been "impolite" not

to have done so. *Id.*

During their initial meeting, Bin Laden asked Abu Ghayth to speak at training camps in

Afghanistan, and Abu Ghayth agreed. Trial Tr. at 711. After spending about 20 days in

Afghanistan, Abu Ghayth traveled to Kuwait to retrieve his family and returned to Afghanistan

with all of them around July 2001. *Id.* at 711-12. Upon his return to Afghanistan, Abu Ghayth

continued to meet with Bin Laden and accepted a position within al Qaeda as a religious scholar

and orator. *Id.* at 712-13. In agreeing to serve in this role in al Qaeda, Abu Ghayth made a mini

*bayat* to Bin Laden, pledging his assistance to al Qaeda and Bin Laden. *Id.* at 713. Abu Ghayth

understood that Bin Laden desired his services because Abu Ghayth was a well-known religious

scholar and experienced speaker, and Bin Laden was hoping to attract more al Qaeda members

from the Persian Gulf region. *Id.* at 713-14.[2] Accordingly, Abu Ghayth assumed the position of

al Qaeda's spokesman. *Id.* at 714.

True to his pledge to Bin Laden, Abu Ghayth spoke at various al Qaeda locations during

the summer of 2001. Around June 2001, Abu Ghayth spoke at two al Qaeda training camps,

---

[2] At this time, in mid-2001, most of al Qaeda's leaders were from Egypt. Trial Tr. at 714.

known as Matar and Dar Mawak,[3] on each occasion to about 150 or more trainees. *Id.* at 711, 716. Abu Ghayth was aware that these camps were supported and funded by Bin Laden, and that trainees at the camps were learning how to use weapons, how to make explosives, and skills relating to guerilla warfare. *Id.* at 716. Saajid Badat[4] similarly testified that, as of the spring of 2001, the Matar camp was an al Qaeda training camp in Afghanistan, offering courses that covered security and intelligence techniques and urban warfare, including weapons training. *Id.* at 493-502. Special Agent Butsch testified that, in Abu Ghayth's post-arrest interview, Abu Ghayth described the content of the speeches he delivered to al Qaeda trainees at these training camps as follows:

> He said that the content was religious in nature and that his purpose in speaking to the students was to help them understand the importance of the training they were receiving at the training camps, the importance of being at the training camps, and the importance of the defense of Islam in the Islamic lands.

*Id.* at 716.

In the summer of 2001, Abu Ghayth also spoke at an al Qaeda guesthouse in Kandahar, Afghanistan, where al Qaeda recruits, including Sahim Alwan,[5] stayed as they awaited transfer to an al Qaeda training camp. *Id.* at 242. The recruits at this guesthouse were indoctrinated with al Qaeda propaganda, including by being shown an al Qaeda propaganda video that glorified the attack on *USS Cole* and sought to motivate viewers to engage in training with al Qaeda and conduct similar attacks. *Id.* at 246-48; GX 21. Bin Laden himself visited this al Qaeda

---

[3] It appears that the "Dar Mawak" training camp was incorrectly transcribed in the trial transcript as "Dar Almarak." Trial Tr. at 711.

[4] Badat pled guilty to a terrorism offense in the United Kingdom and has entered into a cooperation agreement with British authorities. Trial Tr. at 417, 436.

[5] Alwan pled guilty in the Western District of New York, pursuant to a cooperation agreement, to providing material support to al Qaeda, and was sentenced to about nine years' imprisonment and three years of supervised release. Trial Tr. at 219-222. At the time of Alwan's testimony at trial, he had completed his terms of imprisonment and supervised release. *Id.* at 223.

guesthouse and, when asked about rumors that something was going to happen, told the recruits that there were "brothers willing to carry their souls in their hands." Trial Tr. at 258, 263-64. Abu Ghayth visited this guesthouse as well. *Id.* at 258. Abu Ghayth spoke to a small group of the recruits at the guesthouse about the concept of *bayat*, which is a solemn oath of allegiance. *Id.* at 272. Abu Ghayth explained to the recruits the significance of *bayat*, including that if they were to give *bayat* to Bin Laden, they also by extension would be giving *bayat* to Mullah Omar, the leader of the Taliban, because Bin Laden himself had given *bayat* to Omar. *Id.* at 273.[6]

### b.     The Events of September 11, 2001

In the days leading up to the attacks of September 11, 2001, Abu Ghayth evacuated his wife and children from Afghanistan. On September 5, 2001, Abu Ghayth took his pregnant wife out of Kabul, Afghanistan, where they were living, and brought her to Pakistan for medical treatment. *Id.* at 720. Abu Ghayth then instructed his wife to travel to Kuwait, while he returned to Afghanistan. *Id.* Abu Ghayth testified that he returned to Afghanistan (rather than join his pregnant wife in Kuwait) because, "I believed in the days or so to come, I would have the opportunity to offer something. I had something to offer in the time to come." *Id.* at 1179. Abu Ghayth further admitted in his post-arrest interview that, while he was not aware of the specific plans for September 11th, he had heard around the al Qaeda training camps that something big was going to happen. *Id.* at 720.

On the day of September 11, 2001, within hours of the attacks, Bin Laden summoned Abu Ghayth, and Abu Ghayth responded. *Id.* at 722, 1183. Abu Ghayth traveled to meet with Bin Laden that night at a cave in the mountains of Afghanistan. *Id.* at 1183-84. Bin Laden told

---

[6] Abu Ghayth also admitted in his post-arrest statement that he delivered sermons at Bin Laden's compound on two or three occasions to about 10 to 15 family members of Bin Laden. Trial Tr. at 718-19.

Abu Ghayth that al Qaeda was responsible for the attacks that day, *id.* at 722, 1185, and asked

Abu Ghayth what he expected would happen, *id.* at 1185. Abu Ghayth answered that the United

States would not rest until it had killed Bin Laden and toppled the Taliban. *Id.* Bin Laden also

reminded Abu Ghayth of his agreement to speak on behalf of al Qaeda and assist Bin Laden and

al Qaeda as an orator and religious scholar. *Id.* at 722. Abu Ghayth agreed to do so, delivering a

series of speeches on behalf of al Qaeda, the first occurring the following day, September 12,

2001. *Id.* at 723, 1188-89.

On the morning of September 12, Abu Ghayth traveled to a region of Afghanistan—most

likely the Logar Province just south of Kabul—where he met with Bin Laden, Zawahiri, and Abu

Hafs al-Masri. Trial Tr. at 723-24. Early that morning, Abu Ghayth recorded a video with Bin

Laden, Zawahiri, and Abu Hafs al-Masri regarding the September 11th attacks. *Id.* at 725-26,

742-46; *see also id.* at 812-13 (identifying participants in this video). In this video—which was

aired on al Jazeera in early October 2001, *id.* at 813, and also was made available on web forums

that al Qaeda used to disseminate its media, *id.* at 812—Abu Ghayth justified the attacks of

September 11th, threatened further attacks, and urged others to join al Qaeda's fight. With an

AK-47 by his side, Abu Ghayth proclaimed, among other things:

> America must know that what happened to it is a direct result of this policy, and if
> America will continue implementing this policy, Muslims' sons will not stop under any
> circumstances at all to seek revenge for the injustice and oppression they are subjected to.

* * *

> However, America and its allies in this stand must know that we are capable, with the
> permission of God the Almighty, to continue the path, and . . . we are capable of
> engaging in this confrontation.

* * *

> If these strikes and this Lord wrath [sic], clearly, against America, didn't deter it and
> didn't frighten it, and what happened to Russia didn't teach it a lesson, then it must know

10

that the beginning of its fall, by the grace of God the Almighty and shall come with the first step it takes on the blessed land of Afghanistan.

\* \* \*

This is a final call which I address to the Nation of One Billion, to the nation of Islam, to the nation of jihad, to the nation of Muhammad, may God's peace and blessings be upon him, to the grandsons of Abu Bakr, Omar, and Khalid Ibn Al-Walid.[7] I tell them, O ride forth the steed of God, O ride forth the steed of God, O ride forth the steed of God, for what has happened has happened, and the battle is a decisive battle. It's a battle between faith and disbelief. So choose the trench in which you wish to be in, for there are only two trenches, and no third one! Either you shall be in the people of faith trench, or you shall be in the people of disbelief trench.

\* \* \*

O sons of the nation, O youth of the nation, O men of the nation and O women of the nation! This is the call for jihad summoning you! This is the Lord call summoning you!

\* \* \*

So fight ye against the friends of Satan . . . .

GX 1-T at 2-3 (footnote added).

Zawahiri and Bin Laden also spoke on the video. Zawahiri directed his message to Americans, stating that "your government is driving you toward a new losing war," citing, among other things, being "slapped on the face in Aden," *id.* at 4, a reference to the October 2000 bombing of *USS Cole* off the coast of Aden, Yemen, Trial Tr. at 814-15. Zawahiri then made a call for Muslims to join al Qaeda's war against America:

O young mujahidin, O truthful scholars of Islam, and O believers who love God and His Prophet, this is one of the new crucible battles of Islam, and a new battle of faith in which the great battles in the history of Islam such as Hattin, Ain Jalut, and the conquest of Bayt Al-Maqdist, are repeated. Here is the crucible battle is repeating itself! So come to the glory of life and the victory in the hereafter! Come to the honor of jihad!

---

[7] "Abu Bakr" and "Omar" were references to reputed Islamic emperors, and "Khalid Ibn Al-Walid" was a famous Muslim military general who is known as "the sword of Islam." Trial Tr. at 814.

GX 1-T at 5.

Bin Laden spoke last, referencing al Qaeda's August 1998 attacks on the U.S. Embassies in Nairobi and Dar Es Salaam, *id.* at 7, Trial Tr. at 815, and giving thanks for the September 11th terror attacks:

> Now here is America who has been struck by God the Almighty in one of its death sites, and so the Almighty destroyed one of its greatest buildings. Praise and thanks are due to God. And here is America filled with fear from north to south and from east to west. Praise and thanks are due to God.

GX 1-T at 6.

### c.    Subsequent to September 11, 2001

Following September 11, 2001, and through 2002, Abu Ghayth continued to speak on behalf of al Qaeda as its spokesman, and filmed more videos for the terrorist group. Abu Ghayth explained in his post-arrest interview that the purpose of these post-9/11 videos was propaganda through distribution in the media. Trial Tr. at 726.

### i.    The "Storm of Airplanes" Threats

In several of his post-9/11 speeches, which are discussed in greater detail below, Abu Ghayth repeatedly made unambiguous and bone-chilling threats that al Qaeda would continue to conduct terrorist attacks using airplanes:

- In an October 9, 2001 speech that was broadcast on al Jazeera, Abu Ghayth threatened, "America must know that the Storm of Airplanes will not abate." GX 8-T at 2.

- In an October 13, 2001 speech that was broadcast on al Jazeera, Abu Ghayth warned, "The storms shall not lessen, especially the Storms of the Airplanes," and, "we strongly advise Muslims in America and . . . Britain . . . not to board aircraft and we advise them not to live in high rises and tall buildings." GX 5-T at 4.

- In al Qaeda's "Convoy of Martyrs" propaganda video, Abu Ghayth warned, "The storms shall not lessen . . . especially the Storm of the Airplanes." GX 6-T at 18.

Abu Ghayth's threats of the continuing "Storm of Airplanes" foreshadowed al Qaeda's efforts to detonate bombs hidden in the shoes of suicide operatives who were passengers in airplanes. At the same time Abu Ghayth was making these "Storm of Airplanes" threats, al Qaeda's senior leaders were plotting the "shoe bomb" operation. Badat testified that the "shoe bomb" plot was hatched in late September or early October 2001 in Afghanistan, Trial Tr. at 521, 533, where Abu Ghayth also was at that time. Badat further testified that the "shoe bomb" plot was led by Bin Laden and Bin Laden's military commander, Abu Hafs al-Masri, *id.* at 533-34, two of the al Qaeda leaders who sat with Abu Ghayth the morning of September 12, 2001, *id.* at 724-26. Abu Ghayth remained with Bin Laden in the mountains of Afghanistan for weeks after September 11th, *id.* at 1192—the same time and location that Bin Laden was planning the shoe-bomb plot. Moreover, Badat's testimony established that this "shoe bomb" plot involved Great Britain and America, which mirrored the defendant's explicit warning to "Muslims in America and Britain" not to board aircraft or live in high rises and tall buildings. GX 5-T at 4.

### ii.    The October 9, 2001 al Jazeera Statement

On October 9, 2001, less than a month after the September 11th attacks, Abu Ghayth delivered a statement on behalf of al Qaeda that was broadcast on al Jazeera. GX 8. In this speech, during which Abu Ghayth first articulated the "Storm of Airplanes" threat, *see supra* II.A.2.c.i, Abu Ghayth addressed his "message to the entire Islamic nation" and announced that the war with the United States had begun: "Here is the crusader war that Bush promised, has been launched against the Islamic Afghanistan territory and against the believer people who have

faith in God." GX 8-T at 1. Abu Ghayth also called upon all Muslims to join al Qaeda's war with

America across the globe wherever American interests were located:

> U.S. interests are disseminated throughout the world. So, every Muslim must carry out
> his actual role to grant victory to his nation and to grant victory to his religion. Carrying
> out terrorism against the oppressors is a creed in our religion and in our Shari'ah—
> "Against them make ready your strength to the utmost of your power, including steeds of
> war, to strike terror into the hearts of the enemies of God and your enemies."

*Id.* at 2.

During this October 9, 2001 speech, Abu Ghayth praised the 9/11 hijackers ("these young

men . . . who destroyed America and launched the Storm of Airplanes against it") for having

"done a good deed." *Id.* at 2. Abu Ghayth lauded the hijackers for "transferr[ing] the battle into

the heartland of America," and warned that "the battle will not leave [America's] land until [the

United States] leaves our lands, and until it stops supporting the Jews, and until it lifts the unjust

embargo on the Iraqi people who lost more than 1 million children." *Id.*

In threatening America that "the Storm of Airplanes will not abate," Abu Ghayth assured

that "[t]here are thousands of the nation's youths who are yearning to death just as the Americans

yearn to live." *Id.* at 2-3. Abu Ghayth further promised to "fight" the Americans with all

financial power, moral strength, and faith. *Id.* at 3. Finally, Abu Ghayth called on all Muslims to

join in the fight: "I am addressing this speech to the sons of Muslims, to the youths, and to the

men and women to take on their responsibility. . . . [T]he nation must take on its responsibility;

otherwise, would be a disgrace if the nation fails to do so." *Id.*

### iii.     The October 13, 2001 al Jazeera Statement

Four days later, on October 13, 2001, Abu Ghayth delivered another speech that was

broadcast on al Jazeera. GX 5. In this speech, Abu Ghayth referred to the U.S.-led military action

in Afghanistan, which had begun on October 7, 2001, Trial Tr. at 999: "Based on the questions

14

and inquiries that we have received, and regarding our opinion about the events over the last five

days, we say that the Crusader Campaign led by the two Crusaders Bush and Blair is still

ongoing in the Islamic land of Afghanistan." GX 5-T at 1. Abu Ghayth further spoke on behalf

of al Qaeda condemning then- and past-American Presidents and the leadership of Great Britain

and Israel: "[T]he Al-Qaeda organization declares that Bush the father, Bush the son and Clinton,

among them, as well as Blair and Sharon,[8] are the top criminals among the Zionists and

Crusaders." *Id.*

 During this speech, Abu Ghayth made clear that al Qaeda would be prepared to attack

Americans if they did not leave the Arabian Peninsula:

> Al-Qaeda organization in the Arabian Peninsula also declares to the Americans and to the
> polytheists in the Arabian Peninsula, foremost among the Americans and the British, that
> they are to leave the Arabian Peninsula. If the mothers of those people have any concern
> for the souls of their sons, they must demand that they leave the Arabian Peninsula, for
> the ground shall ignite under their feet, by the permission of God the Almighty.

*Id.* at 3.

 Abu Ghayth concluded his October 13 speech by reiterating the "Storm of Airplanes"

threat from four days earlier, sending a

> message to the U.S. Secretary of State, who expressed doubt about our previous
> statement and who underestimated what we said that there are thousands of young
> Muslims who look forward to die for the sake of Allah and that the Storm of Aircrafts
> will not stop, by the permission of God the Almighty.

*Id.* at 4. Abu Ghayth stated that American government officials know that if "Al-Qaeda promises

or threatens, it fulfills," and assured that "tomorrow shall come soon enough." *Id.* Abu Ghayth

stated that attacks by al Qaeda would not subside until America "withdraw[s] from Afghanistan

in defeat" and "and until [America] stop[s] supporting the Jews in Palestine, until [America]

---

[8] "Blair" was a reference to Tony Blair, the former Prime Minister of the United
Kingdom, and "Sharon" was a reference to Ariel Sharon, the former Prime Minister of Israel.
Trial Tr. at 1001.

stop[s] the embargo on the people of free will, and until [America] leave[s] the land of the Arabian Peninsula, and until [America] stop[s] supporting the Hindus against the Muslims in Kashmir." *Id.*

### iv.    The "Convoy of Martyrs" Video

The defendant also appeared twice in a prominent al Qaeda propaganda video called the "Convoy of Martyrs." GX 6. The "Convoy of Martyrs" video was produced by As Sahab, al Qaeda's media wing, and was made available on multiple web forums that al Qaeda used to disseminate its media; portions of the video also aired on television news. Trial Tr. at 816. The "Convoy of Martyrs" paid homage to al Qaeda fighters who were killed in Afghanistan in mid- and late 2001, glorified the September 11th attacks, and aired speeches by al Qaeda leaders emphasizing that they would continue to launch attacks against the United States in the future. GX 6; Trial Tr. at 817. Much like other al Qaeda propaganda, the purposes of this video were to terrify al Qaeda's enemies, inspire al Qaeda sympathizers to contribute financially to al Qaeda, and recruit people to join the terrorist group. Trial Tr. at 818-19.

The defendant first appeared on Convoy of Martyrs delivering a speech. GX 6-T at 13-14. The defendant testified that he filmed this speech while he was still with Bin Laden in the mountains of Afghanistan, within two weeks of September 11, 2001. Trial Tr. at 1193. In that speech, Abu Ghayth spoke proudly of the success of the 9/11 attacks:

> God the Almighty has ordered us to terrorize the infidels, so we terrorized the infidels. God the Almighty has ordered us to battle the leaders of infidels, so we battled the leaders of infidels.
>
> * * *
>
> Indeed, we have been able to strike at the head of disbelief, that deliberately day and night, publicly expresses its hostility toward Islam. We have been able to strike it at its heartland.

16

* * *

> We gave what God has ordered us to do, so He the Almighty must give us what He has
> promised us. Either victory or martyrdom.

GX 6-T at 13-14. Footage of this speech also was aired on the foreign news station MBC. GX 7.

After showing footage of the speech described immediately above, MBC showed footage of Abu

Ghayth sitting next to Bin Laden and Zawahiri, while Bin Laden took pride in the financial harm

that the September 11th attacks had caused the United States. Trial Tr. at 74; GX 7-T at 1-3.

Abu Ghayth appeared a second time on Convoy of Martyrs to deliver a similar threat

regarding the continuing "Storm of Airplanes" that he had made in his October 13, 2001 speech.

GX 6-T at 18; *compare* GX 5-T at 4. Abu Ghayth delivered "a message to the U.S. Secretary of

State" that "tomorrow shall come soon enough" and "[s]torms shall not lessen . . . especially the

Storm of the Airplanes," and cautioned "Muslims in America, and the kids, and those who reject

the unjust American policy . . . not to board aircrafts and not to live in tall towers." GX 6-T at 18.

At another point in Convoy of Martyrs, Bin Laden referred to Abu Ghayth by name and

to Abu Ghayth's threats against the United States and Great Britain, making clear that al Qaeda

was targeting any countries that sided with the United States:

> Even though Sheikh Sulaiman Abu Ghayth made special reference to America and
> Britain in his previous statements, this was not exclusive but rather to give other states a
> chance to revise their accounts. So what does Japan have to do with it? What makes
> Japan join in this tough and violent war in a flagrant attack on our people in Palestine?
> Japan won't be able to put up with a war against us; so it must revise its account. What
> does Australia in the far south have to do with those oppressed in Afghanistan and
> Palestine? What does Germany have to do with this war, except for infidelity and
> crusade. It is a repeated crusade like the previous ones, such as Richard I, Barbarossa of
> Germany, and Louis of France. They all rushed directly today, when Bush raised the
> cross, all crusader countries rushed in.

GX 7-T at 10.

17

v.       **The June 2002 As Sahab Interview**

In June 2002, Abu Ghayth conducted an interview with As Sahab, al Qaeda's media

wing, in his capacity as al Qaeda's official spokesman. GX 11; GX S-1 ¶ 9. Abu Ghayth used

that interview—which was made available on al Qaeda's website, al Neda, on June 23, 2002, and

was broadcast in part on al Jazeera in late June 2002, Trial Tr. at 808—to call on others to join al

Qaeda's war with America.

This interview began with the interviewer introducing the defendant as al Qaeda's

spokesman: "As-Sahab Foundation for Islamic Media Publication is pleased to conduct this

recorded interview and the first of its kind, with the spokesman of Al-Qaeda organization,

Sheikh Sulaiman Abu Ghayth." GX 11-T at 1. Throughout the interview, Abu Ghayth conducted

himself as al Qaeda's spokesperson, speaking on behalf of the terrorist organization, taking

credit on behalf of al Qaeda for prior attacks, providing updates as to the status of the

organization and its leaders, threatening additional terrorist attacks, and urging Muslims to wage

jihad.

Abu Ghayth made clear during this interview that al Qaeda's declared war against

America was ongoing:

> [R]egarding our war with the United States of America, it is not over. And it will not be
> over, because the battle between us and the Americans is not a battle of self-interest or a
> personal battle. As a matter of fact, it is a battle between right and falsehood. It is a
> conflict between good and evil. America represents the head of this falsehood and the
> body of that evil.

*Id.* at 2-3. He further celebrated al Qaeda's previous deadly attacks on America, citing the

August 1998 bombings of the U.S. Embassies in East Africa, the October 2000 bombing of *USS*

*Cole*, and the attacks of September 11th:

> God the Glorified and the Almighty has granted us victory in this century, and in the last
> few years of the previous century, or in the final years of the last century and early this

18

century. He granted us a tremendous historical victory that broke the back of the
Americans. Breaking the back of the greatest power in this world. God the Almighty has
granted us victory, over them, in Nairobi and Dar es Salaam, and He has granted us
victory in Aden, in bombing the USS Cole. He granted us victory over them when the
world saw with its own eyes what the mujahidin carried out for the sake of God the
Glorified and the Almighty in New York and Washington.

*Id.* at 4. Abu Ghayth noted, however, notwithstanding these attacks, "We believe we are still at

the beginning of the war. As a matter of fact it's one round among other rounds and . . . we are

still at the beginning of the road." *Id.*

    Abu Ghayth also took credit for a specific attack conducted by al Qaeda—a suicide

bombing that occurred in Djerba, Tunisia, in April 2002:

What your brothers carried out in Djerba in the last operation,[9] yes, it is an operation that
was carried out by Al-Qaeda organization, and it was by a young man affiliated with this
organization. He could not stand seeing his brothers in Palestine being killed,
slaughtered, bloodshed, raped, while he's watching, the Jewish are in his city Djerba,
overjoyed, sightseeing practicing their rituals as they please. So, that zeal and jihadist
spirit arose inside him, and he carried out this successful operation—one of a kind, which
we ask Allah—the Glorified and the Almighty to accept it from him.

*Id.* at 13 (footnote added).

    Abu Ghayth also emphasized that al Qaeda continued to function, despite the American

military offensive following September 11, 2001. He assured that al Qaeda's two most senior

leaders, Bin Laden and Zawahiri, were in good health:

I'd like to frankly reassure Muslims, I mean to rectify the other part of your previous
question that the Sheikh Usama Bin Laden by the grace of Allah the Almighty is in good
health and well-being, and all rumors that has been fabricated about Sheikh Usama
regarding his illness or his injury in Tora Bora, are utterly untruthful news. And so are the
news about Dr. Ayman Al- Zawahiri and the rumors about his injury in Tora Bora, the
news are utterly untruthful.[10] And I can say that ninety-eighty percent of the commands

---

    [9] In April 2002, a suicide bomber detonated a truck full of explosives outside a
synagogue popular with European tourists on the island of Djerba, Tunisia, killing a number of
innocent people. Trial Tr. at 838.

    [10] At around the time of this interview in 2002, there were rumors that Bin Laden and
Zawahiri had been killed, injured, or were otherwise ill, possibly as a result of a U.S. military
offensive in the Tora Bora region of Afghanistan. Trial Tr. at 835.

in Al-Qaeda . . . Al-Qaeda organization were safe by the grace of Allah the Glorified and the Almighty, and they are running their affairs in the most complete fashion.

*Id.* at 7 (footnote added). Abu Ghayth further reported not only that al Qaeda's leadership was

alive and well, but also that al Qaeda was still functioning:

> The American campaign, thank God, was not able to obliterate the organization. The organization is standing and I bring the good news to Muslims that the organization is still standing and working to the extent of its full energy and capability; it is even working with a greater energy and greater determination, and greater persistence on the continuation and retaliation for the blood of the innocents. Al-Qaeda organization is not a jellied or a fragile organization, as some people could believe that it can be destroyed so easily, especially when we know who we are fighting . . . .
>
> * * *
>
> Our multi-system devices of military, security, economic and the . . . media and others were not affected.

*Id.* at 5-6.

Abu Ghayth emphasized that, with al Qaeda's military, security, and media components

still operational, the terrorist group not only remained capable of executing additional attacks

against the United States, but intended to do so:

> We are men of action and not men of words. And yes, we still possess the capability to threaten America, in fact, to carry out these threats, and in the next few coming days and months will prove to the whole world—by the permission [of] Allah—the Glorified and the Almighty—the credibility of what we're saying.

*Id.* at 8-9. Abu Ghayth further assured his audience that, with al Qaeda prepared to conduct

additional attacks, the terrorist group was in the process of surveilling new American targets:

> [O]ur military and security system[s] are now conducting surveillance, investigation, and monitoring to new American targets other than those that have been previously monitored, which we will strike within a short amount of time that Muslims will be happy about God willing.
>
> * * *
>
> And America must be ready and stand by and let them fasten their seatbelt, as we will strike them—by the permission of Allah the Glorified and the Almighty—where they

least expect it. "We do await that Allah afflicts you with torture by His hands or by our hands, then await us, we're with you awaiting."

*Id.* at 6.

To that end, Abu Ghayth promised—as he had previously in his multiple "Storm of Airplanes" speeches, *see* GX 5; GX 6; GX 8—that al Qaeda would be launching more attacks against America:

> [W]hat the American officials are saying that we will launch attacks against America, yes, we will launch attacks against America, but at the time that we pick, and the place that we pick, and the method that we pick. Neither Dick Cheney, nor the U.S. Secretary of Defense, nor the U.S. President can determine the time, place, and method which we will use to carry out or launch such operation.

GX 11-T at 8. Abu Ghayth also shed light on how al Qaeda would strike America again—through al Qaeda's suicide operatives, or "[o]ur martyrdom personnel," Trial Tr. at 834, which Abu Ghayth called al Qaeda's "ammunition":

> [O]ur martyrdom personnel are ready and eager to carry out operations against American and Jewish targets inside and abroad. There is no doubt that these martyrdom personnel are our ammunition with the blessing of God the Glorified and the Almighty, and we are conducting th[ese] martyrdom operations against that arrogant enemy which is not reachable except through these operations.

GX 11-T at 6.

With al Qaeda's declared war against America continuing, and al Qaeda still capable and ready to attack America, Abu Ghayth urged Muslims to join that war. Throughout this interview, Abu Ghayth tried to drive more young men to al Qaeda, emphasizing throughout that jihad "is a mandatory duty on every Muslim," *id.* at 12; *see also id.* at 2 (referring to the "duty of jihad for the sake of Allah"); *id.* at 12 (jihad "is a duty on every Muslim who believes in Allah"). Abu Ghayth concluded the interview with a call to all Muslims to engage in jihad:

> Muslims must not sit by and watch and they must not to stand idly by; jihad is everlasting until the day of resurrection. Jihad is not limited to Al-Qaeda organization and is not limited to Usama Bin Laden, and is not limited to such person, but in fact, it is the issue

21

of the entire nation and a struggle between right and falsehood, and Muslims must learn
this fact, and bear full responsibility in front of Allah—the Glorified and the Almighty—
and in front of these oppressed Muslim publics all over the world, and they must carry
out what Allah—the Glorified and the Almighty—obliged them to do in support of this
religion.

*Id.* at 13.

### vi.     The December 2002 Statement

Abu Ghayth recorded another statement on behalf of al Qaeda on or about December 7,
2002, GX 12, S-1 ¶ 10, which also was made available on al Qaeda's Al Neda website, Trial Tr.
at 839-40. Abu Ghayth mentioned an operation "that took place in Mombasa, Kenya, against the
Jewish interests," GX 12-T at 1, referring to a December 2002 attack by al Qaeda on Israeli
tourists in Mombasa, Trial Tr. at 841.[11]  Abu Ghayth proclaimed that "the Jewish-Crusader
alliance," GX 12-T at 1—a phrase used by al Qaeda to refer to the alliance between the United
States and other western countries, and Israel, Trial Tr. at 842—"will not be saved, God willing,
from the attacks of the mujahidin wherever that alliance is," and al Qaeda "will strike its vital
joints and strategic projects with all the means we have." GX 12-T at 1.

During this December 2002 statement, Abu Ghayth again threatened that al Qaeda would
continue to engage in acts of terror against its enemies:

> Third, chasing the enemy, which is projected as the Jewish-Crusader alliance with the
> weapon of terror that granted victory to our Prophet Mohammed, God's blessing and
> peace be upon him, and his noble Companions. This is a lethal weapon that must be
> opened against the enemy by widening the battle fronts and carrying out swift and
> focused operations against its body stretched over a large area of this world, so that it can
> feel the danger and the lack of security and stability on land, sea, and air.

---

[11] In December 2002, al Qaeda conducted a two-prong attack on Israeli interests in
Mombasa. Trial Tr. at 841. First, al Qaeda executed a suicide bus bombing targeting the Paradise
Hotel in Mombasa, a popular location with Israeli tourists. *Id.* Second, an al Qaeda operative
fired a surface-to-air missile at an Israeli commercial airliner as it departed from Mombasa. *Id.*

*Id.* at 2. Finally, Abu Ghayth yet again summoned Muslims, especially the youth, to join al

Qaeda's fight:

> Fifth, the men of this nation and its sons of scholars, preachers, intellectuals, merchants, and youth, as well as other categories, particularly the Islamic movements and jihad movements, have a great duty in this sensitive phase of the nation's history. This duty consists of the direct repulsion of this enemy and serious readiness for the next phase, which will be bigger and more grave.
>
> Sixth, the Muslim youth, which is the nation's backbone and its pursued hope everywhere, must not pay attention to the calls of those discouragers, the intimidation of threats, and the slogans of seculars and liberals fascinated by the West. They must also be careful of not getting driven into marginal battles that are not part of the key battle against the foremost global infidelity, projected as the Jewish-Crusader alliance in this phase. They must also avoid becoming preoccupied with trivial matters, which is the goal of the jihad's enemies, to disperse the capabilities and efforts. And so our goal is clear and our politics are known. Our politics have defined lines and do not adopt any action that does not lead to the right direction against the Jewish-Crusader alliance.

*Id.* at 2-3.

> ### d. Additional Evidence of Abu Ghayth's Participation in al Qaeda's Conspiracy to Kill Americans
>
> #### i. The November 2001 Video with Bin Laden and Zawahiri

Further evidence that Abu Ghayth associated with the highest levels of al Qaeda came

from the November 2001 video of Abu Ghayth with Bin Laden and Zawahiri visiting one of their

supporters. GX 4; GX S-1 ¶ 4. That video depicted Abu Ghayth sitting on Bin Laden's right, as

Bin Laden reflected on the 9/11 attacks. GX 4-T at 7-8. Abu Ghayth, in turn, gleefully recounted

a dream of Bin Laden attacking America that he suggested was a premonition of the 9/11 attacks.

*Id.* at 13. This video, which plainly was not a staged speech, reflected Abu Ghayth's close

relationship with Bin Laden and their mutual trust, shown by not just the subject matter of their

conversation but also their body language, which displayed their intimacy and comfort with one

another.

### ii.      The al Qaeda Code Cards

Further proof of Abu Ghayth's central position in al Qaeda comes from the various al Qaeda brevity cards that were recovered in Afghanistan and Pakistan. These cards were used by members of al Qaeda to communicate in code, listing, among other things, al Qaeda leadership, other prominent terrorist figures, and important al Qaeda-related locations, each with corresponding numbers.

Six brevity cards were recovered on November 24, 2001 in Takhteh-Pol, Afghanistan, when two members of al Qaeda were apprehended by U.S. forces while driving on the main road between Kandahar and Pakistan. GX S-2 ¶ 1; GX 206-1; GX 206-2; GX 206-3; GX 207-1; GX 207-2; GX 207-3. Also recovered with these cards were two surface-to-air missiles, handwritten notes about using boats and divers to transport explosives, al Qaeda propaganda, multiple passports, airplane tickets, and a letter requesting military equipment. GX S-2 ¶ 1. Another brevity card was recovered in Rawalpindi, Pakistan, in March 2003, at an al Qaeda safehouse where Khalid Sheikh Mohammed, al Qaeda's chief operational planner, and Mustafa al-Hawsawi, another member of al Qaeda, were captured. GX S-2 ¶ 2; GX 208. Also recovered at this al Qaeda safehouse were a letter from Bin Laden to his children, documents related to the September 11, 2001 hijackers, such as passport photographs, a map of the United States, and a piece of paper reading, "poisons easy to prepare." GX S-2 ¶ 2.

Some of the cards recovered in both Takhteh-Pol and Rawalpindi listed a number of prominent al Qaeda figures and al Qaeda locations. Among those named on the cards was the defendant ("Salman Abu Ghayth"), as well as:

- Bin Laden ("Sheikh Abu 'Abdullah"): the leader of al Qaeda;

- al-Zawahiri ("The Doctor"): Bin Laden's second-in-command;

- Abu Hafs al-Masri ("Sheikh Abu Hafs"): Bin Laden's second-in-command before Zawahiri, the head of al Qaeda's military committee, and the planner for the shoe-bomb plot;

- Khalid Sheikh Mohammed ("Mukhtar"): al Qaeda's chief operational planner, who was responsible for the shoe-bomb plot after Abu Hafs al-Masri was killed in November 2001;

- Saif al Adl: a senior member of al Qaeda, who was the head of Bin Laden's security and the head of the Ubaidah training camp;

- Abu Mohammed al-Masri: a senior member of al Qaeda, who was in charge of al Qaeda's training camps, including the al-Faruq training camp;

- Al Sheikh Abu al-Khair: a senior al Qaeda figure; and

- Mullah Omar ("Amir Al-Mo'Neneen"): the leader of the Taliban.

GX 206-1R; GX 206-2R; GX 207-1R; GX 208-1R.

The brevity cards also listed a number of locations affiliated with al Qaeda, including:

- Matar: an al Qaeda training camp near the Kandahar Airport, and one of the training camps where Abu Ghayth spoke to at least 150 trainees;

- Al Faruq Camp: a major al Qaeda training camp located in Kandahar;

- Media: al Qaeda's media center, where Badat worked on al Qaeda propaganda videos;

- Compound 6: the location where Abu Ghayth met with Bin Laden; and

- Sheikh Abu Hafs: a reference to the location of Abu Hafs al-Masri, al Qaeda's former military chief, where the "shoe bomb" explosives were stored.

GX 206-1R; GX 206-2R; GX 207-1R; GX 208-1R.[12]

These cards permitted al Qaeda members to communicate covertly. Sergeant Major Karnes—who was fighting alongside indigenous Afghan forces beginning in November 2001—testified that he monitored the radios and heard members of al Qaeda speak in code, often using numbers. Trial Tr. at 144-46. Badat similarly testified that al Qaeda members would talk over walkie-talkies using code that entailed substituting numbers for names. *Id.* at 515-17. Thus, to use the cards to avoid detection, a user simply would refer to the numbers on the card rather than the actual names and locations. These cards were operational in nature—used for battlefield communications—and the defendant's inclusion on these cards further substantiates his significance to al Qaeda.

### iii.    Abu Ghayth's Arrest with Senior al Qaeda Leaders in Iran

The circumstances of Abu Ghayth's arrest in Iran further demonstrate his close association with senior members of al Qaeda. Abu Ghayth told Special Agent Butsch that, after he left Afghanistan, he was arrested in Iran on April 23, 2003, with three senior members of al Qaeda: Saif al Adl, Abu Mohamed al-Masri, and Abu Khair. Trial Tr. at 727; *see also supra* Part II.A.2.D.ii (discussing these three individuals on the code cards). Abu Ghayth acknowledged in his post-arrest interview that he knew these individuals to be members of al Qaeda. Trial Tr. at 739.

---

[12] In addition, some of the cards recovered in Afghanistan in November 2001 listed various weapons, such as "sam 7" (surface-to-air missile), "stinger," "cannon," "chemical," "biological," "bomb," and "rocket," as well as tactical phrases, such as "transportation of weapons," "transportation of equipment," "transportation of individuals," "start shooting," "advance quickly," "attack," and "siege." GX 206-3R; GX 207-2R; GX 207-3R.

**B.      The Jury Verdict**

On March 26, 2014, the jury returned a verdict finding the defendant guilty of the three counts charged in the Indictment.

**C.      The Presentence Investigative Report**

On July 15, 2014, the Probation Office submitted its final PSR in this case. The Probation Office found a total offense level of 61, calculated as follows: (1) Counts 1, 2, and 3 are grouped, U.S.S.G. § 3D1.2(b); (2) the base offense level for Count One is 43, *id.* §§ 2A1.5 and 2A1.1; (3) the base offense level for Counts Two and Three also is 43, *id.* §§ 2X2.1, 2M5.3, 2A1.1; (4) three levels are added because the offense involved the intentional selection of a victim or property as the object of the offense because of national origin, *id.* § 3A1.1(a); (5) 12 levels are added because the offense was a felony that involved, or was intended to promote, a federal crime terrorism, *id.* § 3A1.4(a); and (6) three levels are added because the defendant was a manager or supervisor in criminal activity involving five or more participants or otherwise extensive, *id.* § 3B1.1(b). PSR ¶¶ 33-46. The PSR further found the applicable Criminal History Category to be VI, pursuant to U.S.S.G. § 3A1.4(b), because the offense involved, or was intended to promote, a federal crime of terrorism. PSR ¶ 49. Accordingly, the Guidelines imprisonment range is life. *Id.* ¶ 77.

The Probation Office recommended a sentence of life imprisonment. PSR at 21. In arriving at this recommendation, the Probation Office explained:

> Due to the nature of the offense, which involved the deaths of almost 3,000 individuals, the defendant's advisory guidelines range is life imprisonment. We can see no fathomable reason to justify a sentence other than life. We believe this sentence complies with the purposes set forth in 18 U.S.C. 3553.

*Id.* at 22.

## III. THE COURT SHOULD IMPOSE A SENTENCE OF LIFE IMPRISONMENT

**A.     Applicable Law**

The U.S. Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 50 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 522 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B.      The Statutory Sentencing Factors Call for Life Imprisonment**

####      1.      The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Abu Ghayth participated at the highest levels of al Qaeda in the months preceding September 11, 2001—and for *more than a year after*. His purpose was to motivate al Qaeda's fighters and drive more men to al Qaeda's mission to kill Americans. He glorified al Qaeda's mass murder of thousands of Americans, and threatened more attacks to come. It is hard to fathom more serious and socially-repugnant conduct. Even when he testified, he grossly minimized his conduct, refusing to take responsibility for his acts. Thus, the nature of the defendant's offense, as well as his history and characteristics, overwhelmingly weigh in favor of a life sentence. *See* 18 U.S.C. § 3553(a)(1).

### a.      Abu Ghayth's Role in al Qaeda's Conspiracy to Kill Americans

The defendant's criminal conduct demonstrates without question the exceedingly serious nature of the offense and the defendant's character. The defendant played a central role in al Qaeda's conspiracy to kill Americans, unapologetically celebrating the murder of nearly 3000 people, proudly proclaiming to the world that this senseless tragedy was justified and America deserved to be attacked, boldly threatening more attacks of similar magnitude, and working to drive more fighters to join al Qaeda's deadly mission.

First, the defendant was a proud and unabashed supporter of a global terrorist organization whose core and underlying objective is to kill Americans. The defense's suggestion that Abu Ghayth supported some faction of al Qaeda whose mission was something other than the killing of Americans is entirely unconvincing. Defendant's Sentencing Memorandum ("Deft. Sent. Br.") at 3-4; *see id.* at 5 ("al Qaeda was a trans-national revolutionary fighting force with, clearly, a limited wing involved in terrorist activity"). In holding Abu Ghayth accountable for his support of al Qaeda's mission to kill Americans, the Government is not relying on some "monolithic, static depiction of al Qaeda and *jihad* in general." *Id.* at 3. Nor was the commission of mass acts of terror against American civilians the agenda of "semi-autonomous elements within the bin Laden organization" or some "sub-group[]" of al Qaeda that was distinct from the agenda of the defendant. *Id.* at 4, 5. There was no ambiguity in the mission of al Qaeda that Abu Ghayth supported, or the concept of jihad that he endorsed: it was to kill Americans. That is why Abu Ghayth sat with Bin Laden, Zawahiri, and Abu Hafs al-Masri on September 12, 2001, to celebrate the success of the attacks of the day before and to threaten more attacks. GX 1; GX S-1 ¶ 1. That is why Abu Ghayth praised the acts of the 9/11 hijackers for doing "a good deed." GX 8-T at 2. That is why Abu Ghayth announced to the world that U.S. Presidents were the primary

enemies of al Qaeda. GX 5-T at 1. That is why Abu Ghayth made explicit threats to the United States, including to the Secretary of State, that terrorist attacks would continue. GX 5-T at 5; GX 6-T at 18; GX 8-T at 2. That is why Abu Ghayth called upon Muslims to carry out acts of terrorism against American interests across the globe. GX 8-T at 2. That is why Abu Ghayth rejoiced that "we have been able to strike at the head of disbelief" by attacking America in its "heartland." GX 6-T at 14.

To be sure, killing Americans was Bin Laden's unambiguous message when he issued the August 1996 Declaration of Jihad and the February 1998 *fatwah*, and when he sat down for interviews with Peter Arnett and John Miller. It was what al Qaeda was about when al Qaeda operatives bombed the U.S. Embassies in August 1998, killing 224 people; bombed *USS Cole* in October 2000, killing 17 U.S. sailors; and attacked America on September 11, 2001, killing approximately 2976 people. Trial Tr. at 64-66, 1236. And murdering Americans was what al Qaeda was about when Abu Ghayth—an educated and sophisticated man, who was already familiar with al Qaeda and Bin Laden—made the decision to support the terrorist organization and serve as its spokesperson. Abu Ghayth was not in "way over his head," and was not "caught in the rip-tide of history," Deft. Sent. Br. at 10, when he made a knowing, informed, and conscious decision to support a terrorist group whose mission was to murder American civilians.

And Abu Ghayth fully supported that mission. He did not leave al Qaeda after witnessing the senseless and savage events of September 11, 2001. Far from running away from al Qaeda's mission, Abu Ghayth embraced it. Knowing full well that Bin Laden was responsible for those attacks, Abu Ghayth reinforced his commitment to al Qaeda. Immediately after the attacks of September 11, 2001—in the wake of the murder of nearly 3000 innocent people and as our buildings burned and bodies were being removed from the rubble of the World Trade Center and

the Pentagon—Bin Laden sought Abu Ghayth's advice and help. Bin Laden told Abu Ghayth

that al Qaeda was responsible for the attacks that day, Trial Tr. at 722, 1185, and asked Abu

Ghayth what he expected would happen, *id.* at 1185. Abu Ghayth answered that the United

States would not rest until it had killed Bin Laden and toppled the Taliban. *Id.*

Abu Ghayth then proudly sat at Bin Laden's right hand, boasting that "America must

know that what happened to it is a direct result of [its foreign] policy, and if America will

continue implementing this policy, Muslims' sons will not stop under any circumstances at all to

seek revenge for the injustice and oppression they are subjected to," GX 1-T at 2, threatening

"America and its allies . . . that we are capable . . . of engaging in this confrontation," *id.,* and

calling on Muslims to "choose the trench" and "fight ye against the friends of Satan," *id.* at 3.

This was a simple, callous, and horrifying message: The attacks were proper and America was at

fault, and it was a duty of all Muslims to fight with al Qaeda against innocent Americans.

In the days that followed, as smoke still rose from the rubble of our buildings and

America mourned the senseless murder of nearly 3000 victims, Abu Ghayth continued to

dutifully serve Bin Laden. Less than a month after the attacks, Abu Ghayth threatened on

international television that "America must know that the Storm of Airplanes will not abate." GX

8-T at 2. Just four days later, he reiterated that threat, assuring "if the organization of Al-Qaeda

promises or threatens, it fulfills," and "tomorrow shall come soon enough," GX 5-T at 4.

Abu Ghayth's prominence within al Qaeda was demonstrated clearly during his June

2002 interview with As Sahab. GX 11. This interview—which was disseminated by al Qaeda on

its Al Neda website and was broadcast in part on al Jazeera—demonstrated Abu Ghayth's insider

knowledge of al Qaeda and its operations. Only an al Qaeda insider would know about the health

of al Qaeda's two most senior leaders, Bin Laden and Zawahiri, and be in a position to speak

with confidence about the terrorist organization's ability and intent to conduct further terrorist attacks. GX 11-T at 5-9.

The defendant's abhorrent character—as well as his close and familiar relationship with the most senior members of al Qaeda—was perhaps best revealed during the November 2001 video of Abu Ghayth, Bin Laden, and Zawahiri visiting an ill supporter. GX 4. This video, which was made just weeks after the 9/11 attacks, showed Abu Ghayth to be an unwavering and unapologetic supporter of Bin Laden and al Qaeda's mission to kill Americans. It showed Abu Ghayth to be someone who firmly believed the words he was saying in his speeches. Abu Ghayth and Bin Laden joked about the 9/11 attacks and the destruction of that day. Their body language during this video displayed a great level of personal comfort, even while Bin Laden was casually discussing the mass murder of almost 3000 people. This should come as no surprise. Abu Ghayth was a trusted confidant and co-conspirator of Bin Laden—indeed, he was the person Bin Laden turned to moments after four hijacked planes struck our country. And the defendant chose to remain by Bin Laden's side in late 2001, even as the U.S. military was searching the mountains of Afghanistan for Bin Laden. Simply put, the defendant eagerly supported al Qaeda and its mass murder of Americans.

The defense's sentencing submission tries to downplay the seriousness of Abu Ghayth's conduct by asserting that "[a]ll of the Defendant's criminal acts in this case took the form of speech."[13]  Deft. Sent. Br. at 1. But that ignores the critical importance of speech to al Qaeda's success. The defendant's conduct did not merely amount to "whistling past the graveyard." *Id.* at 8. The significance of Abu Ghayth's spoken words is unmistakable. Inspirational and charismatic

---

[13] The defense's attempt to assimilate Abu Ghayth's conduct to "an outrageous daytime 'shock-radio' host," Deft. Sent. Br. at 2, is as absurd as it is offensive. Abu Ghayth was a terrorist who sat alongside Bin Laden the morning of September 12, 2001, celebrating the murder of nearly 3000 innocent men, women, and children the day before.

speakers like Abu Ghayth allow al Qaeda to refill its ranks of suicide operatives by driving more future terrorists to al Qaeda's murderous mission. And endeavoring to recruit more operational terrorists to al Qaeda is exactly what Abu Ghayth did over and over again in public statements disseminated to the world.

Throughout the June 2002 As Sahab interview, for example, Abu Ghayth emphasized that jihad "is a mandatory duty on every Muslim," GX 11-T at 12; *see also id.* at 2 (referring to the "duty of jihad for the sake of Allah"); *id.* at 12 (jihad "is a duty on every Muslim who believes in Allah"), so they could become al Qaeda's "martyrdom personnel"—or "ammunition"—for future attacks. And in multiple speeches that were broadcast globally on television, including the speech filmed the morning after the 9/11 attacks, Abu Ghayth decreed that joining al Qaeda's war against America was a mandatory duty on all Muslims. *E.g.*, GX 1-T at 3 ("O sons of the nation. . . . This is the call for jihad summoning you! . . . So fight ye against the friends of Satan . . . ."); GX 8-T ("U.S. interests are disseminated throughout the world. So, every Muslim must carry out his actual role to grant victory to his nation and to grant victory to his religion. Carrying out terrorism against the oppressors is a creed in our religion . . . ."); GX 12-T at 2 ("[T]he men of this nation and its sons of scholars, preachers, intellectuals, merchants, and youth, as well as other categories, particularly the Islamic movements and jihad movements, have a great duty in this sensitive phase of the nation's history. This duty consists of the direct repulsion of this enemy and serious readiness for the next phase, which will be bigger and more grave.).[14]

---

[14] Moreover, by boasting about the success of the 9/11 attacks, lauding the hijackers for having done a "good deed," and threatening more attacks in the form of a continuing "Storm of Airplanes," Abu Ghayth's globally disseminated statements further served al Qaeda's goal of completing the terror against the purported infidels.

Through these statements and his other conduct, Abu Ghayth conspired with al Qaeda's leadership to drive more young men to the terrorist group and its war against America. That is why Abu Ghayth was prosecuted and convicted. Abu Ghayth was not convicted because the "beliefs the Defendant held—about Islam, American power, Arab identity, the Gulf States and their regimes, the duty of pious Muslims, the conduct of nations, and the future of the Islamic *Ummah*, or 'nation'—are, in and of themselves, crimes," Deft. Sent. Br. at 6. Abu Ghayth was convicted because he participated in al Qaeda's criminal conspiracy to kill Americans by serving as the spokesman for the terrorist group, inciting and inspiring al Qaeda recruits at training camps and a guesthouse, and attempting to drive more fighters to al Qaeda's mission of murdering Americans.

Nor is it accurate for the defense to claim that Abu Ghayth never "trained killers in a terrorism plot," Deft. Sent. Br. at 1-2. Abu Ghayth spoke at al Qaeda training camps whose sole purpose was to train terrorist operatives. While Abu Ghayth did not provide tactical training to these young men at these camps on how to detonate an explosive or hijack a plane, he provided them with equally important instruction and guidance. Abu Ghayth, by his own admission to Special Agent Butsch, provided al Qaeda trainees at these camps with a religious justification for their training, helping them understand the importance of the training they were receiving and the importance of defending Islam in the Islamic lands. Trial Tr. at 716. For al Qaeda, providing such religious justification for a suicide operative to conduct his mission is just as important as teaching that operative how to assemble the bomb on his suicide vest. In fact, religious ideology and purported justification for action are even more important, as that ideology and accompanying purported justification are leveraged into the violence.

The defense's repeated suggestion that Abu Ghayth was ignorant of any al Qaeda plots—in addition to being beside the point—is also unconvincing. *See* Deft. Sent. Br. at 2 ("There is no evidence that [Abu Ghayth] knowingly participated in any scheme to murder Americans . . . ."), *id.* at 9 ("Abu Ghayth knew nothing about the terrorist plots of the KSM gang, and is not accused of knowing participation in in those plots."), *id.* (claiming that Abu Ghayth did not support "the hidden, criminal gang of mass murderers, of whom the Defendant knew nothing"); *id.* at 25 ("the Defendant had no fore-knowledge of, or any role in, the planning or execution of 9/11, or of any other bombing or terrorist activity").

There was extensive evidence of Abu Ghayth's knowledge of al Qaeda's terrorist operations. Abu Ghayth admitted in his post-arrest interview that, while he was not aware of the specific plans for September 11th, he had heard at al Qaeda training camps that something big was about to take place. Trial Tr. at 720. Similarly, Abu Ghayth returned to Afghanistan in early September 2001, rather than travel to Kuwait with his pregnant wife, because he "believed in the days or so to come, [he] would have the opportunity to offer something." *Id.* at 1179. In multiple recorded speeches that were broadcast to the world, Abu Ghayth warned that al Qaeda's "Storm of Airplanes" would continue. GX 8-T at 2; GX 5-T at 4; GX 6-T at 18. Abu Ghayth threatened that al Qaeda would conduct more attacks using airplanes, as two of the men he sat with on the morning of September 12, 2001, were planning a terrorist operation that entailed detonating bombs on airplanes. Trial Tr. at 533-36. And in his June 2002 interview with As Sahab, Abu Ghayth boasted that al Qaeda's "military and security system[s] are now conducting surveillance, investigation, and monitoring to new American targets," and al Qaeda "will strike [those targets] within a short amount of time." GX 11-T at 6.

The defendant sat with Bin Laden on September 12, 2001, he stayed with Bin Laden for over a year after 9/11, and he was arrested with three of the most senior al Qaeda leders on the planet. He was not ignorant of every one of al Qaeda's plots.

### b.    Abu Ghayth's Lies While Testifying

While the Government is not seeking obstruction of justice points based on Abu Ghayth's trial testimony,[15] it is clear that when Abu Ghayth took the stand, his testimony was riddled with lies and efforts to excuse and minimize his conduct. In addition to reflecting his refusal to be completely truthful when testifying under oath, Abu Ghayth's testimony shows a continued lack of remorse for his exceedingly serious criminal conduct, even 12 years later.

First, Abu Ghayth testified, both on direct and cross-examination, that when he repeatedly used the word "we" in his speeches, he was talking about Muslims in general, not al Qaeda:

> Q.    Were you talking about Al Qaeda when you used those terms?
> A.    I mentioned the word Al Qaeda, yes, but I wasn't talking about Al Qaeda.
> Q.    What do you mean?
> A.    I said that Al Qaeda said, Al Qaeda said, Al Qaeda said, but I wasn't talking about behalf of Al Qaeda.

Trial Tr. at 1198.

> Q.    Sir, is it your testimony to this jury that when you say we and us in this speech you are not referring to Al Qaeda?
> A.    When I said we, I meant we Muslims, we Muslim nation. I was not speaking on behalf of Al Qaeda. . . .

*Id.* at 1216.

---

[15] The Government recognizes that without the obstruction enhancement, the Guidelines call for a sentence of life imprisonment—and it is not a close call. This should not be interpreted by the Court as a minimization of the seriousness with which the Government views false testimony and the blemish it is in the truth-finding process that a trial is designed to be. Should the Court seek more from the Government on its position on obstruction, the Government is prepared to provide that information and any legal authority the Court might seek.

This claim was absurd. Of course Abu Ghayth was speaking on behalf of al Qaeda when, on the morning of September 12, 2001, as he sat next to Bin Laden, Zawahiri, and Abu Hafs al-Masri, he said "we are capable . . . to continue the path" and "we are capable of engaging in this confirmation." GX 1-T at 2. And he was speaking on behalf of al Qaeda about a month later, when he announced "the Al-Qaeda organization declares that Bush the father, Bush the son and Clinton, among them, as well as Blair and Sharon, are the top criminals among the Zionists and Crusaders," GX 5-T at 1, that "Al-Qaeda organization" declared that the Americans must leave the Arabian Peninsula, *id.* at 2, and that "if the organization of Al-Qaeda promises or threatens, it fulfills," *id.* at 4. Similarly, Abu Ghayth's June 2002 interview with As Sahab began with him being introduced as "the spokesman of Al-Qaeda," GX 11-T at 1, and he spoke throughout that 24-minute interview about the health of al Qaeda's two top leaders and the status of al Qaeda, *id.* at 5-9, and even declared that al Qaeda was responsible for an April 2002 terrorist operation in Tunisia, *id.* at 13.

Second, Abu Ghayth testified that when he spoke on behalf of Bin Laden, he was simply working off bullet points that Bin Laden had prepared for him. Trial Tr. at 1189, 1252, 1255-56. Again, aside from being beside the point, this claim also was absurd. The defendant's speech on September 12, 2001, as he sat next to Bin Laden, Zawahiri, and Abu Hafs al-Masri, lasted almost seven minutes, during which Abu Ghayth made a passionate call to young Muslims to join al Qaeda's war against America. GX 1-S. Plainly, this was not a speech that was derived from a few bullet points that someone else had written down. Similarly, Abu Ghayth's June 2002 interview, which lasted for over 24 minutes, was a back and forth in which Abu Ghayth, speaking as "the spokesman for Al-Qaeda," answered questions posed of him. GX 11-S. This

interview clearly did not entail Abu Ghayth answering those questions by reading from Bin

Laden's bullet points.

Equally absurd was Abu Ghayth's claim that, in these speeches, he was trying to calm the

tension with the United States:

> Q.    Why did you make those additional videos that you just testified about, the three additional videos?
> A.    The war has erupted at that time, and the condition was very tense and very severe and Sheikh Usama Bin Laden requested for me to talk and try to antagonize the propaganda of the other side to mitigate this propaganda against us. He want to say, I have and I have and I have just for making a propaganda to reduce the amount of attack on us at that time because the amount of attack was huge. And I found that is a suitable time for me to do that, by this way to reduce the amount of attack on us, on me, on these poor people that they have no way of defending themselves. *I was hoping after all of these speeches and the videos that the United States will say, let's go and sit down and talk and solve this problem.* But America was going on, on what I was expecting them to do.

Trial Tr. at 1197 (emphasis added). Abu Ghayth's words were inciting, murderous, and hateful.

They were not words in search of a peaceful resolution of a conflict. For example, in the speech

Abu Ghayth filmed in the mountains of Afghanistan just weeks after 9/11, he glorified al

Qaeda's successful attack on America:

> God the Almighty has ordered us to terrorize the infidels, so we terrorized the infidels. God the Almighty has ordered us to battle the leaders of infidels, so we battled the leaders of infidels.
>
> * * *
>
> Indeed, we have been able to strike at the head of disbelief, that deliberately day and night, publicly expresses its hostility toward Islam. We have been able to strike it at its heartland.

GX 6-T at 13-14. Abu Ghayth struck a similar tone in his globally disseminated threats that al

Qaeda's "Storm of Airplanes" would continue, that when al Qaeda promises to attack, it fulfills,

and that Muslims in America and Britain should avoid airplanes and tall buildings. GX 5-T at 4;

GX 8-T at 3. Abu Ghayth again made clear that he was not interested in conflict mediation

39

throughout his June 2002 As Sahab interview, in which he announced that al Qaeda was investigating new American targets, that al Qaeda's "martyrdom personnel [were] ready and eager to carry out operations against American and Jewish targets," and that America should "fasten its seatbelt" because al Qaeda would strike soon and when America least expected it. GX 11-T at 6.

### c.   Abu Ghayth's Family Circumstances

There are no mitigating family circumstances that in any way explain or justify Abu Ghayth's criminal choices. Quite the opposite, Abu Ghayth reportedly came from a good family. He was raised by his parents in Kuwait, experiencing "a 'normal' childhood" without any problems, and continues to maintain a strong relationship with his family. PSR ¶¶ 55, 56, 61. He and his five siblings grew up comfortably middle-class. Deft. Sent. Br. at 10. Abu Ghayth married in 1990 in Kuwait, a union that produced seven children. PSR ¶ 57. The defendant also is well-educated, having graduated in 1988 from Kuwait University with a bachelor's degree in sharia and education. *Id.* ¶ 69; Trial Tr. at 1150; Deft. Sent. Br. at 10-11. Around 1992, Abu Ghayth passed a test to formally become an Imam, and he has been licensed by the Ministry of Education in Kuwait as a school teacher. Trial Tr. at 1151; PSR ¶ 69. Abu Ghayth worked as an imam and a teacher from 1988 to 2001, teaching children between the ages of 11 and 18. Trial Tr. at 1151-52; PSR ¶ 73. He was employed by the Ministry of Education and, by 2001, was the head of the division, and also volunteered as a speaker for the Ministry of Islamic Endowments, giving lectures and leading prayer. PSR ¶ 73. At the time Abu Ghayth traveled from Kuwait to Afghanistan in mid-2001, when he joined forces with Bin Laden, he had a wife and seven children. Trial Tr. at 1160.

In short, leading to his decision to support al Qaeda and serve as Bin Laden's spokesman, the defendant appeared to have built a loving family and a successful career as an imam. The defendant did not want for family, friends, or opportunity, and there is no unusual deprivation, abuse, or economic hardship in his background. Yet Abu Ghayth chose to walk away from all that and join al Qaeda. Indeed, Abu Ghayth sent his pregnant wife to Kuwait in early September 2001, after hearing at al Qaeda training camps that "something big" was about to take place. Trial Tr. at 720. Abu Ghayth did not join his wife in Kuwait, but rather remained in Afghanistan because, in his words, "I believed in the days or so to come, I would have the opportunity to offer something. I had something to offer in the time to come." *Id.* Abu Ghayth then remained with Bin Laden in Afghanistan after September 11, 2001 for well over a year. His decision to support al Qaeda was thus considered and significant.

### 2.      The Need for Deterrence, Just Punishment, and Promotion of Respect for the Law

Section 3553(a)(2) directs the Court to consider

the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The instant offense, participating in al Qaeda's conspiracy to kill Americans—a conspiracy that in fact has killed thousands of Americans—is justly punished only with a life sentence.

As to incapacitation, it should be total and lifelong. Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult. *United States* v. *Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). Deterrence too provides a substantial justification for a life sentence. As

Judge Walker has put it, "In no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." *United States* v. *Stewart*, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part). It is important that those who might turn to terrorism know a simple fact: If they kill or conspire to kill innocents, if they mark Americans for murder, anywhere in the world, they will be caught, prosecuted, and then imprisoned for life.

      **3.**      **Imposing a Guidelines Sentence Would Advance the Goals of § 3553(a)**

      Pursuant to § 3553(a), the Court is to consider "the kinds of sentence and the sentencing range established [in the Sentencing Guidelines," as well as "any pertinent policy statement [issued by the Sentencing Commission]." 18 U.S.C. § 3553(a)(4), (a)(5). These statutory factors weigh especially heavily in favor of a Guidelines sentence of life imprisonment.

      The Government agrees with the Probation Department's calculation of the advisory Guidelines range in this case. That calculation is as follows:

-     Because all three counts of conviction involve "substantially the same harm," Counts 1, 2, and 3 are grouped together into a single Group. U.S.S.G. § 3D.1.2.

-     Count One charged a conspiracy to murder Americans, in violation of 18 U.S.C. § 2332(b). Pursuant to U.S.S.G. § 2A1.5, if the conspiracy to murder resulted in the death of a victim, U.S.S.G. § 2A1.1 applies. Here, al Qaeda's conspiracy to murder Americans plainly resulted in death, including the 2976 people who were murdered on September 11, 2001. Pursuant to U.S.S.G. § 2A1.1, the base offense level is 43.

-     Because the victims of the offense of conspiracy to murder Americans were selected based on their "national origin," three levels are added, U.S.S.G. § 3A1.1(a), resulting in an offense level of 46. *United States v. Odeh*, 552 F.3d 93, 153-54 (2d Cir. 2008) (affirming

application of hate crime enhancement for conviction of conspiracy to murder U.S. nationals and rejecting argument that the defendant's conviction "obviates the need for the hate crime enhancement"; "it is the very fact that he was convicted of these offenses that justifies the application of the hate crime . . . enhancement[]").

- Because the offense was a felony that involved, and was intended to promote, a federal crime of terrorism, as defined at 18 U.S.C. § 2332b(g)(5), 12 levels are added, U.S.S.G. § 3A1.4(a), resulting in an offense level of 58.

- By serving in a senior position within al Qaeda, as the terrorist group's spokesman and working alongside Bin Laden, Zawahiri, and Abu Hafs al-Masri, Abu Ghayth was a manager and supervisor of a criminal activity that involved five or more participants. Thus, three levels are added, *id.* § 3B1.1(b), resulting in an offense level of 61.

- Because the defendant went to trial, and indeed testified in a manner that reflected his failure to accept responsibility, no reduction is warranted for acceptance of responsibility. Therefore, the final offense level is 61.

Although the defendant has no known prior convictions, the applicable Criminal History Category is VI, because the offense involved, or was intended to promote, a federal crime of terrorism. *Id.* § 3A1.4(b). Accordingly, the Guidelines imprisonment range is life. At offense level 61, the recommended fine is $25,000 to $250,000. *Id.* § 5E1.2(c)(3).

As the Court of Appeals has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors." *United States* v. *Rattoballi*, 452 F.3d 127, 131 (2d Cir. 2006) (citations and internal quotation marks omitted); *cf. United States* v. *Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006) (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or

departure' for the review of sentences" (quoting *United States* v. *Rubenstein*, 403 F.3d 93, 98-99

(2d Cir. 2005))). "[T]o secure nationwide consistency, the Guidelines should be the starting point

and the initial benchmark." *Gall*, 552 U.S. at 50. Indeed, it is precisely because the Guidelines

function as a national "benchmark" that a Guidelines sentence here will advance another

§ 3553(a) goal: "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).[16]

### 4.     The Defendant's Detention in Iran Does Not Warrant Leniency Under § 3553(a)

The defendant asks the Court for leniency in light of the approximately 10 years he was

held in Iran. Deft. Sent. Br. at 25-26. The Court should reject that request. The defendant cannot

carry his burden on this point with unsworn assertions. In any event, even accepting those claims

at face value, they do not warrant leniency in light of the defendant's extensive involvement at

the center of al Qaeda's conspiracy to kill Americans.

"'[P]re-sentence confinement conditions may in appropriate cases be a permissible basis

for downward departures.'" *United States* v. *Teyer*, 322 F. Supp. 2d 359, 377 (S.D.N.Y. 2004)

(quoting *United States* v. *Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (per curiam)). However, "a

departure on this basis lies only 'where the conditions in question are extreme to an exceptional

degree and their severity falls upon the defendant in some highly unique or disproportionate

manner.'" *Id.* (quoting *United States* v. *Mateo*, 299 F. Supp. 2d 201, 208 (S.D.N.Y. 2004));

*accord United States* v. *Naranjo-Ramirez*, 402 Fed. Appx. 576, 578 (2d Cir. 2010) ("[T]he

district judge was under no *obligation* to depart from the Guidelines on the basis of Naranjo-

Ramirez's allegedly harsh pre-sentence confinement conditions."); *Brizard* v. *United States*, No.

11 Civ 6033 (JGK), 2013 WL 1809636, at *6 (S.D.N.Y. Apr. 30, 2013) ("District courts have

---

[16] In light of the nature of the crimes here and the sentence that should be imposed, educational and vocational training of the defendant does not pose a particular concern in this case, nor does the defendant require special medical care or other correctional treatment.

no obligation to reduce a sentence based on conditions of confinement." (internal quotation marks omitted)). The burden is on "the defendant to prove, by a preponderance of the evidence, that a downward departure or reduction of his sentence" is appropriate. *United States* v. *Johnson*, 413 Fed. Appx. 320, 322 (2d Cir. 2011) (citing *United States* v. *Valdez*, 426 F.3d 178, 184 (2d Cir. 2005)).

The defendant in *Carty* allegedly was incarcerated in the Dominican Republic in a dark, four-by-eight-foot cell with three or four other inmates for almost nine months. 264 F.3d at 193. He was allowed only 10 to 15 minutes outside of his cell per day, allowed only one phone call per week, and had no running water and only a hole for a toilet. *Id.* He was allowed no newspapers or radio, and lost 40 pounds while incarcerated. *Id.* Nevertheless, the District Court declined to depart downward on the basis of those pretrial detention conditions, in light of, among other things, "the severity of his crimes and obstruction of justice." *Teyer*, 322 F. Supp. 2d at 378 n.9.

Here, Abu Ghayth has not carried his burden as he offers no evidence or sworn statements regarding his detention in Iran.[17] The Court therefore should decline to depart or vary downward on that ground alone. Moreover, Abu Ghayth was not detained at the behest of the U.S. Government.

In any event, even if the defendant's claims are true, leniency is not warranted. Certainly the defendant's sentencing memorandum describes some very difficult conditions of

---

[17] As an example of the unreliability of the assertions in the defendant's submission, the defendant claims that *while in Turkish custody in January or February 2013*, he suffered "a seizure or stroke of some kind." Deft. Sent. Br. at 21. That assertion contradicts evidence and assertions throughout the pendency of this case that the defendant suffered a stroke some *six years before he came into U.S. custody*. *E.g.*, *United States* v. *Abu Ghayth*, S13 98 Cr. 1023 (LAK) (Oct. 8, 2013) (Suppr'n Hr'g; Direct Testimony of Dr. Stephen N. Xenakis) Tr. at 6 ("Q. Now, there was evidence introduced in the record that the defendant had suffered from a stroke some six years before his transportation, is that correct? A. Yes.").

confinement in Iran. However, those conditions were mitigated by certain other circumstances. For example, the defendant was not detained alone; he was held with several other Arab detainees and formed a "community" with them. Deft. Sent. Br. at 19-20. As part of that community, Abu Ghayth married two women while incarcerated and fathered multiple children. *Id.* At one point in his memorandum, the defendant asserts that he and the other detainees were held in "small attached buildings . . . , in each of which two or more apartments could accommodate families in more or less 'normal' settings." *Id.* at 20. The defendant was able to establish a makeshift school—which received books from a charity—and teach his and the other detainees' children. *Id.* at 20-21. Though no doubt difficult, such conditions are a far cry from the unlit, four-by-eight-foot cell that Carty shared with three or four other inmates for almost 24 hours every day for almost nine months. *See Carty*, 264 F.3d at 193.

In light of the seriousness of the defendant's conduct, his lies to this Court, and his complete lack of remorse, the defendant's conditions of confinement in Iran do not warrant a downward departure or variance and the Court should reject the defendant's request.

In sum, each of the § 3553(a) factors that is relevant here cuts powerfully in favor of a life sentence.

**C.      The Court Should Order Forfeiture of All of the Defendant's Assets**

Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), the Court may forfeit

[a]ll assets, foreign or domestic . . . of any individual, entity, or organization engaged in planning or perpetrating any . . . Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization.

All three counts of conviction in this case constitute federal crimes of terrorism. 18 U.S.C. § 2332b(g)(5).

**IV. CONCLUSION**

For all of the foregoing reasons, the Government respectfully submits that a sentence of life imprisonment is the only appropriate sentence in this case. Thus, the Government respectfully requests that the Court impose a sentence of life imprisonment, order forfeiture of all the defendant's assets, and impose a fine in the range of $25,000 to $250,000.

Dated: New York, New York
        August 25, 2014

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney

By:    /s/ JOHN P. CRONAN
                         JOHN P. CRONAN
                         NICHOLAS J. LEWIN
                         MICHAEL FERRARA
                         Assistant United States Attorneys
                         212-637-2779 / -2337 / -2526

## AFFIRMATION OF SERVICE

MICHAEL FERRARA, pursuant to 28 U.S.C. § 1746, hereby declares under the penalty of perjury:

I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York. On August 25, 2014, I caused copies of the Government's Sentencing Memorandum to be delivered by ECF and electronic mail to the following counsel for defendant Sulaiman Abu Ghayth:

> Stanley L. Cohen, Esq.
> stanleycohenlaw@verizon.net
>
> Geoffrey S. Stewart, Esq.
> gstewart.defender@gmail.com
>
> Zoe J. Dolan, Esq.
> zdolan@gmail.com

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  New York, New York
        August 25, 2014

> /s/ MICHAEL FERRARA
> Assistant United States Attorney